IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| PRISON LEGAL NEWS and )<br>HUMAN RIGHTS DEFENSE CENTER, )<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>BERKELEY COUNTY SHERIFF )<br>H. WAYNE DEWITT, individually and )<br>in his official capacity; CAPTAIN )<br>CLIFF McELVOGUE, individually and in )<br>his official capacity; LIEUTENANT )<br>TONY RILEY, individually and in his )<br>official capacity; JOHN DOE 1, )<br>Berkeley County Detention Center )<br>employee, individually and in his/her )<br>official capacity; JOHN DOE 2, )<br>Berkeley County Detention Center )<br>employee, individually and in his/her )<br>official capacity; JOHN DOE 3, )<br>Berkeley County Detention Center )<br>employee, individually and in his/her )<br>official capacity; JOHN DOE 4, )<br>Berkeley County Detention Center )<br>employee, individually and in his/her )<br>official capacity, )<br>Defendants. )<br>) | **Case No.: 2:10-cv-02594-MBS**<br><br><br><br><br><br><br><br><br><br><br><br>**PLAINTIFFS' MEMORANDUM IN<br>SUPPORT OF MOTION FOR<br>PRELIMINARY INJUNCTION** |

## INTRODUCTION

At the inception of this litigation, the Berkeley County Detention Center ("the Detention Center") banned all books and magazines with one exception: the Bible. While Defendants now claim to have changed the rules, these new policies – adopted *post hoc* and in response to this case – further no legitimate penological interest and eliminate access to reading material almost as completely as the "Bible only" rule. By this motion, Plaintiffs request a preliminary injunction against policies that violate their constitutional right to communicate with detainees.

## FACTUAL BACKGROUND

### A.      Plaintiffs' Publications

Plaintiffs comprise a non-profit organization (under Section 501(c)(3) of the Internal Revenue Code), and publish an award-winning 56-page monthly journal entitled *Prison Legal News*.  Declaration of Paul Wright ("Wright Decl.") ¶¶ 1-3.  The journal provides information about legal issues such as access to courts, disciplinary hearings, prison conditions, excessive force, and religious freedom.  *Id*. ¶ 2.  *Prison Legal News*, which has been continuously published since 1990, currently has over 7,000 subscribers in the United States and abroad, including prisoners, attorneys, journalists, public libraries, and judges.  *Id*. ¶ 7. Plaintiffs also distribute approximately 45 legal and self-help books on topics ranging from legal research to writing a business letter. *Id*. ¶¶ 5-6.

### B.      The "Bible Only" Policy

After numerous instances in which the Detention Center returned to sender and refused to deliver Plaintiffs' publications, *Prison Legal News* Editor Paul Wright inquired about Defendants' mail policies.  Wright Decl. ¶ 22 & Ex. K.  On July 12, 2010, the Detention Center responded in writing:  "Our inmates are only allowed to receive soft back bibles in the mail directly from the publisher.  They are not allowed to have magazines, newspapers, or any other type of books."  Wright Decl. ¶ 24 & Ex. L.  This summary was fully consistent with the Detention Center's written correspondence policy, HFDC 706:

> Packages received at the Detention Center will not be opened except when it is from a licensed bookstore or publishing company. *Inmates will be allowed to have their family or friends send them soft cover bibles directly from a licensed bookstore or publishing company and must be paid for*. Packages of incoming Legal Material will be the only bulk materials permitted and will not be delayed

in inspection and other processing. *All other packages will be stamped "Return to Sender" and sent back out for the next mail pick-up.*[1]

Just two days before Plaintiffs filed this case, Defendants McElvogue and Riley confirmed the "Bible only" policy in a brief submitted in another case:

> Detention Center policy does not deprive the Plaintiff of <u>all</u> books, magazines, and reading material.  Rather, it merely limits the amount and types of reading material he may possess.  The Plaintiff can possess his primary religious book and legal materials ….  Ultimately, the Plaintiff is not subject to a total ban on all reading materials.[2]

On October 6, 2010, the day Plaintiffs filed this case, the Detention Center "confirmed" for an Associated Press reporter that "the only reading material its … inmates are allowed to have are paperback Bibles."[3]

## C.    The Invention of a "No Staples" Rationale

Shortly after confirming the "Bible only" policy for the Associated Press, Defendants changed their story.  Defendants' counsel sent an email to another reporter, denying the allegations in the Complaint and claiming that the July 12, 2010 email in which the Detention Center admitted the "Bible only" policy, "was simply mistaken."[4]  Defendants now claimed that the Detention Center never had a "Bible only" policy, merely a rule against publications that contain staples.[5]  Defendants have continued to press the "no staples" theory in this case.[6]

---

[1]  Declaration of David Shapiro in Support of Motion for Preliminary Injunction ("Shapiro Decl."), Ex. A, at 2 (HFDC 706: Inmate Correspondence) (emphasis added).

[2]  Shapiro Decl., Ex. G, at 3-4 (Response in Opposition to Plaintiffs' Motion for Summary Judgment (Doc. No. 25), *Williams v. Habersham*, No. 9:10-cv-01571-MBS-BM).

[3]  Shapiro Decl., Ex. D (Oct. 6, 2010 AP article); Shapiro Decl., Ex. E (Apr. 12, 2011 AP article).

[4]  Shapiro Decl., Ex. F (Oct. 30, 2010 news article).

[5]  *Id.*

[6]  In their November 1, 2010 Answer, Defendants asserted that "Prison Legal News is not an allowed publication due to its staples."  Answer (Doc. No. 12) ¶¶ 29, 36; *see also* Joint Responses Pursuant to Local Rule 26.03 and FRCP 26(f) (Doc. No. 17-1), at 2 ("Detainees … may receive glued, softbound materials directly from a publisher or even from family members…").

Staples, however, were never the reason that Defendants banned Plaintiffs' publications. The Detention Center maintains a mail log that lists each rejected piece of mail and, in the far right column, the reason for rejection.[7]  Detention Center staff repeatedly wrote reasons for rejection of Plaintiffs' publications that included "magazine," "book," "newspaper," and "no newspapers."[8]  The mail log never referred to staples as a reason for rejecting *Prison Legal News* until March 16, 2011 – more than five months after Plaintiffs filed this case.[9]  The Detention Center also rejected numerous books sent by Plaintiffs, even though none of the books contained staples.[10]  Even after Plaintiffs brought suit, Detention Center staff continued to reject other publications for reasons that included:  "Book not allowed" (November 1, 2010),"GED Book" (December 22, 2010), "newspaper" (January 6, 2011), "only legal or religious books" (January 10, 2011), and "Not religious" (February 14, 2011).[11]  Defendants claimed in their November 1, 2010 Answer that they prohibited *Prison Legal News* due to staples, but a staff person later admitted that *all non-religious publications* were banned until at least January 2011.[12]

Throughout 2008, 2009, and 2010, the Detention Center repeatedly returned copies of books and magazines to Plaintiffs with notations such as "magazines not allowed" and "book not allowed" written on the returned items, and the few notations that mentioned staples at all also referred to a total ban on all newspapers.[13]  When detainees filed request forms regarding access to newspapers, Detention Center staff responded by citing a total ban on newspapers, not a rule

---

[7] Shapiro Decl., Ex. K (Deposition of Katie Shuler ("Shuler Dep.")) at 19.

[8] Declaration of Aglaia Ovtchinnikova ("Ovtchinnikova Decl.") ¶ 6.

[9] *Id.* ¶ 5.

[10] Wright Decl. ¶¶ 12, 26 & Ex. C.

[11] Ovtchinnikova Decl. ¶ 13.  As recently as March 31, 2011, a detainee complained that the Detention Center removes staples from religious publications but refuses to deliver non-religious stapled publications such as *Prison Legal News*.  The staff response avoided the allegation rather than denying it.  Wright Decl., Ex. G (last page of exhibit).

[12] *See supra* at 3 n.6; Shapiro Decl. Ex. K (Shuler Dep.) at 94-96.

[13] Wright Decl. ¶¶ 12, 16, 29, Fig. 1, Ex. C & Ex. D.

against staples.[14]   These responses included: "[y]ou can not get any type of Newspaper here in jail. Thats why you have not got it," "[y]ou can not get Newspapers," and "I have told you many times you can not get Newspaper or magazine."  Wright Decl. ¶ 17 & Fig. 2.

Current written policies also ban publications sent by mail.  The Inmate Rules prohibit all packages, without any exception for packages containing books:  "Packages will not be accepted."[15]   The Inmate Rules also state that it is a disciplinary offense for a detainee to possess more than one book.[16]   Similarly, when Plaintiffs brought suit, the Detention Center's online correspondence policy completely prohibited all publications: "The only mail allowed to be received by inmates are letters only.  No packages are accepted at the Detention Center.  The only exception to this is pictures."[17]   This policy remained on Defendants' website when Plaintiffs filed their first motion to compel on March 9, 2011; Defendants modified the online rule only after Plaintiffs quoted the policy in their motion to compel brief, attached the policy as an exhibit, and wrote: "[E]ven *to this day*, and even as Defendants claim that detainees can receive publications sent by mail so long as there are no staples, the website of the Berkeley County Sheriff's Office states that detainees cannot receive publications in the mail…"[18]

## D.    Shifting Explanations for the "No Staples" Rule

Defendants' explanations for the "no staples" rule have shifted throughout this litigation. In October 2010, when the Defendants announced the "no staples" rule in the media, they cited three rationales: (1) detainees place staples in locks, (2) detainees interfere with plumbing by

---

[14] Wright Decl. ¶ 17, Fig. 2 & Ex. G.

[15] Shapiro Decl., Ex. B, at 2 (§ 14.i) (Inmate Rules).

[16] Shapiro Decl., Ex. B, at 4 (Inmate Rules) (stating that the following is a Category D Disciplinary Offense:  "Possession of more than one of the following ... g) one book").

[17] Complaint (Doc. No. 1), Ex. A, at 2.

[18] Plaintiffs' Memorandum in Support of Motion to Compel Discovery (Doc. No. 23-1) at 9 (emphasis in original); *see also* Declaration of David M. Shapiro, Ex. N (online policy printed from the Detention Center website on February 28, 2011) (Doc No. 23-17).

flushing staples down toilets, and (3) detainees use staples to make tattoos.[19]  In their Answer, Defendants restated the "no staples" policy but did not cite a rationale for the rule.[20]

On the evening before a February 23, 2011 inspection of the Detention Center by Plaintiffs' expert witness on correctional security and management, Defendants' counsel emailed Plaintiffs' counsel with a new set of rationales:

> Please have your expert prepared to look at electrical issues/speakers as well as the plumbing.  With regard to plumbing, the sinks, toilets, showers, sprinkler system etc have been the frequent targets of tampering with the aid of staples … [S]taples have been used to short circuit the electrical locks and to start fires/light cigarettes or charge cell phones.[21]

During the inspection, Defendants' counsel modified the rationales yet again.  Whereas counsel had previously stated publicly that staples caused problems when flushed down the toilets and into the plumbing, counsel now asserted that inmates instead inserted staples next to the flush button, causing the button to jam and the toilet to flush continuously.[22]

In another case – which also involves detainee access to *Prison Legal News* – Defendant McElvogue has put forth a completely different rationale for banning staples.  On December 16, 2010, during the same time period that Defendants were asserting various justifications in this case, Defendant McElvogue filed an affidavit in the other case, stating:  "Staples have been known to be used as weapons …"[23]  The accompanying summary judgment brief states:

> [T]he Inmate Rules and the Inmate Hand Guide … clearly state that homemade weapons or other articles that could be used as weapons are considered contraband.  Staples can be used as weapons and are considered contraband.

---

[19] Shapiro Decl., Ex. F (October 30, 2010 news article).
[20] Answer (Doc. No. 12) ¶¶ 29, 36; *see also* Joint Responses Pursuant to Local Rule 26.03 and FRCP 26(f) (Doc. No. 17-1), at 2.
[21] Shapiro Decl., Ex. N (2-22-11 Email from Sandra Senn to David Shapiro).
[22] Declaration of Toni V. Bair ("Bair. Decl.") ¶ 27.
[23] Shapiro Decl., Ex. I, ¶ 8 (Affidavit of Clifford McElvogue (Doc. No. 51-2), *Hazel v. McElvogue*, No. 2:09-cv-03276-RMG-RSC).

Prison Legal News is a magazine that is bound with staples, and thus, inmates in A-Pod are not allowed to possess a copy of it.[24]

Not only have Defendants not asserted the "weapons" rationale in this case, but none of the rationales identified in this case, such as making tattoos or jamming locks, were asserted in the summary judgment brief in the other case. Defendant McElvogue simultaneously advanced different theories in different cases.

## E.    Staples for Sale

Defendants have admitted that through January 2011, the Detention Center commissary sold detainees legal pads with staples.[25] Thus, on all relevant dates – including October 6, 2010 (when Plaintiffs brought suit), on November 1, 2010 (when Defendants asserted a "no staples" policy in their Answer) and on December 6, 2010 (when Defendants made similar assertions in the Rule 26(f) Report) – detainees could quite literally buy items with staples from the Detention Center itself. While Defendants may claim not to have known, at the time this litigation commenced, about the staples contained in the pads, their failure to investigate demonstrates a lack of concern with staples and confirms the *post hoc* invention of the "no staples" policy.

## F.    The Minimal Amount of Time Necessary To Remove Staples From Publications

Defendants could remove staples from publications without any effect on staffing or resources. Katie Shuler, who processes mail, testified that on "[a]n average day, maybe, two, three" copies of publications arrive at the Detention Center.[26] If three copies of a publication arrived on a given day and each had two staples, it would take her "[a] couple minutes" to

---

[24] Shapiro Decl., Ex. J at 9-10 (Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. No. 51-1), *Hazel v. McElvogue*, No. 2:09-cv-03276-RMG-RSC) (citations omitted).

[25] Shapiro Decl., Ex. Q at 2 (Response to Request No. 47); Shapiro Decl., Ex. V (commissary order forms) (listing legal pads); Shapiro Decl., Ex. K at 126-27 (Shuler Dep.).

[26] Shapiro Decl., Ex. K at 25 (Shuler Dep.).

remove the staples.[27] Notably, Detention Center staff began removing staples from *Prison Legal News* shortly after this litigation commenced, only to revert to rejecting the magazine.[28]

 Rejecting a publication with staples consumes *more time* than removing the staples. To reject a publication, Detention Center staff must take the following steps: (1) write a notation by hand on the publication regarding the reason for rejection; (2) apply a "return to sender" stamp to the publication one or several times; and (3) write several entries, which include at least name of sender, name of detainee, and reason for rejection, by hand in the mail log.[29] When multiple copies of a publication arrive on a given day, Detention Center staff must complete each step for each copy.[30] During his inspection of the Detention Center, Plaintiffs' expert witness observed the processing of mail and noted that it took Detention Center staff an average of 35 seconds per copy to complete these steps – more time than it would take to simply remove the staples from a copy of a publication.[31] Plaintiffs, on the other hand, cannot remove staples prior to sending *Prison Legal News* because a magazine placed in the mail without staples would fall apart.[32]

## G. The Invention of a "Sexual Content" Rationale

 On January 26, 2011, Defendants announced a new rationale for banning Plaintiffs' publications: "I have learned that your publication now contains sexual content. That is going to be an issue in addition to the staples."[33] This rationale was also devised *post hoc*. The Detention Center has *never* returned to Plaintiffs a publication with a notation regarding sexual or

---

[27] Shapiro Decl., Ex. K at 35 (Shuler Dep.).

[28] Shapiro Decl., Ex. K at 32, 35 (Shuler Dep.); Shapiro Decl., Ex. Q, at 2 (Response to Request No. 45).

[29] Bair Decl.¶ 34; Shapiro Decl., Ex. K at 18-19 (Shuler Dep.).

[30] Bair Decl. ¶ 34; Shapiro Decl., Ex. K at 18-19 (Shuler Dep.).

[31] Bair Decl. ¶ 35. Ms. Shuler did nothing differently during Mr. Bair's inspection than on any other day. Shapiro Decl., Ex. K at 36 (Shuler Dep.).

[32] Wright Decl. ¶¶ 30-31.

[33] Shapiro Decl., Ex. O (1-26-11 Email from Sandra Senn to David Shapiro).

8

inappropriate content, only notations such as "[n]o magazines allowed" and "[b]ooks not allowed." Wright Decl. ¶¶ 12, 16 Fig. 1, Ex. C & Ex. D. Since 2008, the mail log has contained over 500 references to inappropriate content, but not a single one involved publications sent by Plaintiffs. Ovtchinnikova Decl. ¶ 7. Plaintiffs brought suit in October 2010, and a Detention Center staff person with primary responsibility for processing mail could recall no instance prior to 2011 in which she rejected *Prison Legal News* due to sexual content.[34] Even through April 4, 2011, the date of the most recent mail log entries produced by Defendants, the mail log has not referred to sexual or inappropriate content in connection with Plaintiffs' publications. Ovtchinnikova Decl. ¶ 7. And as recently as April 1, 2010, a Detention Center staff person confirmed that "sexual content" is not a genuine reason for rejection by responding as follows to a detainee's request to receive *Prison Legal News*: "The reason is the staples. If they would send it without the staples you can get it."[35]

## H.    Defendants' "Sexual Content" Policies

An array of sweeping and inconsistent rules apply to "sexual content." Both the correspondence policy (HFDC 706) and the Inmate Hand Guide state that detainees cannot receive "[a]ny photo that is considered inappropriate (i.e., pornographic, lack of clothing, drugs, weapons, alcohol, cigarettes, etc.)."[36] The policies leave the meaning of "inappropriate" to the discretion of staff "consider[ing]" a given item. As a Detention Center staff member testified, to determine if a photograph is "considered inappropriate" under the policy "normally we just – if we see that it is inappropriate, then we send it back."[37] The term "pornographic" in the policy

---

[34] Shapiro Decl., Ex. K (Shuler Dep.) at 65.

[35] Wright Decl., Ex. G (last page of exhibit).

[36] Shapiro Decl., Ex. A, at 2 (HFDC 706: Inmate Correspondence); *see also* Shapiro Decl., Ex. C, at 17 (Inmate Hand Guide).

[37] Shapiro Decl., Ex. K, at 66 (Shuler Dep.).

9

"would be anything that's related to anything sexual," and the word "etc." means that the policy does not list all items that could be "considered inappropriate."[38]  HFDC 706 and the Inmate Hand Guide separately ban "[m]aterial that would encourage deviant sexual behavior" without defining what constitutes "deviant sexual behavior" or what expressive materials "encourage" such behavior.[39] A Detention Center staff person agreed that "the term 'encourage deviant sexual behavior' includes *any material* that refers to sex."[40]  Under these rules, a publication is banned in its entirety if it contains any depiction of a man or woman without a shirt or without pants or a skirt – even if the person is wearing a shirt and underwear.[41]

When shown advertisements for underwear, alcohol, and tropical vacations that recently appeared in the *Washington Post* and *USA Today*, a Detention Center staff member who processes mail stated that she would refuse, under HFDC 706, to deliver any issue of the newspapers that contained the advertisements.[42]  She further stated that under these policies she would ban any publication that contained great works of art that depict nudity, including the *Venus de Milo* sculpture and Botticelli's *Birth of Venus*.[43]

Other Detention Center rules impose different, but equally vague and sweeping, restrictions on sexual content.  The Inmate Rules state:  "You may only have three (3) photographs in your possession at one time.  The photos may not be erotic or pornographic in

---

[38] *Id.* at 68-71.
[39] Shapiro Decl., Ex. A, at 3 (HFDC 706: Inmate Correspondence); *see also* Shapiro Decl. Ex. C, at 17 (Inmate Hand Guide).
[40] Shapiro Decl., Ex. K, at 71 (Shuler Dep.) (emphasis added).
[41] *Id.* at 69-70.
[42] Shapiro Decl., Ex. K at 72-75, 86-89 (Shuler Dep.); Shapiro Decl., Ex. L (Shuler Dep. Exs. 7, 9, 13, 14).
[43] Shapiro Decl., Ex. K at 89-91 (Shuler Dep.); Shapiro Decl., Ex. L (Shuler Depo. Exs. 15 & 16).

nature, or give the impression of being such."[44]   This rule lacks any standard for the terms "erotic" or "pornographic," and even bans items that "*give the impression*" of being erotic or pornographic.   A separate provision of the Inmate Rules adds another set of vague terms ("indecent" and "sexually oriented") by stating: "[l]etters or cards containing any indecent items, sexually oriented, stickers, items not approved by this Detention Center administration or any items that can be obtained through the commissary will be confiscated or 'return to sender.'"[45]

*Prison Legal News* occasionally contains advertisements for sexually explicit content. The vast majority of the advertisements contain no pictures, and in the rare cases when pictures are included, "these are barely visible; each is less than one square inch; there is no nudity; and any clothed depictions of breasts, buttocks, or the groin area are rendered invisible by a white star."  Bair Decl. ¶ 41 & Ex. C.

## I.        Lack of Notice

When the Detention Center refuses to deliver a book or magazine sent by mail, the detainee receives no notice and no opportunity to appeal.[46]   The sender or publisher receives no notice other than a curt reason for rejection written on the returned item, and no opportunity to appeal.[47]   The notations on returned items often consist of vague statements that provide no information about the basis for rejection, such as "[c]an not have," "can not get," and "Info. Not Allowed."  Wright Decl. ¶¶ 13, 16, Fig. 1 & Ex. E.  In some cases, the Detention Center returns publications with the notation "gone," even when detainees remain at the Detention Center.

---

[44] Shapiro Decl., Ex. B, at 1 (Inmate Rules).
[45] *Id.* at 2.
[46] Shapiro Decl. Ex. S, at 7 (Response to Request No. 33); Shapiro Decl., Ex. R, at 10 (Response to Request No. 18); Shapiro Decl., Ex. K, at 24 (Shuler Dep.).
[47] Shapiro Decl., Ex. S, at 7 (Response to Request No. 32); Shapiro Decl., Ex. R, at 10 (Response to Request No. 18); Shapiro Decl., Ex. K, at 24-25 (Shuler Dep.).

Wright Decl. ¶ 14.  And in other cases, the Detention Center returns publications to Plaintiffs without any notation written on the publication.  Wright Decl. ¶ 15 & Ex. F.

## ARGUMENT

District courts in the Fourth Circuit consider four factors when deciding whether to grant a preliminary injunction:  "(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted, (3) the likelihood that the plaintiff will succeed on the merits, and (4) the public interest." *Willis v. Town of Marshall*, 426 F.3d 251, 267 (4th Cir. 2005) (citation omitted); *MicroStrategy Inc. v. Motorola, Inc*., 245 F.3d 335, 339 (4th Cir. 2001) (same).    Each of these factors supports the grant of a preliminary injunction in this case.

## A.    Plaintiffs Are Likely To Succeed on the Merits of Their First Amendment Claim.

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987).  Rather, courts consider four factors to determine whether a jail or prison regulation violates the First Amendment.  First, a policy violates the First Amendment unless the government can show "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89; *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989); *Montcalm Publ'g Co. v. Beck*, 80 F.3d 105, 108 (4th Cir. 1996).  While respectful of prison officials' expertise, *Turner*'s "reasonableness standard is not toothless."  *Abbott*, 490 U.S. at 414 (citation omitted). "[D]eference does not imply abandonment or abdication of judicial review."  *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003).[48]

---

[48] *See also Campbell v. Miller*, 787 F.2d 217, 227 n.17 (7th Cir. 1986) ("[D]eference to the administrative expertise and discretionary authority of correction officials must be schooled, not absolute.").

Second, courts consider "whether there are alternative means of exercising the right that remain open to prison inmates," allowing prisoners "other avenues" for "the asserted right." *Turner*, 482 U.S. at 90; *Abbott*, 490 U.S. at 417; *Montcalm*, 80 F.3d at 108. Third, courts assess "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90; *Abbott*, 490 U.S. at 418; *Montcalm*, 80 F.3d at 108. Finally, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90; *Abbott*, 490 U.S. at 418; *Montcalm*, 80 F.3d at 108. As demonstrated below, Plaintiffs are likely to prevail as to each of these factors.

**1.     Plaintiffs' Right To Send Publications To Prisoners Is Well-Settled.**

Courts across the nation, applying the *Turner* standard, have upheld Plaintiffs' right to send *Prison Legal News* to incarcerated persons. "The speech at issue [consisting of *Prison Legal News* and other publications] is core protected speech … Nor does receipt of such unobjectionable mail implicate penological interests." *Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) (striking down prison rule that prevented delivery of *Prison Legal News*); *Miniken v. Walter*, 978 F. Supp. 1356, 1363 (E.D. Wash. 1997) (granting prisoner's motion for summary judgment and stating "Plaintiffs' First Amendment right to receive his personal subscription to *Prison Legal News* has been violated"); *Jacklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004) (reversing grant of summary judgment for Defendants in case involving *Prison Legal News*).[49]

---

[49] *See also, e.g.*, *Prison Legal News v. Lehman*, 397 F.3d 692, 703 (9th Cir. 2001) (striking down regulation that prevented delivery of *Prison Legal News*); *Taylor v. Hayman*, 2011 WL 735449, at *11 (D.N.J. Feb. 23, 2011) (allowing prisoner's First Amendment claim to proceed "given the absence of a record showing the legitimate penological interests served by the alleged denial of access to the Prison Legal News monthly publication"); *Worthen v. Okla. Dep't of Corr.*, No.

More broadly, the right of a publisher to send books and magazines to prisoners is well-settled. "There is no question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Abbott*, 490 U.S. at 408. A magazine publisher, as the Fourth Circuit has stated, "indeed has a constitutional interest in communicating with its inmate subscribers." *Montcalm*, 80 F.3d at 109. Innumerable federal courts have reached the same conclusion, rejecting unreasonable restrictions on the right to send and receive publications.[50]

**2.    The "No Staples" and "Sexual Content" Policies Fail the First Prong of the *Turner* Standard (Valid, Rational Connection to Legitimate Penological Interest).**

**a.    There Is No Valid, Rational Connection Between the "No Staples" Policy and Any Legitimate Penological Interest.**

**i.    The "No Staples" Policy Cannot Withstand Scrutiny Because Defendants Invented It *Post Hoc*.**

Defendants rejected Plaintiffs' publications under a total ban on newspapers and magazines. The alleged "no staples" policy is a product of this case; the rationale has morphed throughout this litigation; and on the day Plaintiffs brought suit and for months thereafter, the Detention Center was selling detainees legal pads with staples. *See supra* at 3-7. "Prison officials are not entitled to the deference described in *Turner* … if their actions are not actually

---

CIV-07-687-R, 2010 WL 3295010, at *11 (W.D. Okla. Aug. 4, 2010) (stating that Defendants did not present sufficient "evidence in support of the rejection of [an issue of *Prison Legal News*] as a security threat.").

[50] *See Mann v. Smith*, 796 F.2d 79, 82 (5th Cir. 1986) (jail's "policy that forbade inmates to receive or possess newspapers and magazines" violated First Amendment); *Green v. Ferrell*, 801 F.2d 765, 772 (5th Cir. 1986) (jail's prohibition on newspapers violates First Amendment); *Johnson v. Forrest County Sheriff's Dep't*, No. 98-60556, 2000 WL 290118, at *1 (5th Cir. Feb. 15, 2000) ("A blanket ban on newspapers and magazines …violates the First Amendment."); *Sizemore v. Williford*, 829 F.2d 608, 610 (7th Cir.1987) (noting prisoners' "First Amendment right to receive and to read newspapers and periodicals"); *Crofton v. Roe*, 170 F.3d 957, 960-61 (9th Cir. 1999) (striking down prison ban on gift publications); *Thomas v. Leslie*, Nos. 97-3346, 97-3361, 1999 WL 281416, at *7 (10th Cir. Apr. 21, 1999) (an "absolute ban on newspapers" violates the First Amendment).

motivated by legitimate penological interests *at the time they act*." *Quinn v. Nix,* 983 F.2d 115, 118 (8th Cir. 1993) (emphasis added). *See also Salahuddin v. Goord*, 467 F.3d 263, 276-77 (2d Cir. 2006) ("Under … *Turner* … prison officials must show that the disputed official conduct was motivated by a legitimate penological interest….Post hoc justifications with no record support will not suffice."); *Walker v. Sumner,* 917 F.2d 382, 386 (9th Cir. 1990) ("Prison authorities … must first identify the specific penological interests involved and then demonstrate … that those specific interests are the *actual bases* for their policies …") (emphasis added); *Greybuffalo v. Kingston*, 581 F. Supp. 2d 1034, 1045 (W.D. Wis. 2007) ("The inquiry the Court has made under *Turner* is what *actually* motivated the restriction, not what could have motivated it.").[51]

### ii.    Staples Are Not A Valid Correctional Concern.

Plaintiffs' expert witness in correctional security and management, Mr. Toni Bair, has held numerous high-level positions in corrections departments; his career in corrections spans over 30 years; he has overseen over 50 prisons.  Bair Decl. ¶ 39; *see also id.* ¶¶ 3-12.  In every facility where Mr. Bair worked and every facility that he oversaw, prisoners – including death row prisoners, maximum security prisoners, and prisoners in disciplinary segregation – were allowed to possess staples.  Bair Decl. ¶¶ 37, 39.  Staples never caused a problem.  *Id.*  As Mr. Bair states, "[p]rofessionals in the field of corrections face many serious challenges on a daily basis," but "inmate access to staples is not a matter of serious concern to corrections professionals."  *Id.* ¶ 36.  Moreover, banning reading material threatens prison security because

---

[51] *See also Smith v. Artus*, No. 9:07-CV-1150, 2010 WL 3910086, at * 12 (N.D.N.Y. Sept. 30, 2010) ("[T]he legitimate penological interest advanced must have been the *actual* reason for the defendants' actions."); *Koutnik v. Berge,* No. 03-C-345-C, 2004 WL 1629548, *8 (W.D. Wis. July 19, 2004) ("[T]o avoid liability, [defendants] cannot argue now that plaintiff's letter *could have* been justifiably censored on other grounds").

"inmate idleness can contribute to disturbances and disciplinary violations," and reading materials can help prepare prisoners for reentry into society.  *Id.*  ¶ 43. *See also Cline v. Fox*, 319 F. Supp. 2d 685, 694 (N.D.W.Va. 2004) (access to reading material "may benefit inmates," and "good books … lift the spirit, improve the mind, enrich the human personality, and develop character") (quotation omitted).

The Editor of *Prison Legal News*, who carefully tracks rejections, is aware of no facility or jail – with the exception of the Berkeley County Detention Center and one other facility – that has ever returned or refused to deliver an issue of *Prison Legal News* on the ground that the publication contains staples.  Wright Decl. ¶¶ 27-28.  In fact, over one million copies of *Prison Legal News* – staples included – have been delivered since publication commenced in 1990, and most of the magazine's subscribers are confined in prisons or jails.  *Id.* ¶¶ 26, 28.  *Prison Legal News* is currently distributed to approximately 2,200 correctional facilities across the United States, including institutions within the Federal Bureau of Prisons and the correctional systems of all 50 states.  *Id.* ¶¶ 8, 28.  The magazine is currently distributed to death row units and "supermax" prisons including the federal ADX supermax in Colorado, the most secure prison in the United States.  *Id.* ¶ 8.  In short, Defendants' ban on staples departs radically from mainstream correctional practice, and is not supported by any legitimate penological interest.[52]

iii.    **The Documents Produced By Defendants Show that Staples Pose No Threat.**

Defendants have produced hundreds of pages of incident reports and maintenance records involving jammed locks, homemade tattoos, and other occurrences that supposedly justify the challenged publication ban.  In fact, these documents further undercut the validity of the policy.

---

[52] *See Procunier v. Martinez*, 416 U.S. 396, 414 n.14 (1974) ("While not necessarily controlling, the policies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction."), *overruled in part on other grounds*, *Abbott*, 490 U.S. 401.

*Jamming and Opening Locks*: Not a single incident report or maintenance record produced by Defendants states that a detainee jammed or opened a lock with a staple. Bair Decl. ¶¶ 14-15. These documents show detainees using everything *except* staples – including toothbrushes, melted Styrofoam, toilet paper, spoons, playing cards, "gummy black stuff," and pieces of human fingernails – to interfere with locks. *Id.* ¶¶ 14-15.[53] Most of these items are readily available to detainees, who order paper products, playing cards, and toothbrushes from the commissary,[54] and keep plastic spoons, styrofoam cups, and paper products in plain view in their cells.[55] As Mr. Bair states, "[t]o the extent interference with doors and locks presents a security concern at the Detention Center, there is ample evidence that these problems are caused by items other than staples to which inmates have ready access." Bair Decl. ¶ 18.

*Damage or Flooding*: Not a single incident report or maintenance record suggests that detainees have used staples to damage objects such as toilets, intercoms, light fixtures, or electrical outlets. *Id.* ¶¶ 23-24.[56] When the incident reports and maintenance records do identify a cause of damage, staples obviously were not involved. Bair Decl. ¶ 24.[57] During his inspection of the Detention Center, Mr. Bair closely inspected numerous intercoms, toilets, light

---

[53] *See also* Shapiro Decl., Ex. T (incident reports), at Bates Nos. 297 ("paper stuffed in the lock"), 302 (toothbrush used to pop lock); 305 ("melted styrofoam" used to jam lock); 308 ("playing card" used to jam lock); 310 ("gummy black stuff" used to prevent door from closing); 311 ("paper" and "black substance" stuffed in lock); 314 ("paper" jammed in lock); 319 ("plastic spoon broken off in the lock"); 322 (door "stuffed with toilet paper"); 323 (detainees opened a cell door by kicking it repeatedly); 326 ("toilet paper" stuffed in lock); 327 ("playing card" stuffed in lock); 942 ("piece of a fingernail" inserted in lock).

[54] Bair Decl. ¶ 16; Shapiro Decl., Ex. V (commissary order forms).

[55] Bair Decl. ¶ 16.

[56] *See also* Shapiro Decl., Ex. T (incident reports) at Bates Nos. 228 (clogged toilet; cause unidentified); 270 (damaged intercom and light fixture; no indication of staples); 1030 (damaged intercom; no indication of staples); 1051 (damaged intercom; no indication of staples).

[57] *See also* Shapiro Decl., Ex. T (incident reports) at Bates Nos. 275 (bent nail jammed into electrical outlet), 1039 (prisoners hotwired an electric lock by connecting two wires); Shapiro Decl., Ex. U (maintenance records) at Bates Nos. 2096 ("shower constantly running due to piece of plastic stuck in valve"); 2110 ("toilet clogged (possibly w/ paper suit)").

17

fixtures, sprinklers, sinks, and showers, and saw no evidence that staples had been used to cause clogging or damage.  Bair Decl. ¶¶ 25-27.  According to Mr. Bair, "[t]o the extent damaged fixtures present a security or management concern at the Detention Center, there is ample evidence that these problems are not caused by staples."  *Id*. ¶ 24.

*Tattoos*: The documents produced by Defendants contain only four incident reports that suggest staples may have been included in tattoo kits, and numerous other instances in which detainees have used items other than staples – such as safety pins, paperclips, sharp pieces of plastic, wires, needles, pencils, and toothpaste caps – in such kits.  Bair Decl. ¶¶ 19-20.[58]  Many of these items, such as pencils, toothpaste caps, and plastic items, can still be ordered from the commissary.  Bair Decl. ¶¶ 19-20.[59]  Defendants also produced certain photographs that appear to show tattoo kits that contain staples – but other photographs show the same type of tools being made with needles, pens, pencils, toothpaste caps, and the like.  Of course, none of the staples used in tattoo kits came from publications sent by mail – the Detention Center handed out the staples through its own commissary.[60]

---

[58] Shapiro Decl., Ex. T (incident reports), at Bates Nos. 232 ("metal safety pin," "unbent paper clip," "[g]rey plastic 'stickers' with sharp metal point resembling 'stickers' used in checking blood sugar levels," "sharp piece of plastic about 2" long," "black ink pen"); 235 ("wooden pencil with a sharp metal point sticking out of it"); 236 ("partial paperclip," "pieces of thin metal," "white plastic clip probably from shoes"); 239 ("one pencil with a needle on the end of it"); 243 ("ink and needle"); 246 ("pencil wrapped with paper and thin wire on one end," "white toothpaste caps filled with a black liquid in them"); 248 ("tattoo pen/ink set and lighter"); 251 ("toothpaste caps"); 261 ("golf pencil with what appeared to have a staple affixed to it."); 264 ("stick of hard plastic with a staple melted into the top"); 266-67 (pens, needles, paperclips, and staples); 269 ("piece of metal approximately two inches long"); 306 ("blue ink pen," "BIC lighter," "tattoo tools made of toothbrush and staple").

[59] *See also* Shapiro Decl., Ex. V (commissary order forms).  Toothpaste caps presumably come with the toothpaste tubes listed on the commissary order forms but may also be used to hold ink.

[60] *See supra* at 7; *see also* Shapiro Decl. Ex. K, at 24 (Shuler Dep.) ("Q:  So if a staple were found in a detainee's cell, that would not be a staple that came through the mail room; is that correct?  A:  Yes.").

According to Mr. Bair, "[t]he low number of [incident reports referring to tattoo kits with staples] suggests that the use of staples to create tattoos is not a widespread or systemic problem," and "considering the limited number of cases in which staples appear to have been used in possible tattoo kits, and the ability of inmates to readily assemble such kits with items other than staples to which they have ready access, efforts to limit inmate access to staples would not have a significant effect on the ability to assemble tattoo kits." Bair Decl. ¶¶ 19-21.

A prison regulation designed to prohibit access to certain types of items fails the *Turner* standard where – as here – detainees can readily obtain similar items from other sources. In *Mann v. Smith*, for example, jail officials argued that a ban on newspapers and magazines was justified to prevent detainees from using papers to clog toilets and set fires, but detainees had access to other paper materials. 796 F.2d 79, 82 (5th Cir. 1986). The Fifth Circuit struck down the ban under the First Amendment, finding the rule "patently underinclusive" and defendants' rationale "tenuous at best." *Id.* Similarly, in *Jackson v. Elrod*, 671 F. Supp. 1508, 1511 (N.D. Ill. 1987), the Court rejected the argument that hardcover books must be banned to prevent concealment of contraband because "[c]ontraband has been secreted in items other than hardback books: in paperbacks (which detainees may receive through the mail) and in mattresses, light fixtures, and ceilings in cells." The Court similarly rejected the argument that hard covers could be turned into knife handles or bludgeons because "many items permitted in cells – bed pieces, soda pop containers, food trays, rolled-up magazines, game boards, and shoes, for example – have been used as bludgeons. Though deprived of hard covers, detainees manage to fashion knife

handles out of wrapped cloth and melted toothbrushes or ballpoint pens." *Id.* (citations omitted).

Numerous other cases apply the same logic in striking down prison regulations.[61]

### iv. Banning Publications With Staples Is Irrational Because Defendants Could Remove the Staples.

If staples present a genuine problem – which they do not – an easy solution exists: Detention Center staff could remove the staples before delivering the publications. *See Jackson*, 671 F.Supp. at 1511 ("[P]laintiff establishes an obvious, easy alternative to rejecting a book [with hard covers]. The covers easily can be removed at the mailroom.").  The Detention Center receives "maybe two, three" publications a day, and removing the staples would take "a couple minutes." *See supra* at 7-8.  Numerous cases hold that limited effects on staff time do not justify restrictions on access to publications or other First Amendment rights.[62]  Moreover, even if the

---

[61] *See, e.g.*, *Prison Legal News v. Lehman*, 397 F.3d 692, 700 (9th Cir. 2005) (prison asserted that a rule against bulk mail was necessary to prevent contraband from entering the prison, but prisoners were allowed to receive first-class mail, which could also contain contraband); *Thomas v. Leslie*, Nos. 97-3346, 97-3361, 1999 WL 281416, at *5, *7 (10th Cir. Apr. 21, 1999) (holding that the county's rationales – preventing fires, the use of newspapers as weapons, and health hazards caused by the accumulation of papers – were undercut by the fact that detainees had access to Bibles, puzzle books, and paperbacks, which would create the same dangers); *Allen v. Coughlin*, 64 F.3d 77, 80 (2d Cir. 1995) (court rejected prison officials' claim that ban on newspaper clippings sent to prisoners was necessary to restrict "inflammatory material" from entering the prison; prisoners could obtain the same material by ordering full copies of newspapers); *Clement v. California Dep't of Corr.*, 364 F.3d 1148, 1152 (9th Cir. 2004) (court invalidated rule against mailing prisoners material printed from the Internet; prison officials claimed that such material could contain code, but prisoners could receive typed documents, which might also contain code).

[62] *Prison Legal News v. Lehman*, 397 F.3d 692, 700 (9th Cir. 2005) (rejecting regulation designed to reduce volume of mail); *Prison Legal News v. Cook*, 238 F.3d 1145, 1151 (9th Cir. 2001) (rejecting administrative burden justification for banning certain type of mail where lifting the ban would result only in "the addition of 15 to 30 pieces of mail" each day); *Clement v. California Dept. of Corr.*, 364 F.3d 1148, 1152 (9th Cir. 2004) (prohibiting a certain type of mail to reduce total volume "is an arbitrary way to achieve a reduction in mail volume"); *Hrdlicka v. Reniff*, 631 F.3d 1044, 1052-53 (9th Cir. 2011) (jail officials "provided no information quantifying the additional resources that would be required to distribute [a magazine]"); *see also Beerheide v. Suthers*, 286 F.3d 1179, 1191 (10th Cir. 2002) ($13,000 annual cost of accommodating First Amendment rights of Jewish prisoners held *de minimis*).

Detention Center did receive a high volume of stapled publications, removing the staples still would not impose a burden because the current process for rejecting a publication takes more time than removing a few staples. *See supra* at 8.[63]

**b.    There Is No Valid, Rational Connection Between Defendants' "Sexual Content" Policies and Any Legitimate Penological Interest.**

**i.    The Detention Center's Policies Regarding Sexual Content Are Facially Unconstitutional.**

The Detention Center's "sexual content" policies prohibit an array of mainstream materials, including the *Washington Post*, *USA Today*, and works of art. *See supra* at 10. These sweeping policies prohibit "anything that's related to anything sexual," *see supra* at 9-10, and contain no exception for publications, such as *Prison Legal News*, that have redeeming social value. *See Aiello v. Litscher*, 104 F.Supp.2d 1068, 1081 (W.D. Wis. 2000) (prison ban on nudity overbroad where "there are no exceptions for objectionable material that has some redeeming social value"). Such restrictions violate the First Amendment. In *Cline v. Fox*, a district court in this Circuit struck down a prison ban on "obscene material" that would:

> prohibit[ ] all books, magazines, paintings, and photographs that contain even one description of sexual intercourse. The prohibition also applies regardless of the context of the depiction or the context of the work as a whole. Therefore, literary classics like George Orwell's *1984* and religious texts like the Bible technically violate this regulation. It is difficult to understand how denying inmates access to such books promotes security, prevents sexual assaults, or furthers rehabilitation.

319 F. Supp. 2d 685, 692 (N.D.W.Va. 2004). Similarly, last year, another district court in this Circuit struck down a prison regulation forbidding "explicit … descriptions of sexual acts" that would extend to a "number of highly regarded books which include a description of actual sexual intercourse," noting that "the Court could list dozens of the highly regarded works of literature

---

[63] *See Hrdlicka*, 631 F.3d at 1054 (jail banned unsolicited mail but failed to show that delivering unsolicited mail took more staff time than distinguishing between solicited and unsolicited mail).

which include an explicit description of a sexual act or intercourse." *Couch v. Jabe*, 737 F. Supp. 2d 561, 567-68 (W.D. Va. 2010); *see also Aiello*, 104 F. Supp. 2d at 1073 (prison regulation that banned "nudity which appeals to the prurient interest in sex" overbroad where prohibited materials included "a picture of Michelangelo's Sistine Chapel," "the *Sports Illustrated* swimsuit issue," and "various issues of *Vanity Fair*, *Rolling Stone*, [and] *Maxim*").

Because Defendants' written policies on sexual content violate the First Amendment, such policies must be enjoined as facially invalid regardless of whether the Detention Center could constitutionally prohibit the specific content contained in *Prison Legal News*. *Abbott*, 490 U.S. at 404 (noting that prison regulations may be challenged both facially and as applied under the First Amendment); *Couch*, 737 F. Supp. 2d at 571 (a prison regulation may "sweep[ ] so broadly" that "it must be deemed irrational as a whole."). That said, as demonstrated below, Defendants' policies are also unconstitutional as applied to *Prison Legal News*.

### ii. Defendants' "Sexual Content" Policies, As Applied to *Prison Legal News*, Violate the First Amendment.

### (a) The Content Defendants Find Objectionable Poses No Security Threat.

Plaintiffs' expert witness, Mr. Bair, has examined the pages of *Prison Legal News* which Defendants view as "sexual content," and in his view, "[n]one of these pages would present a security or management concern in a correctional environment." Bair Decl. ¶ 40 & Ex. C. The vast majority of these advertisements contain no pictures, and "[w]hen there are pictures, these are barely visible; each is less than one square inch; there is no nudity; and any clothed depictions of breasts, buttocks, or the groin area are rendered invisible by a white star." *Id*. ¶ 41 & Ex. C. A prison cannot ban publications that "have some literary value but describe sexual conduct" based on "conclusory and unpersuasive" assertions about order and security. *Cline*, 319 F. Supp. 2d at 694.

Isolated pictures of a portion of a buttocks or breast provide no constitutional basis for banning an entire magazine – especially one that has been described as "core protected speech." *Prison Legal News v. Cook*, 238 F.3d at 1149.  Like this case, *Strope v. Collins* involved "the censorship of *entire publications* because they contain what appears to be a few photographs of a women's partially bare buttocks," and the Court stated, "there appears to be *no precedent* upholding the constitutionality of [such] a regulation."  492 F. Supp. 2d 1289, 1296 (D. Kan 2007) (emphasis added); *see also Aiello*, 104 F. Supp. 2d at 1081 (prison regulation overbroad where it banned "magazines that contain the occasional advertisement showing a portion of the breast of an otherwise fully-clothed woman"); *Jackson v. Godwin*, 400 F.2d 529, 536 (5th Cir. 1968) (prison official's "objections to sex" in a publication held insufficient because they were based on "a small advertisement and a picture of tribal women"); *Owen v. Willie*, 117 F.3d 1235, 1237 (11th Cir. 1997) (counsel for prison officials conceded that "a blanket ban on nude photographs would be unconstitutional"); *Frost v. Symington*, 197 F.3d 348, 357-58 (9th Cir. 1999) (upholding prison's ban on pornography depicting sexual penetration, but stating that the plaintiff "evidently may access sexually explicit publications that do not depict actual penetration"); Shapiro Decl., Ex. M, at 9 (current Bureau of Prisons policy, which allows federal prisoners to receive "[l]ingerie catalogs" and "[s]ports magazine swimsuit issues").[64]

---

[64] Of course, none of this is to suggest that jails must permit pornography – merely that a jail cannot constitutionally ban all publications that sometimes show men and women wearing underwear or dressed for the beach.  In *Abbott*, the Supreme Court upheld a regulation that prohibited "sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity," noting that the rule specifically forbade censorship of a publication "solely because its content is … sexual."  490 U.S. at 404-05, 415 (1989).  *See also Amatel v. Reno*, 156 F. 3d 192, 195, 202 (D.C. Cir. 1998) (en banc) (upholding regulation that prohibited *Playboy* and *Penthouse* but allowed prisoners to receive the "Sports Illustrated (Swimsuit Edition) and the Victoria's Secret Catalog"); *Aiello*, 104 F. Supp. 2d at 1077.

**(b)**      **The "Sexual Content" Assertion is A** *Post Hoc* **Rationalization for Banning** *Prison Legal News***.**

Defendants' reliance on their "sexual content" policies as a reason for banning *Prison Legal News* also fails the *Turner* standard because it constitutes a *post hoc* rationalization.  *See supra* at 14-15 (citing cases).  Defendants noted the "no staples" rationale in their Answer, *see supra* at 3 n.6, but did not mention "sexual content" until January 26, 2011, when counsel announced the new theory via email, *see supra* at 8.  Plaintiffs have *never* received a returned publication from the Detention Center with a notation regarding sexual content, nor does the Detention Center mail log contain such a notation.  *See supra* at 8-9.  Just as the Defendants in *Miniken v. Walter* changed the definition of "bulk mail" during litigation so as to prohibit *Prison Legal News*, here the Defendants have extended their sexual content rules *post hoc* to *Prison Legal News*.  978 F. Supp. 1356, 1361 (E.D. Wash. 1997) ("The court is reminded of Lewis Carroll's classic advice on the construction of language:  'When I use a word,' Humpty Dumpty said in a rather scornful tone, 'it means just what I choose it to mean.'").

**3.**      **The Detention Center's "No Staples" and "Sexual Content" Policies Fail the Second Prong of the** *Turner* **Standard (Alternative Means of Exercising the Right).**

The Detention Center fails to provide "alternative means of exercising" the First Amendment right at issue – the right to read publications.  *Turner*, 482 U.S. at 90.  The "no staples" rule is a *de facto* ban on magazines because virtually all magazines have staples.  The "sexual content" policies ban mainstream newspapers and works of art.  *See supra* at 10-11.

Nor can detainees borrow books from a library.  Defendants admit that "[t]he Detention Center does not have a library of books, magazines, or newspapers which detainees presently are permitted to visit," asserting that such access will be available only at some future date.[65]

---

[65] Shapiro Decl., Ex. S, at 2 (Response to Request No. 5).

Numerous detainees state: "We have no library."[66]  Courts repeatedly have held that prisoners

lack alternative access to publications where correctional facilities do not provide a library.[67]

Defendants cut off access to virtually all reading material, for any reason or for no

reason. Under the Inmate Rules, possession of more than one book is a disciplinary offense.  *See*

*supra* at 5.  Defendants' written policies forbid "[c]lippings from newspapers, magazines or

books of any kind," "[i]nternet printouts of any kind," and all mail containing glue or tape.[68]  On

July 22, 2010, a staff member refused to deliver mail, writing "photo to small."[69]  Eight days

later, a staff member wrote the opposite reason, "photo 2 big."[70]  Arbitrary reasons for rejection

of mail include: "photo of a dog," "business card," "pamphlets not allowed," "dictionary,"

"bookmark," and "sonogram" (presumably sent by a pregnant loved one).[71]  Since 2008,

Detention Center staff has rejected mail at least sixteen times for containing jokes, at least nine

---

[66] Declaration of Orval Dennis Emery ¶ 11; Declaration of Jamichael Howard ¶ 11; Declaration of Nicholas McBeth ¶ 11; Declaration of Herbert Singleton ¶ 11; Declaration of Ronald Webster ¶ 11; Declaration of St. Elmore Andrew Mack ¶ 11; Declaration of Jackie Kerce ¶ 11.  *See also* Shapiro Decl., Ex. H, ¶ 12 (Affidavit of Captain Clifford McElvogue (Doc No. 32-3), *McCray v. Berkeley County Detention Center*, No 1:10-cv-1615-TLW-SVH) ("There is not and never has been a law library on the premises of the … Detention Center.").

[67] *E.g.*, *Lindell v. Frank*  377 F.3d 655, 659 (7th Cir. 2004) (prisoner "did not have access to the prison library's limited supply of publications."); *Allen v. Coughlin*, 64 F.3d 77, 80 (2d Cir. 1995) (limited opportunities for interlibrary loan); *Jackson v. Elrod*, 671 F. Supp at 1511 ("few if any [of the books a prisoner sought] were available through the jail's library service."); *Spellman v. Hopper*, 95 F.Supp.2d 1267, 1284 (M.D.Ala.1999) (prisoners could not obtain newspapers from the prison library). *Cf. Bell v. Wolfish*, 441 U.S. 520, 552 n.33 (1979) (detainees had adequate alternative access because jail library consisted "of more than 3,000 hardback books, which include general reference texts and fiction and nonfiction works, and more than 5,000 assorted paperbacks, including fiction and nonfiction").

[68] Shapiro Decl., Ex. A, at 2 (HFDC 706: Inmate Correspondence); Shapiro Decl., Ex. C, at 16 (Inmate Hand Guide) (same language).  These rules against clippings and Internet printouts are unconstitutional in and of themselves.  *Lindell v. Frank*, 377 F.3d 655, 659-660 (7th Cir. 2004) (clippings ban); *Allen v. Coughlin*, 64 F.3d 77, 79-81 (2d Cir. 1995) (clippings ban); *Clement v. California Dept. of Corr.*, 364 F.3d 1148, 1152 (9th Cir. 2004) (Internet printout ban).

[69] Ovtchinnikova Decl. ¶ 13.

[70] *Id.*

[71] *Id.*

times for containing song lyrics, and more than 300 times for containing tri-fold cards.[72]
Defendants either deem these outlandish reasons consistent with policy – or have fallen asleep at
the wheel.[73]

Finally, because many detainees remain at the Detention Center for long periods of time,
the blackout imposed on reading material lasts for many months or even years. As of January
19, 2011, over 100 detainees were incarcerated at the Detention Center for more than 60 days, 51
detainees were incarcerated for more than 180 days, and 43 detainees were incarcerated for more
than one year.[74] The detainee declarations submitted with this motion in which detainees express
their desire to receive *Prison Legal News* include eight declarations from detainees who
remained in custody for many months, or even over a year: Jamichael Howard (detained
7/29/10), Benjamin Jackson (detained 6/2/10), Herbert Singleton (detained 3/1/10), Ronald
Webster (detained 11/18/10), Nicholas McBeth (detained 1/8/10), Konnie Glidden (detained
7/15/10), Orval Douglas Emery (detained 7/26/10), and Jackie Kerce (detained nearly two years
ago on 7/11/2009).[75]

4.    **Defendants' Rules Fail the Third and Fourth Prongs of the *Turner* Standard (Effect on Resources and Feasibility of Alternative Policies).**

The third and fourth prongs of the *Turner* standard pivot on whether accommodating the
First Amendment right in issue will impose a significant burden on prison officials, and whether

---

[72] *Id*. ¶¶ 10-12.

[73] Specifically, DeWitt, McElvogue, and Riley claim no knowledge of *any* violation of mail policy since at least the beginning of 2008. Shapiro Decl., Ex. S, at 6 (Response to Request No. 29).

[74] Shapiro Decl., Ex. P, at 5 (Response to Interrogatory No. 16).

[75] Shapiro Decl., Ex. W (inmate locator printouts for these detainees); *see also* Wright Decl. ¶¶ 20-21. Some of the declarations indicate that the detainees had received publications from Plaintiffs. This may be because at one point during this litigation, staff members began removing staples from publications and delivering the publications, a practice that was later abandoned. *See supra* at 8.

ready alternatives to the challenged policies exist.  *See supra* at 13.  In particular, where a plaintiff "can point to an alternative that fully accommodates the prisoner's rights at a *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."  *Turner*, 482 U.S. at 91.

In this case, the Detention Center could easily accommodate the First Amendment rights at issue by removing staples from publications. *See supra* at 7-8.  Notably, the South Carolina Department of Corrections, rather than banning stapled items, removes the staples from mail sent to a limited set of high-security prisoners (and delivers mail with staples to other prisoners).[76] Defendants' admission that they removed staples from *Prison Legal News* at one point during this litigation fatally undercuts any contention that this is not a feasible alternative. *See supra* at 8.  As for the sweeping ban on "sexual content," the Detention Center could craft an appropriately tailored rule against pornographic publications, such as the policy in effect in the federal Bureau of Prisons.[77]

**5.    *Hause v. Vaught* Does Not Govern this Case.**

The Fourth Circuit's decision in *Hause v. Vaught*, 993 F.2d 1079 (4th Cir. 1993), bears mention but does not govern this case.  *Hause* upheld the denial of publications to a short-term detainee, and the Court carefully limited its holding to "periods of short-term confinement," noting that a detainee incarcerated for 60 days or less probably would not have time to order and receive a publication "prior to his release or transfer." 993 F.2d at 1083-84.  This limitation of

---

[76] Shapiro Decl., Ex. F (October 30, 2010 news article) (Spokesperson for South Carolina Department of Corrections states that mail with staples is allowed, except that staples are removed for Death Row prisoners and those who have committed disciplinary infractions).

[77] *See* Shapiro Decl., Ex. M (Federal Bureau of Prisons Incoming Mail Policy); *Cline*, 319 F. Supp. 2d at 695 (stating that a prison could adopt a more narrowly tailored policy on sexual content without any threat to "security or inmate rehabilitation"); *see also Aiello*, 104 F. Supp 2d at 1082.

the holding to incarceration of less than 60 days followed from *Bell v. Wolfish*, 441 U.S. 520, 552 (1979), where the Supreme Court emphasized the same period: "We are … influenced in our decision by the fact that the rule's impact on pretrial detainees is limited to a maximum period of approximately 60 days." *See also Hause*, 993 F.2d at 1083 (citing this portion of *Bell*).   The Seventh Circuit highlighted the limitation on *Hause*'s holding to short-term detainees in *Lindell v. Frank*, noting that "[a]lthough the court in *Hause* did hold that a ban on all published materials (regardless of source or type) was a constitutional restriction on a pretrial detainee's free-speech rights, the court also *stated that its holding was limited to the facts before it*, including the fact that the plaintiff was seeking damages for limitations placed on his rights *during limited periods of short-term confinement*." 377 F.3d 655, 659 (7th Cir. 2004) (emphasis added).

Here, the Detention Center holds, on a given day, over one hundred detainees incarcerated for more than 60 days and more than 40 detainees incarcerated for over one year – and many of these long-term detainees wish to receive Plaintiffs' publications.  *See supra* at 26. Moreover, Prison Legal News, as a publisher, has a continuing interest in communicating with detainees at the Detention Center – a right Plaintiffs have sought to exercise for years.   Wright Decl. ¶ 11.  Whereas the injunctive claims in *Hause* were moot, and the holding was limited to a "short-term detainee seeking damages" based on "previous periods of short-term confinement," 993 F.2d at 1081, 1084, the instant motion seeks prospective relief from a longstanding and ongoing violation of a publisher's First Amendment rights.

*Hause* is inapposite for several other reasons.   First, the *pro se* plaintiff in *Hause* "conceded" that the challenged policies were "rationally related to [a] legitimate, neutral penological purpose," 993 F.2d at 1083, a critical element of the *Turner* standard and a point that Plaintiffs in this case certainly do not concede, *see supra* at 14-24.   Defendants in this case have

also disavowed the penological rationales put forward in *Hause*, which were based on access to paper, not staples.  993 F.2d at 1083; Shapiro Decl., Ex. S at 5 (Responses to Requests 23-25).

Second, the detainee in *Hause* had access to a library and newspapers, which satisfied the second prong of the *Turner* test.  993 F.2d at 1083-84.  Here, by contrast, the Detention Center's draconian rules prevent alternative access to publications.  *See supra* at 24-26. Third, the detainee in *Hause* failed to present a ready alternative to the challenged regulation under the fourth prong of the *Turner* standard, 993 F.2d at 1083, whereas the Detention Center could easily remove staples and adopt a more narrow rule against sexual content. *See supra* at 20-21, 23 n.64.

Finally, *Hause* must be read in light of the Fourth Circuit's subsequent decision in *Montcalm*, which plainly stated that a magazine publisher "indeed has a constitutional interest in communicating with its inmate subscribers."  80 F.3d at 109.  Any reading of *Hause* that eliminated the right to send publications to detainees would be inconsistent with *Montcalm* – and countless decisions from other federal courts that recognize the right to send and receive publications in a correctional environment.  *See supra* at 14 n. 50 (citing cases).

**B.      Plaintiffs Are Likely To Succeed on the Merits of Their Due Process Claim.**

The Due Process Clause requires a correctional institution, each time it censors an incoming publication, to provide both the prisoner and the sender with notice and an opportunity to challenge the censorship. The Fourth Circuit held in *Hopkins v. Collins*, 548 F.2d 503, 504 (4th Cir. 1977), that a prisoner must receive: "(1) appropriate notice; (2) a reasonable opportunity to challenge the initial determination; and (3) an ultimate decision by a disinterested party not privy to the initial censorship determination."  The Fourth Circuit later held in *Montcalm* that prisons must also provide senders of publications with procedural protections, stating that notice and an opportunity to be heard for the prisoner alone will not suffice because "[a]n inmate who

cannot even see the publication can hardly mount an effective challenge to the decision to withhold that publication." 80 F.3d at 109. The *Montcalm* Court stated that "providing a copy of [a rejection notice] to publishers of disapproved publications and allowing the publishers to respond in writing would pose a minimal burden on corrections officials." *Id.*[78]

Contrary to this binding Circuit precedent, the Detention Center does not provide detainees with any notice or opportunity to be heard when publications are rejected. *See supra* at 11-12. The Detention Center also fails to provide meaningful notice to publishers – rejecting publications without any notation on the package, with vague notations such as "Can not get," or with the notation "gone" even when detainees remain at the Detention Center. *Id.* Nor does the Detention Center provide publishers any opportunity to be heard. *Id.*

**C.    A Preliminary Injunction Is Necessary To Prevent Irreparable Harm.**

Defendants' policies prevent Plaintiffs from carrying out their core function – to communicate with incarcerated persons about developments in the law and protection of one's health and personal safety. Wright Decl. ¶ 9. As the Supreme Court and Fourth Circuit have stated, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Giovani Carandola, Ltd. v. Bason,* 303 F.3d 507, 520-21 (4th Cir. 2002) (same); *Newsom v. Albemarle County School Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (same). Such freedoms are at stake here, for "there is no

---

[78] These Fourth Circuit decisions stem from the Supreme Court's decisions in *Martinez* and *Abbott*. In *Martinez*, the Supreme Court held that a prison's "decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards." 416 U.S. at 417 (1974), *overruled in part on other grounds*, *Abbott*, 490 U.S. 401 (1989). In *Abbott*, the Court upheld prison regulations that provided publishers with notice of rejection and an opportunity to be heard each time a publication was censored. 490 U.S. at 406. *See also Jacklovich*, 392 F.3d at 434 (notice to publisher that mailed material has been rejected is constitutionally required); *Prison Legal News v. Cook*, 238 F.3d at 1152-1153 ("failure to provide notice and administrative review" in rejecting mail held to violate due process).

question that publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners." *Abbott*, 490 U.S. at 408. Courts have repeatedly found irreparable harm based on the denial of First Amendment rights in correctional settings.[79]

Further, *Prison Legal News* covers recent events and judicial decisions that affect prisoners' lives and legal cases. The ability to deliver issues of the magazine quickly – and before the news becomes stale or filing deadlines expire – is critical to Plaintiffs' mission. Wright Decl. ¶¶ 9-10; *CBS, Inc. v. Davis*, 510 U.S. 1315, 1318 (1994) (Blackmun, J., in Chambers) ("[I]ndefinite delay of [a] broadcast will cause irreparable harm to the news media that is intolerable under the First Amendment."). Plaintiffs also face irreparable harm because future monetary damages cannot provide full compensation for continuing First Amendment injuries. "[I]rreparable injury is suffered when monetary damages are … inadequate." *Multi-Channel TV Cable v. Charlottesville Quality Cable*, 22 F.3d 546, 551 (4th Cir. 1994).

**D.    A Preliminary Injunction Will Not Harm Defendants.**

Defendants could easily comply with the Proposed Order submitted by Plaintiffs by removing the staples from the limited number of publications that arrive by mail and by developing an appropriately tailored policy on sexually explicit reading material. Given the penological benefits of access to publications, the requested injunction would likely improve both security and rehabilitation at the Detention Center. *See supra* at 15-16.

---

[79] *E.g.*, *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (affirming grant of preliminary injunction against prison publication policy and stating, "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury') (quoting *Elrod*, 427 U.S. at 373); *Alameen v. Coughlin*, 892 F.Supp. 440, 447-48 (E.D.N.Y. 1995) (burden on prisoner's religious exercise constitutes irreparable harm); *Martyr v. Bachik*, 770 F.Supp. 1406, 1410-11 (D. Or. 1991) (granting preliminary injunction and noting that correspondence restrictions imposed on involuntarily committed individual "impose a great hardship upon him").

31

### E.     A Preliminary Injunction Will Serve the Public Interest.

Defendants' censorship policies harm not only Plaintiffs but other publishers and detainees as well.  Because magazines contain staples, "no staples" is "no magazines" by another name; the rule against sexual content is a rule against the *Washington Post*, *USA Today*, ancient Greek sculpture, and Renaissance painting.  *See supra* at 10.  This case, as the United States asserts, "implicate[s] important federal interests in protecting the Constitutional and statutory rights of institutionalized persons."[80]  And detainees long for reading material:

> I love to read. I want to receive the Prison Legal News.  I want to receive letters and books from Prison Legal News.  I want information about prisoner's rights.

> I do want to have reading material.  The Prison Legal News is of interest [and] help to me.  I want to continue to receive it.

> I am interested in reading about prisoner rights.  I want to know the news.  I want to receive magazines, letters, and books from Prison Legal News.

> I enjoy the reading.  I would like to continue to receive Prison Legal News [and] letters and books from them.  [Their] information about diabetes has helped me.[81]

Detainees' desire to read is also reflected in the numerous letters Plaintiffs received expressing interest in *Prison Legal News*, and in request forms submitted to the Detention Center by detainees hoping to receive the magazine. Wright Decl. ¶ 18 & Ex. H.  These request forms, letters, and declarations speak to the hunger for expressive freedom that Justice Thurgood Marshall described in *Procunier v. Martinez*:  "When the prison gates slam behind an inmate, he does not lose his human quality; his mind does not become closed to ideas; his intellect does not cease to feed on a free and open interchange of opinions … It is the role of the First Amendment

---

[80] Memorandum of Points and Authorities in Support of United States' Motion To Intervene (Doc. No. 35-1), at 2.

[81] Declaration of Jamichael Howard ¶ 12; Declaration of Herbert Singleton ¶ 12; Declaration of Ronald Webster ¶ 12; Declaration of Jackie Kerce ¶ 12.

and this Court to protect those precious personal rights by which we satisfy such basic yearnings of the human spirit."[82]

## F.    Only A Nominal Bond Should Be Required.

Under Federal Rule of Civil Procedure 65(c), District courts have discretion to determine the amount of the bond accompanying a preliminary injunction, and this includes the authority to set a nominal bond.  "Where the district court determines that the risk of harm is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly. In some circumstances, a nominal bond may suffice."   *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,  174 F.3d 411, 421 n.3 (4th Cir. 1999) (citing with approval *International Controls Corp. v. Vesco,* 490 F.2d 1334 (2d Cir.1974), and noting that *International Controls Corp.* set the bond at zero dollars).

"The amount of the bond … ordinarily depends on the gravity of the potential harm to the enjoined party," *Hoechst Diafoil* Co., 174 F.3d at 421 n.3, and here Defendants would suffer no financial harm because removing staples will not have any effect on resources or staffing.  *See supra* at 7-8.  *See also Winnebago Tribe v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003) (no bond necessary where there was no showing of harm from injunction).  A nominal bond is also appropriate because: (1) Plaintiffs have shown a high likelihood of success on the merits, (2) Plaintiffs are a non-profit organization with limited resources, (3) the requested injunction is in the public interest, and (4) the injunction would vindicate fundamental constitutional rights.[83]

---

[82] *Martinez*, 416 U.S. at 428 (Marshall, J., concurring).

[83] Wright Decl. ¶ 35.  *See Moltan Co. v. Eagle-Picher Indus., Inc*., 55 F.3d 1171, 1176 (6th Cir. 1995) (finding no bond necessary where plaintiff had strong likelihood of success on merits); *Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002) ("minimal bond amount should be considered" in public interest case); *Complete Angler, LLC v. City of Clearwater*, 607 F.Supp.2d 1326, 1335 (M.D. Fla. 2009) ("Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right."); *Santa Rosa Memorial*

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be granted.

---

*Hosp. v. Maxwell-Jolly*, 380 Fed. Appx. 646, 658 (9th Cir. 2010) ("[N]o bond or a nominal bond may be appropriate in cases involving the public interest."); *People of State of Cal. ex rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985) (nonprofit unable to post substantial bond).

    The Prison Litigation Reform Act requires a court to make certain additional findings when granting a preliminary injunction "[i]n any civil action with respect to prison conditions." 18 U.S.C. § 3626(a)(2).  Specifically, "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm."  *Id.*  Such findings are warranted here because the requested preliminary injunction is narrowly tailored to remedy violations of Plaintiffs' First Amendment rights and is neither intrusive nor burdensome.

DATED: May 4, 2011

Respectfully Submitted,

ATTORNEYS FOR PLAINTIFFS
_____s/Susan Dunn_____
Susan Dunn
Federal Bar No. 647
Staff Attorney
ACLU of South Carolina
P.O. Box 20998
Charleston, SC 29413-0998
(843) 720-1425
Fax: (843) 720-1428
sdunn@aclusouthcarolina.org

David M. Shapiro
dshapiro@npp-aclu.org
David C. Fathi*
dfathi@npp-aclu.org
ACLU National Prison Project
915 15th St., N.W., 7th Floor
Washington, DC 20005
(202) 715-0838
Fax: (202) 393-4931
*Not admitted in DC; practice limited to federal courts

Lance Weber
Human Rights Defense Center
P.O. Box 2420
West Brattleboro, VT 05303
(802) 579-1309
Fax: (866) 735-7136
lweber@humanrightsdefensecenter.org