IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| PRISON LEGAL NEWS and<br>HUMAN RIGHTS DEFENSE CENTER,<br>　　　　　　Plaintiffs,<br><br>　　　vs.<br><br>BERKELEY COUNTY SHERIFF<br>H. WAYNE DEWITT, individually and<br>in his official capacity; CAPTAIN<br>CLIFF McELVOGUE, individually and in<br>his official capacity; LIEUTENANT<br>TONY RILEY, individually and in his<br>official capacity; JOHN DOE 1,<br>Berkeley County Detention Center<br>employee, individually and in his/her<br>official capacity; JOHN DOE 2,<br>Berkeley County Detention Center<br>employee, individually and in his/her<br>official capacity; JOHN DOE 3,<br>Berkeley County Detention Center<br>employee, individually and in his/her<br>official capacity; JOHN DOE 4,<br>Berkeley County Detention Center<br>employee, individually and in his/her<br>official capacity,<br>　　　　　　Defendants. | **Case No.: 2:10-cv-02594-MBS**<br><br><br><br>**DECLARATION OF<br>TONI V. BAIR** |

TONI V. BAIR, pursuant to 28 U.S.C. § 1746, makes the following declaration under penalty of perjury:

1. My name is Toni V. Bair. I am a corrections consultant and an expert witness on corrections management, use of force, wrongful death, and death row. A true and correct copy of my curriculum vitae is attached hereto as Exhibit A.

2. I have been retained by the National Prison Project of the ACLU in this matter to render an opinion as to Berkeley County Detention Center ("Detention Center") policies and

1

practices that limit the ability of the Plaintiffs to send publications to detainees.

3. I received a Bachelor of Sciences (B.S.) in psychology from Weber State College in 1965 and a Master of Social Work (M.S.W.) from the University of Utah in 1967. I have completed course work toward a Ph.D. in sociology at Utah State University and course work toward a Doctorate of Public Administration with a focus on corrections at Virginia Commonwealth University.

4. I served as the Maximum Security Unit Manager at Utah State Prison from 1978 to 1979 with responsibility for all maximum security and death row inmates and programs, and as a Captain at Utah State Prison from 1979 to 1982. As Captain, I co-chaired the American Correctional Association Standards accreditation process for the prison. From 1982 to 1983, I served as a Utah State Prison Investigator, conducting investigations regarding illegal inmate, visitor, and staff activities.

5. From 1983 to 1985, I was the Warden of the Utah State Prison – Youthful Offender Program. From 1985 to 1986, I was the Warden of Mecklenburg Correctional Center in Boydton, Virginia, which housed Virginia's death row. From 1986 to 1990, I was a Regional Administrator for the Virginia Department of Corrections. In that position, I supervised the wardens of seven adult prisons, three correctional field units, and one work release unit; I developed and monitored standards of performance for regional office staff, institutional wardens, and superintendents.

6. My duties as a Regional Administrator included reviewing decisions by wardens as to whether certain publications should be delivered to inmates.

7. I was the Assistant Commissioner for the New York City Department of Corrections New York City jail system from 1990 to 1992, where my work included monitoring the

Department's adherence to court orders, stipulations, judgments and decrees, city and state standards, and Department policies and procedures.

8. From 1991 to 1993, I was an Adjunct Professor at the City University of New York, John Jay College of Criminal Justice. Between 1993 and 2008, I was an adjunct professor at Weber State University.

9. Since 1985, I have performed approximately seventy prison and jail evaluations.

10. I understand that the Detention Center asserts that: (1) publications sent by Plaintiffs have not been delivered based on a rule against publications that contain staples, and (2) publications sent by Plaintiffs have not been delivered due to material viewed as "sexual content." The purpose of this declaration is to evaluate whether there is a valid, rational connection between these reasons for not delivering publications sent by Plaintiffs and a legitimate penological interest.

11. I base this declaration on my background working for Departments of Corrections, within individual prisons, as a warden, regional administrator, and assistant commissioner; my training in corrections issues; the knowledge and expertise I have developed as a professor of criminal justice; and standards promulgated by the American Correctional Association.

12. I have reviewed filings in this case, and documents produced by the Plaintiffs and Defendants in discovery (including Detention Center policies and procedures, incident reports, maintenance records, inmate grievances regarding publications, responses by the Detention Center to such grievances, and notations on issues of *Prison Legal News* rejected by the Detention Center). I conducted an inspection of the Detention Center on February 23, 2011, accompanied by Detention Center staff and counsel for the Plaintiffs

3

and Defendants. During the inspection, I examined cells and dorms and dayrooms within most pods of the Detention Center and observed the processing of that day's mail.

### A. "No Staples" Rule

13. I understand that Defendants assert that the following rationales support a "no staples" rule: (1) detainees use staples to interfere with locks; (2) detainees use staples to make tattoos; (3) detainees use staples to damage or clog various fixtures at the Detention Center (including sinks, showers, sprinklers, intercoms, and light fixtures). I discuss each of these rationales below.

#### 1. Locks

14. I have reviewed the incident reports produced by Defendants to Plaintiffs in this case. In total, these reports span over 100 pages. Although many of these incident reports show detainees interfering with locks and cell doors, I did not encounter a single incident report that involves a detainee using a staple to interfere with a lock or door. Rather, the incident reports refer to other items, such as plastic spoons, Styrofoam, paper, and playing cards being used to interfere with locks and doors.

15. I also reviewed the maintenance records produced by Defendants to Plaintiffs in this case. None of these refers to staples being used to interfere with locks. One such record refers to a lock being stuffed with paper.

16. I have reviewed the commissary order forms produced by Defendants in this case; these forms show that detainees are allowed to order items such as paper products and playing cards. During my inspection of the Detention Center on February 23, 2011, I observed in plain view in the cells of numerous detainees items such as plastic spoons, Styrofoam cups, and paper products.

4

17. During my inspection of the Detention Center, I closely inspected several locks. I did not see any staples inserted into locks, and I saw no evidence that staples had been used to damage locks.

18. To the extent interference with doors and locks presents a security concern at the Detention Center, there is ample evidence that these problems are caused by items other than staples to which inmates have ready access.

### 2. Tattoos

19. Out of the more than 100 pages of incident reports produced by Defendants, only four incident reports suggest that staples have been found in possible tattoo kits. The low number of such reports suggests that the use of staples to create tattoos is not a widespread or systemic problem.

20. Other incident reports refer to possible tattoo kits that include various items other than staples, such as safety pins, paperclips, sharp pieces of plastic, wires, and needles. These kits also contain items, such as pencils and toothpaste caps, that, based on my review of commissary order forms, can be ordered from the commissary.

21. Considering the limited number of cases in which staples appear to have been used in possible tattoo kits, and the ability of inmates to readily assemble such kits with items other than staples to which they have ready access, efforts to limit inmate access to staples would not have a significant effect on the ability to assemble tattoo kits.

### 3. Damage to Other Fixtures

22. In my experience as a corrections professional, I have never known the use of staples to damage fixtures in a prison or jail to be a serious concern.

23. The incident reports produced by Defendants show that various fixtures at the Detention

Center have sometimes been damaged or clogged, but none of these reports mentions staples as the cause. In the incident reports that do identify a cause of damage, staples clearly were not involved.

24. I have also reviewed the maintenance records produced by Defendants. None of these records refers to staples as a cause of damage or flooding. These records refer to other items (including pieces of blanket and paper) being used to cause damage or clogging.

25. During my inspection of the Detention Center, I closely inspected numerous intercoms, toilets, light fixtures, sprinklers, sinks, and showers. I saw no evidence that staples had been used to damage any of these fixtures or had been used to cause flooding.

26. During the inspection, counsel for the Defendants told me that inmates used staples to short circuit the wires in intercoms (after first removing the metal covering), which then opened the electric locks in the doors. I cannot imagine any way that a staple would short circuit an electric lock or intercom. In fact, an inmate who attempted this would likely be shocked and burned. I also reviewed an incident report produced by Defendants which shows that inmates can short circuit locks simply by crossing wires, without the use of a staple. A copy of this incident report is attached hereto as Exhibit B.

27. I previously had understood Defendants' view to be that inmates clogged toilets by flushing staples down toilets. During my inspection of the Detention Center, I saw no evidence of this having occurred. During the inspection, counsel for the Defendants also asserted that inmates insert staples next to the flush button, causing the button to jam and the toilet to flush continuously. I likewise saw no evidence of this having occurred. In any case, an inmate seeking to cause a toilet to flush continuously could simply hold down the flush button rather than using a staple.

28. To the extent damaged fixtures present a security or management concern at the Detention Center, there is ample evidence that these problems are not caused by staples.

### 4. Pads of Paper with Staples

29. For the reasons stated above, inmate access to staples does not present a genuine security threat or management concern. If there were a need to limit access to staples, however, prohibiting publications with staples would not accomplish this result.

30. Inmates at the Detention Center have ready access to staples from sources other than publications. During my inspection of the Detention Center, I observed at least 6 legal pads in inmates' cells. These pads were held together with cardboard, staples, and a strip at the top. Although the staples were covered by the strip, I could clearly see the staple indentation in the strip of paper covering the top of the legal pads.

31. All of the pads that I observed in various cells were identical. I have also reviewed Detention Center commissary order forms, which show that inmates can order legal pads from the commissary. Based on these order forms, and the fact that the legal pads with staples that I observed were identical, it is highly likely that detainees are able to order legal pads that contain staples from the Detention Center commissary.

32. Regardless of the source of the legal pads that contain staples, however, it is clear based on my observations at the Detention Center that inmates have ready access to legal pads with staples. As a result, prohibiting inmates from obtaining publications with staples would not significantly limit their overall access to staples.

### 5. Removal of Staples

33. If access to publications containing staples were a valid security or management issue, the Detention Center could simply remove the staples from publications prior to delivery

to inmates, rather than rejecting the publications entirely.

34. Removing staples would not impose a burden on Detention Center staff; in fact, it would save staff time. During my inspection of the Detention Center, I closely observed two Detention Center staff members processing the mail that had arrived that day. Ten to eleven copies of the same magazine (which was not *Prison Legal News*) had arrived that day; no other magazines were in that day's mail. Each copy of this magazine contained two staples. The Detention Center staff person who processed these magazines went through the following procedure for *each* magazine: (1) wrote a notation on the magazine regarding the reason for rejection; (2) applied a "return to sender stamp" to the publication one or several times; and (3) wrote several entries, which included at least name of sender, name of inmate, and reason for rejection, by hand in a mail log for each rejected copy.

35. Using my watch, which has a second hand, I determined that it took roughly 35 seconds per copy to complete these steps. Because it takes far less than 35 seconds to remove two staples, the rejection process actually consumes more staff time than removing staples would.

36. For the reasons explained above, there is no valid, rational connection between a ban on publications with staples and any justifiable penological interest. Professionals in the field of corrections face many serious challenges on a daily basis; these range from preserving security to preparing inmates for release. In my experience, however, inmate access to staples is not a matter of concern to corrections professionals.

37. Although I have spent over 30 years in the field of corrections, I had never heard of an instance (prior to my involvement in this case) in which a corrections professional

8

believed that inmate access to staples was a concern. I cannot recall any situation in which a superior, subordinate, or colleague of mine at a correctional facility raised a security or management concern related to inmate access to staples. I also cannot recall any security incident at any correctional facility that was precipitated by inmate access to staples.

38. Based on my inspection of the Detention Center and review of documents, there is nothing unique about the Detention Center that would make inmate access to staples more of a concern there than at most other correctional facilities. The Detention Center is a fairly typical county jail with a fairly typical inmate population.

39. Most of the 2.3 million inmates currently incarcerated in the United States have access to staples. In every facility where I have worked or which I have overseen, inmates were allowed access to staples. This included death row inmates, maximum security inmates, and inmates in segregation due to disciplinary violations. During my over 30 years in corrections, none of the jails or prisons that I oversaw (of which there were more than 50) prohibited staples.

### B.    "Sexual Content"

40. I have reviewed the pages of *Prison Legal News* issues which the Defendants view as containing "sexual content" (Bates Nos. 1845-1853 and 2029-2031) (Attached hereto as Exhibit C). None of these pages would present a security or management issue in a correctional environment.

41. For the most part, the content consists of written advertisements for magazines and does not contain pictures. When there are pictures, these are barely visible; each is less than one square inch; there is no nudity; and any clothed depictions of breasts, buttocks, or the groin areas are rendered invisible by a white star.

9

42. These advertisements do not pose a threat to security or management, and certainly do not provide a reason to prohibit a magazine such as *Prison Legal News*, which contains over 50 pages of important content per issue. When correctional facilities are concerned with items advertised in publications, the proper solution is to prohibit the items advertised, not to ban the publications with occasional advertisements.

### C.   Reading Material

43. Reading material is an important tool in the management of correctional institutions. Publications can help alleviate the boredom attendant to prison life, which is important because inmate idleness can contribute to disturbances and disciplinary violations. Access to reading material can also contribute to inmate habilitation and preparation for release.

44. I have consistently noticed that inmates have a high level of interest in *Prison Legal News* because of the information the magazine contains about their legal rights.

45. The American Correctional Association (ACA) is the preeminent organization of corrections professionals in the United States. Sheriff Darron Hall of Davidson County, Tennessee currently serves as ACA's President; ACA's Executive Committee consists of other leaders in the field. ACA promulgates standards for detention centers and correctional institutions and accredits institutions that satisfy these standards.

46. The importance of publications is reflected in Standards 4-ALDF-5B-07 and 4-ALDF-5B-08 of ACA's *Performance-Based Standards for Adult Local Detention Facilities* (Fourth Edition). These Standards state in relevant part, "[i]nmates have access to publications," and "[m]ail is read, censored, or rejected based on legitimate facility

interests of order and security." A copy of these Standards is attached hereto as Exhibit D.

47. The Detention Center's policies or practices that prevent delivery of *Prison Legal News* are inconsistent with these ACA Standards because such policies or practices allow the rejection of publications that pose no threat to facility order or security.

48. During my inspection of the Detention Center, I visited an area that Defendants' counsel described to me as a law library that inmates could visit. The library consisted solely of legal books and did not contain magazines or publications such as *Prison Legal News*.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: April 8/11, 2011

_____
Toni V. Bair