IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| PRISON LEGAL NEWS and | ) | **Case No.: 2:10-cv-02594-SB-BM** |
| HUMAN RIGHTS DEFENSE CENTER, | ) | |
| Plaintiffs; | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff Intervenor; | ) | |
| vs. | ) | |
| | ) | |
| BERKELEY COUNTY SHERIFF | ) | |
| H. WAYNE DEWITT, individually and | ) | |
| in his official capacity; CAPTAIN | ) | |
| CLIFF McELVOGUE, individually and in | ) | |
| his official capacity; LIEUTENANT | ) | |
| TONY RILEY, individually and in his | ) | **PLAINTIFFS' SUPPLEMENTAL** |
| official capacity; JOHN DOE 1, | ) | **BRIEF IN SUPPORT OF MOTION FOR** |
| Berkeley County Detention Center | ) | **PRELIMINARY INJUNCTION** |
| employee, individually and in his/her | ) | |
| official capacity; JOHN DOE 2, | ) | |
| Berkeley County Detention Center | ) | |
| employee, individually and in his/her | ) | |
| official capacity; JOHN DOE 3, | ) | |
| Berkeley County Detention Center | ) | |
| employee, individually and in his/her | ) | |
| official capacity; JOHN DOE 4, | ) | |
| Berkeley County Detention Center | ) | |
| employee, individually and in his/her | ) | |
| official capacity, | ) | |
| Defendants. | ) | |

Pursuant to the Court's Orders of December 8 and 18, 2011, Plaintiffs submit this supplemental brief in further support of Plaintiffs' Motion for Preliminary Injunction (Doc. No. 47). Since the filing of the motion on May 4, 2011, significant discovery has occurred:

- Plaintiffs' deposition of Captain Cliff McElvogue, Director of the Detention Center, on November 17, 2011 ("McElvogue Dep.," excerpted at Exhibit A to the Declaration of David Shapiro filed concurrently with this brief ("Shapiro Decl.")).

- The United States' deposition of Lieutenant Tony Riley, second-in-command at the Detention Center, on November 17, 2011 ("Riley Dep.," excerpted at Exhibit B to Shapiro Decl.).

- The United States' depositions, pursuant to Federal Rule of Civil Procedure 30(b)(6), of Sergeant Kris Jacumin, on November 2 and 3, 2011 ("Nov. 2 Rule 30(b)(6) Dep.," excepted at Exhibit C to Shapiro Decl.; "Nov. 3 Rule 30(b)(6) Dep.," excepted at Exhibit D to Shapiro Decl.).

- Plaintiffs' depositions of David Taschner, Patrick Garrett, and Garrett Harvey on September 7, 2011 ("Taschner Dep.," excerpted at Exhibit E to Shapiro Decl.; "Garrett Dep.," excerpted at Exhibit F to Shapiro Decl.; "Harvey Dep.," excerpted at Exhibit G to Shapiro Decl.).

- The submission to Defendants, on September 2, 2011, of the report of Toni V. Bair, Plaintiffs' expert witness ("Bair Report," Shapiro Decl. Ex. S).[1]

- The submission to Defendants, on November 21, 2011, of the reports of John Clark and James Aiken, the United States' expert witnesses ("Clark Report," Shapiro Decl. Ex. T; "Aiken Report," Shapiro Decl. Ex. U).[2]

- Additional document discovery discussed below. *See* Shapiro Decl. Exs. J-R.

---

[1] Mr. Bair has held numerous high-level positions in corrections, including service as Warden of prisons in Utah and Virginia and as Assistant Commissioner for the New York City Department of Corrections. Bair Report at 2.

[2] Mr. Clark has served as Assistant Director of the Federal Bureau of Prisons (BOP) and Warden of BOP facilities. Clark Report at 3. Mr. Aiken has served as Warden of South Carolina facilities and Deputy Regional Administrator for the South Carolina Department of Corrections, a position that required him to manage sixteen South Carolina prisons. Aiken Report at 3.

**ARGUMENT**

**A.**  **Recent Evidence Confirms that Defendants' Ban on Publications that Contain Staples Has No Valid Connection to a Legitimate Penological Interest.**

    **1.**  **Prohibiting Publications with Staples Is Irrational Because the Detention Center Allows Detainees to Have Regular Access to Other Sources of Staples.**

The Detention Center is full of staples, and detainees are allowed in areas where they can easily access staples.  According to Mr. Clark, who conducted a two-day inspection of the Detention Center in October 2011, legal volumes that contain staples are "available for prisoners to use upon request."  Clark Report at 17.  *See also id.* (detainees have access to staples located in furniture and a flip chart).  The Detention Center's 30(b)(6) witness conceded that detainees are given access to a multi-purpose room that houses bookshelves, baseboards, chairs, and other furniture that contain nails, staples, and screws.  Nov. 3 Rule 30(b)(6) Deposition at 291-97.

In short, "BCDC exhibits an irrational approach to the presence of staples within the facility.  While BCDC prohibits light grade staples in magazines, it has taken no steps to remove the presence of hundreds of somewhat sturdier staples accessible to prisoners in law volumes, chairs and a flip chart."  Clark Report at 18.  *See also* Aiken Report at 10 ("Based upon my contrary experience in 40 years of correctional management, (including facilities in South Carolina), and on the fact that inmates at BCDC can already access staples, fasteners and various other objects not from publications, I could not find a foundation for a legitimate penological interest [in prohibiting stapled publications]."); *id.* at 11-16 (photographs of numerous items at the Detention Center which contain staples and to which detainees have access); Clark Report at 33-34 ("I also observed jagged pieces of metal protruding from broken pieces of shelving in the room containing the law books, and from the book shelves recently placed on the Pods …. The

presence of these objects indicates a slipshod approach to security inspection procedures by the facility.").

Because the Detention Center grants detainees ready access to staples, banning publications sent by mail that contain staples chokes off access to reading material but does not restrict access to staples. Such a policy is plainly irrational.

> **2.** **Prohibiting Publications that Contain Staples Is Irrational Because the Detention Center's Slipshod Security Practices Allow Detainees Access to a Vast Array of Contraband from Sources Other than Publications.**

The ban on publications that contain staples is irrational because the Detention Center's loose security practices allow detainees to obtain not only staples but all types of contraband. According to Mr. Clark, "[t]here is a poor design to prevent the introduction of contraband through the perimeter of the facility," and there are numerous "avenues for the potential introduction and movement of all sorts of contraband through the facility." Clark Report at 30-31. *See also* Bair Report at 6-7 (the Detention Center's failure to discover that it was selling detainees legal pads that contain staples "suggests that [Defendants] are unable to prevent access to staples, even if their rules prohibit staples … [A] rule against publications with staples merely prevents access to publications – not access to staples.").

The Director of the Detention Center himself conceded that on at least three occasions, detainees broke windows, and people outside the jail threw in contraband. McElvogue Dep. at 76-77. He admitted that detainees can gain access to staples even if the Detention Center prohibits staples. McElvogue Dep. at 79; *see also* Shapiro Decl., Ex. J (two incident reports showing that detainees obtained access to a screwdriver, a pair of pliers, six lighters, a roll of wire, and razor blades).

The Detention Center's inability to control contraband is one of the many "extensive gaps in security at BCDC [that] place the good order and safety of the facility and ultimately of the Berkeley County community at risk."  Clark Report at 43; *see also id.* at 30 ("For two days I observed a striking level of loose, disorganized security which could put the public, the staff and the prisoners of BCDC at risk. The intense focus on such marginal aspects as staples and even mildly suggestive content in publications is totally incongruent with systemic gaps in good practice and with a number of violations of good security practices evident in the overall management of BCDC….When taken together, these problems present a picture of a very loose, casual approach to security on the part of the administration and the department responsible."); Aiken Report at 23 ("The penological interest in banning staples, publications for content, and religious items has no impact on the security status of BCDC especially when compared to the unstable and critical posture of BCDC security I observed during the inspection.").

Simply put, the Detention Center's ban on publications is irrational because it severely restricts access to expressive material protected by the First Amendment while dangerous security practices allow detainees ready access to contraband.

**3.     Recent Evidence Confirms that the Ban on Staples Results in the Rejection of Vital Correspondence, Including Material that Could Affect Custody of One's Children.**

The Detention Center's ban on written material that contains staples could affect such fundamental matters as child custody.  The log of rejected mail shows at least eight instances in which mail from the Department of Social Services ("DSS") has been rejected under the "no staples" policy.  Shapiro Decl., Ex. K.  The Detention Center's second-in-command testified as follows:

Q     Does that [entry in the mail log] likely stand for the Department of Social Services?

A      Yes, sir.

Q      The Department of Social Services engages in functions such as making sure that children receive child support and things of that nature; is that right?

A      Yes, sir.

Q      So mail from the Department of Social Services could be information that a detainee would need to receive in order to make payments for the support of their child; is that right?

A      Not payments, sir, maybe custody of the child, or something like that, but not payment.

Q      So mail from the Department of Social Services could have an effect on a detainee's right to custody of their children.

A      Yes, sir.

Q      And Exhibit 16 shows that mail from the Department of Social Services has been rejected because it contains staples, right?

A      Yes, sir.

Q      Are you aware of anything that the detention center has done to contact the Department of Social Services to address the rejection of mail from them on the basis that it contains staples?

A      No, sir.

Riley Dep. at 80-81.

Due to the "no staples" policy, the Detention Center also rejects items from several other organizations and governmental entities, including religious organizations, substance abuse rehabilitation organizations, the South Carolina Department of Education, the Social Security Administration, and the United States Department of Justice. Nov. 3 Rule 30(b)(6) Deposition at 244-257. *See also* Riley Dep. at 18-19 (the "no staples" policy results in the rejection of both religious publications and mainstream newsmagazines such as *Time*); Nov. 2 Rule 30(b)(6) Dep. at 217 (agreeing that "at least a couple dozen detainees … were unable to get religious content because of the staples policy"); Clark Report at 24 ("BCDC effectively prevents prisoners from receiving virtually all religious publications through the mail because of its ban on staples.").

4.      **Recent Evidence Shows that the "No Staples" Policy, Combined with the Detention Center's Other Draconian Restrictions on Reading Material, Threatens Institutional Order.**

The Detention Center's sweeping prohibitions on publications, including the "no staples" rule, promote disorder by leaving inmates idle and depriving them of access to constructive activity.  According to Mr. Clark:

> Based on my experience in corrections management, I find that BCDC's entrenched practice of excluding virtually all reading material is not founded on principals of good correctional management and is not rationally related to the goal of maintaining good order and security.  To the contrary, such practices have the foreseeable effect of undermining these fundamental correctional goals. Through two days of on-site inspection, including several dozen conversations with prisoners, I observed widespread idleness and lack of mental stimulation among large numbers of prisoners in most areas of the BCDC facility at a level exceeding what I have witnessed at other pretrial facilities.  Such idleness frequently leads to an unnecessary degree of frustration and tension – predictable enemies of good order and security, frequently played out in aggression against other prisoners and staff. Extensive frustration and tension is evident at BCDC, exacerbated by the lack of constructive activities, reading materials, or religious programs.
> …
> Even if it were conceivable that prohibiting staples, sexually suggestive content or important religious materials, books and publications could provide some minimal benefit to security or good order at BCDC, that benefit is far outweighed by the current harm posed to security and good order by the idleness and tension associated with the banning of such materials.

Clark Report at 11, 41; *see also* Aiken Report at 25 ("Preventing the introduction of reading materials, to include educational and religious materials/items, due to such materials being secured with a staple does not materially improve the security status of the confinement facility. Instead, preventing these reading materials/religious items decreases security because inmates are more idle and less constructively engaged."); Bair Report at 16 ("Publications can help alleviate the boredom attendant to prison and jail life, which is important because inmate idleness can contribute to disturbances and disciplinary violations.").

5.    **Emails to and from Donald Leach Discredit the Affidavit Leach Submitted to the Court.**

In opposing Plaintiffs' Motion for Preliminary Injunction, Defendants relied heavily on an affidavit submitted by Donald Leach and a "survey" attached thereto (Doc. No. 65). While Leach purported to include all responses in this survey, Leach Aff. (Doc. No. 65) ¶ 42, emails between Leach and jail administrators recently obtained in discovery demonstrate that Leach selectively excluded from his "study" numerous responses that contradicted his position. Leach signed his affidavit, to which he attached the survey, on May 26, 2011. Before May 26, Leach received the following responses, which are not included in his study:

Waseca County, Minnesota: "We allow Staples."[3]

Pitkin County, Colorado:  "Don, right off the bat I'll tell you that we do allow stapled paper inside…."[4]

Bergen County, New Jersey:  "No, we no longer remove staples or restrict publications with staples."[5]

Tompkins County, New York: "We remove the staples."[6]

Holmes County, Ohio: "We do remove all staples from documents and publications, we do not prohibit items from being brought in but the staples will be removed before they enter the housing unit."[7]

---

[3] Shapiro Decl. Ex. L at 37 (received by Leach on May 23, 2011).

[4] Shapiro Decl. Ex. L at 115 (received by Leach on May 24, 2011).

[5] Shapiro Decl. Ex. L at 133 (received by Leach on May 25, 2011).

[6] Shapiro Decl. Ex. L at 121 (received by Leach on May 25, 2011).

[7] Shapiro Decl. Ex. L at 140 (received by Leach on May 25, 2011). Lest Defendants respond that Leach did not include all responses received after a certain date, it should be noted that Leach did include other responses received as late as May 26, 2011. Shapiro Decl. Ex. L at 159 (email from Grand County, Colorado received by Leach on May 26, 2011 and included in Leach's study).  And not only did Leach exclude from his survey numerous responses, but Defendants also failed to provide in discovery emails from numerous jails that *are* listed in the chart, including emails from the following jails (among others): Bartow County, Georgia; Clayton County, Georgia; Laurens County, South Carolina; Lexington County, South Carolina.

Aside from omitting entirely the jails listed above (among others), Leach also implied in his affidavit that he included in the survey all comments received from the respondents: "Comments on the rationale for their policies are listed in the attachment." Leach Aff. (Doc. No. 65) ¶ 42. This assertion was false. Leach cherry-picked the comments, excluding all of the following:

> Corrections Center of N.W. Ohio: "For our first ten years of operations we did not allow staples. We do now. After 21 years we have never had a cuff pic'd or lock jammed with a sta[p]le. During my previous time in a state prison we never worried about it." [8]

> Franklin County, New York: "Here at the Franklin County Jail in Malone, NY we do not prohibit Staples, We do not prohibit publications with staples and we do not remove staples from publications."[9]

> Macomb County, Michigan: "Hi. We don't prohibit them….hope all is well. Michelle."[10]

> Coconino County, Arizona: "Any publications that are manufactured with sta[p]les for binding are not prohibited" and "[w]e do not remove staples from any publications."[11]

> Travis County, Texas, "[W]e let publications come in with staples…." [12]

Not only did Leach misrepresent the results of his study, but his manifest bias infected the responses he received. Leach made it clear that he wanted favorable responses to use in a partisan fight; as a result, many jails that permit staples no doubt opted not to respond. When contacting jails via email, Leach repeatedly made such representations as "I am trying to help a small county jail under assault from Prison Legal News and the ACLU."[13] In response to one

---

[8] Shapiro Decl. Ex. L at 118 (received by Leach on May 24, 2011).
[9] Shapiro Decl. Ex. L at 119 (received by Leach on May 25, 2011).
[10] Shapiro Decl. Ex. L at 4 (received by Leach on May 20, 2011).
[11] Shapiro Decl. Ex. L at 82 (received by Leach on May 23, 2011).
[12] Shapiro Decl. Ex. L at 101 (received by Leach on May 24, 2011).
[13] Shapiro Decl. Ex. L at 18 (sent by Leach on May 23, 2011 and subsequently forwarded by the recipient to 19 others); Shapiro Decl. Ex. L at 19 (sent by Leach on May 23, 2011).

email, Leach wrote, "[t]his is a modern shakedown racket against jails."[14]    Leach never

mentioned in these emails that the Detention Center was also being sued by the United States –

presumably because that fact interfered with the story he was peddling to the respondents: *ACLU*

*going after jail.*

Leach's conduct in this case demonstrates why his testimony has not been well received

by the courts.  *See* Plaintiffs' Reply Brief in Support of Motion for Preliminary Injunction (Doc.

No. 84) ("Pl. Reply") at 15 n.46 (citing decisions criticizing Mr. Leach as an expert witness,

including *Villegas v. Davidson County*, 789 F.Supp.2d 895, 917 (M.D. Tenn. 2011), where the

court described Leach's opinion as "unpersuasive for several reasons").  And as Defendants

recently admitted, Leach has *never* been qualified to testify at trial.  Shapiro Decl. Ex. M at 4

(Defendants' Response to Plaintiffs' Third Set of Requests for Admission).

Under these circumstances, Leach's affidavit and the attached survey should be assigned

no weight in adjudicating Plaintiffs' Motion for Preliminary Injunction.  *See Perry v. Scruggs*, 17

Fed.Appx. 81, 87 (4th Cir. 2001) (excluding expert testimony where expert's "assumptions are

speculative and not supported by the record"); *Baumholser v. Amax Coal Co.*, 630 F.2d 550, 552

(7th Cir. 1980) ("To qualify a study or opinion poll for admission into evidence, there must be a

substantial showing of reliability. There must be some showing that the poll is conducted in

accordance with generally accepted survey principles and that the results are used in a

statistically correct manner."); *In re Agent Orange Product Liability Litigation*, 611 F.Supp.

1223, 1245 (E.D.N.Y. 1985) ("If the underlying data are so lacking in probative force and

---

[14] Shapiro Decl. Ex. L at 97 (sent by Leach on May 24, 2011); *see also id.* at 191 ("Thank you very much for the response and your comments. Hopefully this will help the Berkeley County Sheriff's Office in South Carolina. They are being sued by Prison Legal News and the ACLU over staples and stapled publications, amongst other things. Your information is very helpful in my efforts to assist them in this litigation.").

reliability that no reasonable expert could base an opinion on them, an opinion which rests entirely upon them must be excluded.").[15]

    **6.**    **The Maintenance Workers who Submitted Affidavits in Opposition to Plaintiffs' Motion for Preliminary Injunction Admitted During Deposition that they Have No Idea Whether Staples Cause Damage at the Detention Center.**

In their opposition to Plaintiffs' Motion for Preliminary Injunction, Defendants relied heavily on affidavits submitted by three maintenance professionals. Defendant's Opposition (Doc. No. 64) ("Def. Op.") at 16-18. These witnesses fell apart in their depositions. They admitted to having no idea whether staples cause damage at the Detention Center and testified that other objects that detainees are permitted to have cause far greater damage.

    **a.**    **David Taschner**

David Taschner admitted that he had no knowledge of detainees *ever* using a staple to damage any item at the Detention Center.

> Q    Are you aware of a single case in which a toilet at the Berkeley County Jail has been damaged with a staple?
> A    I am not.
> …
> Q    Is there a single case in which you are certain that a shower at the Berkeley County Jail was damaged by a staple?
> A    No.
> …
> Q    Is there a single case in which you are certain that a lock at the Berkeley County Jail was damaged by staples?
> A    I could not be certain of that.

---

[15] Perhaps in recognition of Leach's credibility problems, Defendants recently served a report from a second expert, Gary DeLand. DeLand has apparently never been to the Detention Center, and in his 33-page report he pointedly refrains from opining that prohibiting prisoners from receiving *Prison Legal News* is reasonably related to legitimate penological interests, either because it is bound with staples or because of its advertising content. Indeed, DeLand's suggestion that *Prison Legal News* be made available to prisoners through the Detention Center's library is flatly inconsistent with Defendants' contention that the images in some advertisements carried in *Prison Legal News* threaten jail security and must be kept from prisoners' eyes at all costs.

> …
> Q    Have you ever at any time seen something retrieved from a damaged
>      fixture at the Berkeley County Jail that you are one hundred percent
>      certain was a staple?
> A    No, sir.

Taschner Dep. at 62, 64, 71.

Tashner further conceded that any item jammed in a lock – including *permissible* items

such as toilet paper – could damage the lock:

> Q    Is it true that some non-metal objects can do the same kind of damage as
>      staples?
> A    That is true.
> Q    Such as toilet paper stuffed in a lock for example?
> A    That is correct.
> Q    Styrofoam stuffed in a lock?
> A    Any object that is stuffed in a lock.
> Q    Any object stuffed in a lock could damage that lock?
> A    It could.

Taschner Dep. at 88-89.

### b.    Patrick Garrett

Patrick Garrett, who repaired locks at the Detention Center for a full eight years, Garrett

Dep. at 62, admitted at his deposition that he was aware of only one or two instances in which a

lock has been damaged with a staple. Garrett also admitted that other items – including items to

which detainees are permitted access – much more frequently are used to damage locks:

> Q    How many times [have you retrieved a staple from a lock at the Detention
>      Center]?
> A    I'm not sure.  Once or twice, maybe three but not a whole abundance.
>      Staples is not something you find a lot of in the jail.  It's mostly comb
>      teeth, plastic forks, cardboard, window putty, plastic off a food tray,
>      styrofoam cups.

Garrett Dep. at 64.  Detainees of course have access to food trays, Nov. 3 Rule 30(b)(6)

Deposition at 283, and until recently were allowed access to styrofoam cups. May 24, 2011 Rule

30(b)(6) Dep. (Doc No. 84-17) at 87-88.

### c.     Garrett Harvey

Garrett Harvey testified that he had *never* seen evidence of damage caused by a staple at the Detention Center, but had seen evidence of damage caused by permissible items:

> Q     Are you aware of any work that Meridian [Harvey's company] has ever done at the Berkeley County Jail that you are certain was the result of damage caused by staples?
>
> A     No, sir
>
>     ….
>
> Q     When you did work at the Berkeley County Jail, Mr. Harvey, have you ever found staples lodged in or otherwise interfering with equipment?
>
> A     No, sir.
>
> …
>
> Q     What kind of material objects have you found?
>
> A     Toilet paper crammed into door jams. Plastic, like plastic fork pieces stuck into intercoms. Toilet paper stuck in intercoms.

Harvey Dep. at 54-55, 57, 58.

### 7.     Recent Evidence Shows that Defendants' Arguments Regarding Staff Resources Are Meritless.

Defendants' argument that removing staples would impose a burden on staff was refuted by Plaintiffs' Reply Brief, which cited testimony from mail room staff that removing staples would take "[a] couple minutes." *See* Pl. Reply at 3-7. Recent evidence confirms this point. The Detention Center's second-in-command testified that, during previous periods when the Detention Center removed staples from incoming publications, overtime work was unnecessary:

> Q     It's fair to say that for at least three or four months, the detention center was able to remove staples without incurring extra costs or having any security incidents?
>
> A     Right.
>
>     ….
>
> Q     … You're not aware of any overtime that was specifically caused by the removal of staples during that period in 2009, right?
>
> A     No.

Riley Dep. at 22, 90. Similarly, the Director of the Detention Center testified:

> Q    …You don't know how much staff time it would take to remove the staples from the publications that arrive in a given day, right?
>
> A    No, I don't.
>
> Q    And no study has ever been done to determine that, right?
>
> A    No, sir.
>
> ….
>
> Q    And you have no recollection of there being a significant increase in overtime during the period when staples were being removed, right?
>
> A    No, sir, not to my knowledge.

McElvogue Dep. at 70-72.    The Detention Center's Rule 30(b)(6) witness also testified as follows regarding a period when staples were being removed from religious publications:

> Q.    As the detention center's 30(b)(6) witness, you're not aware of any cost reasons for stopping this policy of removing the staples, right?
>
> A.    No.

Nov. 2 Rule 30(b)(6) Dep. at 133.

Mr. Clark's report also undermines Defendants' claim that they cannot adopt policies used at other facilities due to limited staffing.  According to Mr. Clark, who is intimately familiar with facilities operated by the federal Bureau of Prisons (BOP), the ratio of staff to inmates at the Berkeley County Detention Center "is consistent with the BOP staffing levels."  Clark Report at 8; *see also id.* at 12 (noting that "small BOP pretrial facilities are similar in size to BCDC and most are similar to BCDC in staffing ratios.").

Finally, rejecting publications that contain staples is irrational because it takes far more time to reject a publication due to staples than to remove the staples.  According to Mr. Bair:

> Removing staples would not impose a burden on Detention Center staff; in fact, it would save staff time. During my inspection of the Detention Center, I closely observed two Detention Center staff members processing the mail that had arrived that day …. The Detention Center staff person who processed these magazines went through the following procedure for *each* magazine: (1) wrote a notation on the magazine regarding the reason for rejection; (2) applied a "return to sender stamp" to the publication one or several times; and (3) wrote several entries, which included at least the name of sender, name of inmate, and reason for rejection, by hand in a mail log for each rejected copy. I understand that the Detention Center has since created an even more involved "Sender Rejection

Notice" that requires staff members, in addition to providing a reason for rejection, to hand write: (1) name of publication, (2) date of rejection, (3) name of inmate, (4) name of staff member, and (5) signature of staff member. While it is indeed necessary to provide such notice when a publication is rejected, when a publication contains staples, it would consume far less time to simply remove the staples.

Bair Report at 11-12.

Ironically, one of the jails that responded to Leach's survey provided perhaps the best

retort to Defendants' protestations about removing staples:

We do prohibit staples, and we remove any that come to the jail. We do not prohibit a publication simply because it may have staples, we just remove them. Even using a Turner v. Safely analysis I didn't think we could justify prohibiting a publication entirely on the basis of a staple, since there is an easy and obvious alternative.[16]

**B.**    **Recent Evidence Confirms that Defendants' "Sexual Content" Policies Have No Valid Connection to a Legitimate Penological Interest.**

  **1.**    **The Detention Center's "Sexual Content" Policies Are Irrational As Applied to *Prison Legal News* Because Defendants Allow Detainees Access to Much More Explicit Content.**

Defendants ban *Prison Legal News* based on supposed "sexual content" but allow

detainees to watch much more explicit content on television.  Nearly all of the pods in the

Detention Center have televisions, where detainees have access to channels such as AMC, A&E,

and FX.  Nov. 3 Rule 30(b)(6) Deposition at 273-274.  Detainees watch television programs that

depict "sexual behavior," including programs such as *Mad Men*.  Nov. 3 Rule 30(b)(6)

Deposition at 275-278.  Much of this content is far more sexually explicit than the tiny images in

*Prison Legal News* of which Defendants complain.  *Compare* Doc. No. 47-18 at 5 (the tiny

image in *Prison Legal News* that Defendants claim would result in disorder) *with*

http://www.amctv.com/shows/mad-men/episodes/season-1/indian-summer    (AMC's    website

---

[16] Shapiro Decl., Ex. L at 272.

describing a scene from Episode 11 of Season 1 of *Mad Men*: "Betty [Draper] attends to the laundry. When the washing machine goes into its spin cycle it begins to clatter against the floor and wall. Leaning to steady it, she feels the vibrations and closes her eyes as she fantasizes about having sex with the air conditioning salesman on top of her dresser.") (click "read more" to navigate to this description); http://www.youtube.com/watch?v=w2_D9eYpSnk (*Mad Men* clip in which a woman repeatedly slaps a man in the face while having sex with him).

This selective policy – banning sexually explicit publications but airing sexually explicit television programs – is plainly irrational. According to Mr. Aiken:

> [T]elevision programs that I observed inmates watching during the facility inspection were sexually suggestive. The fact that BCDC officials allow suggestive book covers, explicit graffiti on cell walls, and sexual television programs demonstrates that BCDC does not have a legitimate penological interest in its broad restrictions on "sexual" content in publications.

Aiken Report at 20; *see also* Clark Report at 21 ("[I]t is clear that BCDC has displayed significant inconsistency in its prohibition of sexually oriented material by banning even mildly suggestive material in publications while permitting some number of prisoners to live in cells displaying large and extremely graphic depictions on the walls and on television.").[17]

### 2.   Banning *Prison Legal News* Based on Sexual Content Is Irrational Because Defendants Lack the Ability to Control the Flow of Contraband into the Facility.

In addition to allowing detainees to watch sexually explicit television programs, the Detention Center fails to prevent detainees from obtaining actual pornography. *See* Shapiro Decl. Ex. N (incident report showing graphic pornography discovered in detainee's cell). Given that lax security practices enable detainees to obtain pornography, there is no rational reason to

---

[17] Furthermore, as already noted, *see supra* n.15, Defendants' expert Gary DeLand advocates making *Prison Legal News* available to prisoners through the Detention Center's library, fatally undermining Defendants' argument that images in *Prison Legal News* threaten jail security.

ban a legal information journal such as *Prison Legal News* based on tiny, non-pornographic images that depict no actual nudity. *See* Doc No. 47-18 at 5.

Defendants' Rule 30(b)(6) witness admitted that although pornography enters the Detention Center, he is not aware of any incident – at the Detention Center or otherwise – in which pornography created a problem in a correctional environment:

> Q.    Does pornography still make it into the facility?
> A.    Yes.
> Q.    Are you aware of any incidents where pornography has caused the problems associated with deviant sexual behavior?
> A.    Not at this time, no.

Nov. 3 Rule 30(b)(6) Deposition at 163.

Defendants also argued, in opposing Plaintiffs' Motion for Preliminary Injunction, that prohibiting sexual content was necessary to prevent sexual harassment suits brought by female Detention Center employees. Def. Op. at 31-32. The Director of the Detention Center, however, conceded that detainees obtained material far more graphically sexual than the items contained in *Prison Legal News* – and that no employee had ever filed a sexual harassment complaint based on such material. McElvogue Dep. at 114-116.[18]

### 3.    The Detention Center's Eleventh-Hour Changes to their Sexual Content Policies Are Meaningless in the Absence of an Injunction.

As demonstrated below, injunctive relief regarding Defendants' sexual content policies is necessary to protect the First Amendment rights of Plaintiffs and detainees, for two reasons. First, Defendants openly admit that their policies are subject to change at any moment and without notice. Indeed, Defendants have repeatedly changed their policies in response to developments in this litigation, leaving no assurance that First Amendment rights will be

---

[18] The advertisement in *Prison Legal News* which Defendants asserted constituted "sexual content" in opposing the motion for preliminary injunction is referred to as Exhibit 56 in the transcript of Captain McElvogue's deposition. McElvogue Dep. at 113-114.

protected unless the Court issues an injunction.  Second, in the absence of a judicial order, Defendants have shown their inability to implement written policies in a consistent manner.

> ### a.    A Preliminary Injunction Is Necessary Because Detention Center Correspondence Policies Are Subject To Change at Any Time and Without Notice.

Referring to Defendants' correspondence policies, the Director of the Detention Center testified as follows:

> [O]ur policies end by saying the safety and security of the facility, *that everything is subject to change depending on the circumstances without any notice.*

McElvogue Dep. at 181 (emphasis added).  In short, in the absence of an injunction, a reversion to former policies could occur at any moment.  *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000) (claim not moot unless "subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur") (citation omitted); *Feldman v. Pro Football, Inc.*, 419 Fed. Appx. 381, 387 (4th Cir. 2011) (finding that Defendants' changed practices did not establish mootness and stating: "defendants face a heavy burden to establish mootness … because otherwise they would simply be free to return to [their] old ways after the threat of a lawsuit has passed") (internal quotation marks omitted); *Virginia ex rel. Coleman v. Califano*, 631 F.2d 324, 326 (4th Cir. 1980) ("Voluntary cessation of established illegal conduct makes a case moot only if it can be said with assurance that there is no reasonable expectation that the wrong will be repeated because otherwise the defendant is free to return to his old ways.").

Moreover, Defendants are manipulating their policies to gain a strategic advantage in this litigation.  As Defendants openly admit, the Detention Center's sexual content policies did not change until May 12, 2011 – eight days after Plaintiffs filed their Motion for Preliminary Injunction.  Declaration of Kris Jacumin Dated December 20, 2011 ("Dec. 20 Jacumin Aff.") at

2-11; *id.* Ex. B ("Effective Date: 5/12/11").  Sergeant Jacumin admitted that the May 12 policy change resulted from this litigation:

> Q.    Why did the detention center decide to revise policy 706 in May of 2011?
> A.    Due to this litigation.

Nov. 2, 2011 Rule 30(b)(6) Deposition at 118.

Although the correspondence policy (HFDC 706) remained unchanged for nearly two years before Plaintiffs moved for a preliminary injunction, Defendants have changed the policy *five times* – nearly once a month – since the filing of Plaintiffs' motion.  Dec. 20 Jacumin Aff. at 3-11.  The latest version of the policy, Dec. 20 Jacumin Aff., Ex. E, states that the policy was "revised" on December 9 – the day after the Court allowed supplemental briefing regarding the Motion for Preliminary Injunction (Doc No. 173) – and was "issued" on December 16 – the same day the Court requested an affidavit regarding Defendants' current policies.[19]

---

[19] In discovery, Defendants failed to provide both the most recent version of the policy and the prior version, which was "revised" on October 12 and "issued" on November 17, Dec. 20 Jacumin Aff. Ex. D – all  despite repeated entreaties from Plaintiffs that Defendants update their discovery by providing any new policies.  On October 7, Plaintiffs' counsel wrote to Defendants' counsel:

> Pursuant to Federal Rule of Civil Procedure 26(e)(1), and to ensure that the Plaintiffs receive the necessary written discovery sufficiently in advance of the depositions, please update your discovery responses with any newly created documents or new information by **November 2, 2011**. To that end, please review all previous discovery requests and provide any additional information and documents, including, **but not limited to**, the following:
> ….
> • Any newly created or previously unproduced policies (including but not limited to policies, inmate rules, and post orders) regarding mail, publications, staples, or "sexual content." *See* Requests for Production Nos. 1, 4, 5, 6, 35, 36, 39.

Shapiro Decl. Ex. H.  As of October 21, Defendants' counsel had provided some documents – but no new policies – and Plaintiffs' counsel wrote to Defendants' counsel:

> **C. Policies:**  In my letter of October 7, Plaintiffs requested that Defendants provide: "Any newly created or previously unproduced policies (including but not

2:10-cv-02594-SB-BM     Date Filed 12/23/11     Entry Number 186     Page 20 of 32

Because policy changes undertaken in response to litigation leave courts with no assurance that new policies will continue once the litigation concludes, such changes do not defeat an entitlement to injunctive relief. *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 n.5 (1953) ("It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption."); *Kellogg v. Shoemaker*, 46 F.3d 503, 507 (6th Cir. 1995) ("The parole authority may not be allowed to abort or delay constitutional review of the parole procedures by substitution of a new procedure on the eve of adjudication."); *Sasnett v. Litscher*, 197 F.3d 290, 291 (7th Cir. 1999) (assertion that "the state has no present intention of reinstating the old regulation" held insufficient to establish mootness in prison case), *abrogated on other grounds*, *Bridges v. Gilbert*, 557 F.3d 541 (7th Cir. 2009); Pl. Reply at 20 n.54 (citing several additional cases).

In addition to the changes in written policy cited above, Defendants have repeatedly manipulated their procedures to serve their litigation objectives, leaving no assurance that recent policy changes will remain in force unless the Court issues an injunction:

- After the filing of this lawsuit, Defendants' counsel instructed the Detention Center to change its policy so as to remove staples from incoming publications. The Detention

---

limited to policies, inmate rules, and post orders) regarding mail, publications, staples, or "sexual content." *See* Requests for Production Nos. 1, 4, 5, 6, 35, 36, 39." No additional policies were provided, and Plaintiffs therefore presume that none exist. **If any other responsive documents exist and are not produced by November 2, Plaintiffs will be prejudiced in their ability to fully and fairly conduct the depositions and will therefore move to exclude, at summary judgment and at trial, any responsive documents that currently exist but that are not produced by November 2, as well as any testimony regarding such documents.**

Shapiro Decl. Ex. I. The Court should make clear that Defendants' casual disregard of their discovery obligations will not be tolerated.

Center did so for a time but has reverted back to rejecting publications outright due to staples.  Pl. Reply at 19-20.

- Until September 2011, the Detention Center provided no religious books without charge other than the Christian Bible; Defendants reversed course nearly a year after litigation commenced:

  | | |
  |---|---|
  | Q | So it's fair to say that from the beginning of 2009 until the beginning of September 2011, the only text available at the detention center was Bibles? |
  | A | Yes. |
  | Q | By that you mean the Christian Bible? |
  | A | Yes. |

  Nov. 2 Rule 30(b)(6) Deposition at 64.

- Just days before the United States' expert witnesses were scheduled to inspect the Detention Center, Defendants rolled out a display of additional religious books in an apparent attempt to influence these experts' reports. Clark Report at 11 ("A few days before my visit, books shelves were installed in the housing units and a small number of donated used books were made available to prisoners.").

- In an August 29, 2011 email, Defendants' counsel literally instructed a Detention Center official to reject an administrative appeal from *Prison Legal News* that had not even been filed: "We are going to again reject the next issue on staples and pornography.  *When they appeal*, we will now be relying on this definition of pornography…." Shapiro Decl., Ex. O (emphasis added).  The subject line of the email was "Next PLN issue."  *Id.*

With litigation strategy so clearly dictating Defendants' policy changes, an injunction is necessary to ensure that Defendants do not revert to prior policies once the heat is off.

**b.     A Preliminary Injunction Is Critical Because Defendants Consistently Violate their Own Policies.**

Recent changes in written policies provide no assurance that Defendants will follow the policies.  *See Skinner v. Uphoff*, 234 F. Supp. 2d 1208, 1215 (D.Wyo. 2002) ("New and improved policies are meaningless if they are not followed.").  The Detention Center routinely deviates from written policy:

- When litigation commenced, Defendants' correspondence policy clearly stated that Detainees could receive no publications other than "soft cover bibles,"  numerous publications were rejected with notations such as "Book not allowed," and Detention Center staff responded to detainee grievances with assertions such as  "[y]ou can not get any type of Newspaper here in jail.  That's why you have not got it."  *See* Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction ("Pl. Mem.") (Doc. No. 47-1) at 2-5. Yet one of Defendants' principal contentions in this litigation is that the Detention Center routinely deviated from its written policy regarding soft-cover bibles. *See* Def. Op. at 2 (conceding that written policy "does state that only soft-covered Bibles are allowed" but asserting that this written policy was inconsistent with other written policies).

- In his November 17, 2011 deposition, Captain McElvogue, referring to a policy regarding publications dropped off at the Detention Center for detainees, testified as follows:

  > Q     All I'm saying is that sometimes the policy isn't followed, right?
  > A     I'd have to honestly say, yes, sometimes.

  McElvogue Dep. at 216.

- On September 21, 2011, Defendants sought to alter the definition of "pornography" applied to incoming photographs not by changing official policy but by stapling a piece

of paper into the mail log.  According to the mail log: "[O]n 9-21-11, Sgt. Moore gave us the definition of pornography.  Starting today, we will send any photos back that reflects [sic] this definition …. The paper that was gave [sic] to us is stapled in this book." Shapiro Decl., Ex. P.

- Defendants' Rule 30(b)(6) witness testified to numerous recent violations of policy with regard to rejected publications.  *See* Nov. 3 Rule 30(b)(6) Deposition at 244-259 (several recent rejections of mail in violation of policy); *id*. at 267-268 (confiscation of book in violation of policy); Nov. 2 Rule 30(b)(6) Deposition at 207-210 (additional rejections of mail in violation of policy).

- The Detention Center's Rule 30(b)(6) witness conceded that a recent change in correspondence practices occurred through "word of mouth" and without any written documentation.  Nov. 3 Rule 30(b)(6) Deposition at 59.

- Sergeant Jacumin conceded in his May 24, 2011 deposition that although he was the Investigations Sergeant, he did not follow written policies that specifically applied to the Investigations Sergeant.  May 24, 2011 Rule 30(b)(6) Deposition (Doc. No. 84-17) at 253-54.  In a subsequent deposition on November 3, Sergeant Jacumin testified that he still did not follow these written policies, even though the deviation had been brought to his attention in his previous deposition.  Nov. 3 Rule 30(b)(6) Deposition at 68-69.

- On its face, HFDC 706 prohibits all books except those sent by a publisher.  Sergeant Jacumin claimed that there is an exception which allows attorneys to send books to prisoners but admitted that the exception is "not documented anywhere."  Nov. 3 Rule 30(b)(6) Deposition at 158.

- Sergeant Jacumin claimed that if a detainee's appeal of a rejected publication is denied, the detainee can appeal further up the chain of command, but he conceded that no written policy allows for such an appeal.  Nov. 3 Rule 30(b)(6) Deposition at 191-92.

- Sergeant Jacumin conceded in his May 24, 2011 deposition that Defendants' online summary of their mail policies failed to provide accurate information.  May 24, 2011 Rule 30(b)(6) Deposition (Doc. No. 84-17) at 153-54.  At the time of Sergeant Jacumin's deposition on November 3, the online summary *still* contained numerous inaccuracies regarding the Detention Center's mail policy.  Nov. 3 Rule 30(b)(6) Deposition at 209-211.  Even to this day, the online policy does not state that mail that contains staples is prohibited.  Shapiro Decl., Ex. Q.

- Defendants' Rule 30(b)(6) witness asserted that religious publications with staples were allowed between June 2009 to mid-2010 but agreed that no written policy reflected this practice, which was "just another verbal order" in violation of written policy.  Nov. 2 Rule 30(b)(6) Dep. at 126-128.

- With regard to another publication policy, the Detention Center's Rule 30(b)(6) witness testified:  "It's not written down.  If [a detainee] would ask a staff member, they would tell him …"  Nov. 2 Rule 30(b)(6) Dep. at 198-99.

- When asked why another policy was not followed, Defendants' Rule 30(b)(6) witness responded:  "Because I didn't write it.  I can't tell you why it's in here."  Nov. 2 Rule 30(b)(6) Dep. at 255.

- Plaintiffs' prior submissions cited several other deviations from written policy contained in both deposition testimony, Pl. Reply at 19 n.52, and Defendants' log of rejected mail. Pl. Mem. at 25-26.

It appears that policies are frequently violated in part because command staff lacks a basic understanding of the Detention Center's written procedures, which further underscores the need for judicial intervention to ensure that policies are enforced. Captain McElvogue, the head of the Detention Center, approved the September 1, 2011 version of the Detention Center's correspondence policy, HFDC 706, in August of 2011. McElvogue Dep. at 108. Yet during his deposition in November of 2011, McElvogue could offer no explanation of key terms in the policy. As detailed below, McElvogue answered basic questions about definitions in the policy with phrases like "I'm not sure exactly," "I'm not real sure. You got me there," and "everyone would have a different opinion probably."

### i.    *The term "considered inappropriate"*[20]

Q    So what's the definition of considered inappropriate?
A    *I'm not sure exactly.* The definition to me would be something that would create or cause an environment that, you know, sexuality with two females back there, all males, what could be drawn on it, the images that could come from it with them drawing. It would create them back there masturbating or fighting, or just a number of things.
Q    So what you just testified to is the definition of considered inappropriate under HFDC-706?
A    But I believe you asked me if I'd go out – I find it inappropriate based on the environment with males back there. I don't know if Sergeant Jacumin found it inappropriate, but it didn't go back. So I'm not sure what their calls was. Mine would be that it was inappropriate to go in a housing area with all males because of what it could cause.
    …
Q    And considered inappropriate could depend upon who's making the decision, right?
A    *Yes, sir.*
...
Q    But there is no guidance as to what the term considered inappropriate means in the policy; is that right?
A    *No, sir.*
    …

---

[20] The September 1, 2011 version of HFDC 706 banned "any photo that is considered inappropriate…" Dec. 20 Jacumin Aff., Ex. B at 2.

Q        So the definition of considered inappropriate would depend on who at the detention center is looking at an image?

A        Right, circumstances and all. I think *everybody would have a different opinion probably.*

Q        Everyone could have a different opinion as to whether or not an image was considered inappropriate?

A        Right.

McElvogue Dep. at 64-67; 100-01 (emphasis added).

## ii.    *The term "general circulation"*[21]

Q        What is the definition of general circulation for purposes of this policy?

A        It could be a newspaper or anything that generally provides an interest for the inmates. First groups of people in there, where they could get general information, circulation, different – to me, I know – I know the newspaper has been allowed in because there is various types of news they can get, circulate throughout the detention center. You got various different diverse groups of people in there. What is it you're really looking for? I mean, I don't. . .

Q        I'm just trying to understand the meaning of the term general circulation in the policy.

A        To me I guess it would mean just a different variety of ways of getting news that circulate in different – news to different groups of people. Whether it's magazines, newspapers. *I'm not real sure. You got me there.*

Q        So you don't know what the definition of general circulation is?

A        General circulation to me would be something that's circulated throughout the facility to various groups of people. That could be newspapers, magazines, different articles, texts, just in general news circulating throughout.

Q        Circulated throughout where?

A        Throughout the facility for the inmates. I know now the newspaper is coming in. Of course, it's coming from the publisher.

Q        The definition of general circulation depends on whether the newspaper is circulating within the institution?

A        Well, the newspaper is allowed in only if it comes from, like I said, the publisher. It's not just 100 copies in there, but it's throughout. It has ways of various groups of people in there, very diverse people, groups, that whether they're reading the newspaper, getting one portion of it, it's circulating around. Just way of them getting news, so publications. Exactly what you're looking for, I don't know.

Q        I'm just asking for the definition of general circulation in the policy that you approved. Do you have any further explanation of it?

---

[21] Both the most recent version of HFDC 706 and the September 1, 2011 version refer to "magazines of general circulation."  Dec. 20 Jacumin Aff., Ex. B at 2 & Ex. E at 2.

A        *No, sir.*

McElvogue Dep. at 97-98 (emphasis added).

## C.    Plaintiffs Are Entitled to Injunctive Relief Regarding their Due Process Claims.

Defendants' notice and appeal practices remain unconstitutional.  Under binding Circuit precedent, appeals regarding rejected correspondence must allow for "an ultimate decision by a disinterested party not privy to the initial censorship determination."  *Hopkins v. Collins*, 548 F.2d 503, 504 (4th Cir. 1977).[22]  In this case, Sergeant Jacumin rules on all appeals.  *See, e.g.*, Wright Decl., Ex. B (Letters from Sergeant Jacumin to *Prison Legal News* with Bates numbers 1955 and 2553 stating that Jacumin would decide appeals).  But Sergeant Jacumin is the very antithesis of "a disinterested party not privy to the initial censorship determination," *Hopkins*, 548 F.2d at 504, because he is intimately involved in the initial decision about which publications to deliver:

Q        But Sergeant Jacumin doesn't make the decision to accept or reject most
         publications that come in, right?
A        About 95 percent of them he does. If there is a question, it comes right to
         him.

Riley Dep. at 30.   After making these initial decisions, Sergeant Jacumin then rules on all appeals – "reviewing" decisions in which he participated in the first place, in clear violation of due process requirements.

The Detention Center also violates the Due Process Clause by failing to provide prompt notice of rejection.  Defendants did not provide notice that the August 2011 issue of *Prison*

---

[22] *See also Procunier v. Martinez*, 416 U.S. 396, 418-19 (1974) ("The District Court required … that complaints be referred to a prison official other than the person who originally disapproved the correspondence … [W]e affirm the judgment of the District Court with respect to the Department's regulations relating to prisoner mail."), *overruled in part on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 401 (1989); *see also Krug v. Lutz*, 329 F.3d 692, 698 (9th Cir. 2003) ("[T]he right to appeal the exclusion of incoming publications to a prison official other than the one who made the initial exclusion decision is … necessary.").

*Legal News* (Volume 22, Issue No. 8), mailed on August 9, had been censored until October 24, 2011.  Declaration of Paul Wright filed December 23, 2011 ("Dec. 23 Wright Decl.") ¶ 4.  Such inexplicable delay is particularly damaging to a monthly legal information journal that provides time-sensitive news to prisoners:  the news becomes outdated before Plaintiffs can discover the rejection and commence an appeal.  Moreover, due process requires prompt notice of the reason for rejection.  *Thornburgh v. Abbott*, 490 U.S. 401, 406 (1989) (upholding prison mail regulations where "[t]he warden must advise the inmate promptly in writing of the reasons for the rejection"); *Leachman v. Thomas*, No. 99-20209,  2000 WL 1239126, at *7 (5th Cir. Aug. 9, 2000) (stating that the Supreme Court upheld the regulations at issue in *Thornburgh* in part because the regulations required the warden "to advise the inmate promptly in writing of the reasons for the rejection"); *Sutton v. Stewart*, 22 F. Supp. 2d 1097, 1110 (D. Ariz. 1998) (finding prison mail policy valid based on "prompt notification that a piece of incoming mail has been rejected").

Notice also remains insufficient because the Detention Center provides conclusory reasons for rejection, and the lack of an intelligible explanation precludes a meaningful appeal. *Hopkins*, 548 F.2d at 504 (facility must provide "appropriate notice"); *Murphy v. Missouri Dep't of Corr.*, 814 F.2d 1252, 1258 (8th Cir. 1987) (facility must "notify the inmate in writing when materials were withheld and, in each case, … state reasons for that decision").  Rejection notices sent to *Prison Legal News* state in conclusory terms that issues are rejected due to "pornography," without any definition of the term.  Dec. 23 Wright Decl., Ex. A (Bates numbered documents 2483, 2485, 2489, 2599).  In responding to detainee appeals, the Detention Center similarly puts forth no comprehensible standard, providing such conclusory reasons as:

"The content is considered inappropriate."  Shapiro Decl., Ex. R (Bates numbered document 2310).

Further compounding the due process violation, counsel has told staff how to rule on appeals in advance, rendering such appeals meaningless.  *See supra* at 21 (counsel instructed a Detention Center official to an reject appeal from *Prison Legal News* before the appeal was filed). "A hearing with a predetermined outcome does not satisfy due process."  *D'Angelo v. Winter*, 403 Fed. Appx. 181, 182 (9th Cir. 2010).

Thus, even if the Court examines only the Detention Center's current notice and appeal practices, preliminary injunctive relief is necessary to ensure due process.  But such relief is also necessary because Defendants have changed their notice and appeal policies – like all other correspondence policies – back and forth, leaving no reason to believe that current policies will remain in force in the absence of an injunction.  When Plaintiffs filed the Motion for Preliminary Injunction on May 4, 2011, the Detention Center provided no notice to detainees when a publication was rejected, no notice to publishers other than incomprehensible notations scrawled on returned items, and no appeals process for publishers or detainees.  Pl. Mem. at 11-12.  Sergeant Jacumin testified that on or about May 12, 2011 – eight days after Plaintiffs' Motion for Preliminary Injunction was filed – Defendants began providing notice to detainees.  May 24, 2011 Rule 30(b)(6) Dep. (Doc. No. 84-17) at 15-16.  This change was not codified in any written policy; in fact, a new version of HFDC 706, which contained no notice requirement whatsoever, was issued on May 12, 2011.  Dec. 20 Jacumin Aff., Ex. B.  And even under the informal change in practice that occurred on or about May 12, Defendants still provided no appeals process for detainees or publishers, nor did Defendants change the inadequate notice practices that applied to publishers.  May 24 Rule 30(b)(6) Dep. (Doc. No. 84-17) at 15-16.  At some later point,

Defendants began to allow appeals by publishers and detainees, but provided only two days for a publisher to appeal. Dec. 23 Wright Decl. Ex. A (rejection notice with Bates number 2217, providing two days for publisher to appeal). Defendants then made yet another informal change in policy, extending the appeals period for publishers to seven days and manually crossing out the relevant section of the rejection notice. Dec. 23 Wright Decl. Ex. A (rejection notice with Bates number document 2483). Defendants continued to tinker with these provisions in a subsequent version of HFDC 706. Dec. 20 Jacumin Aff., Ex. E.

**D.    The Proposed Order Submitted by Plaintiffs Complies with 18 U.S.C. § 3626.**

During the December 8, 2011 conference, the Court requested briefing as to whether the proposed order submitted by Plaintiffs complies with the Prison Litigation Reform Act ("PLRA"). Section 18 U.S.C. § 3626(a)(2) provides:

> **Preliminary injunctive relief.**–In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. *Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm.*

18 U.S.C. § 3626(a)(2) (emphasis added). An order that lacks these findings is subject to immediate termination. 18 U.S.C. § 3626(b)(2). *See Cagle v. Hutto*, 177 F.3d 253, 257 (4th Cir. 1999) (consent decree terminated because "the district court never made the findings required by § 3626(b)(2)"); *see also Gates v. Fordice*, 1999 WL 33537206, No. 4:71cv6-JAD, at \*3-\*5 (N.D. Miss. Jul. 19, 1999) (granting preliminary injunction and stating: "[T]he court finds that the injunctive relief is appropriate and that it can be narrowly drawn to meet the dictates of the PLRA. The court believes that the requirements ordered by the court are narrowly drawn and are necessary to correct the violation of HIV positive inmates' right to adequate medical care and is the least intrusive means of correcting the violation.").

In this case, the Proposed Order submitted by Plaintiffs would, if issued by the Court, comply with the PLRA's preliminary injunctive relief provision because the Proposed Order states: "The preliminary injunction set forth below is narrowly drawn, extends no further than necessary to correct the harm the Court finds requires preliminary relief, and is the least intrusive means necessary to correct that harm." Proposed Order ¶ 6.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant their Motion for Preliminary Injunction.

DATED:  December 23, 2011

Respectfully Submitted,

ATTORNEYS FOR PLAINTIFFS
s/Susan Dunn
Susan Dunn
Federal Bar No. 647
Legal Director
ACLU of South Carolina
P.O. Box 20998
Charleston, SC 29413-0998
(843) 720-1425
Fax: (843) 720-1428
sdunn@aclusouthcarolina.org

David M. Shapiro
dshapiro@npp-aclu.org
David C. Fathi*
dfathi@npp-aclu.org
ACLU National Prison Project
915 15th St., N.W., 7th Floor
Washington, DC 20005
(202) 715-0838
Fax: (202) 393-4931
*Not admitted in DC; practice limited to federal courts

Lance Weber
Human Rights Defense Center
P.O. Box 2420
West Brattleboro, VT 05303
(802) 579-1309
Fax: (866) 735-7136
lweber@humanrightsdefensecenter.org