IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| PRISON LEGAL NEWS and HUMAN RIGHTS DEFENSE CENTER, | Civil Action No.: 2:10-cv-02594-SB-BM |
| Plaintiffs, | |
| U.S. DEPARTMENT OF JUSTICE, | |
| Intervenor, | |
| v. | |
| BERKELEY COUNTY SHERIFF H. WAYNE DEWITT, individually and in his official capacity; CAPTAIN CLIFF McELVOGUE, individually and in his official capacity; LIEUTENANT TONY RILEY, individually and in his official capacity; JOHN DOE 1, 2, 3, &4, each Berkeley County Detention Center employees, individually and in his/her official capacity, | |
| Defendants. | |
| BERKELEY COUNTY SHERIFF H. WAYNE DEWITT and BERKELEY COUNTY SHERIFF'S OFFICE, | |
| Defendants/ Intervenees, | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants respectfully submit this memorandum in support of their Motion for Summary Judgment on the grounds that there are no genuine issues of material fact. Defendants believe that the motion is appropriate at this time, and even before discovery has ended, because the Court should rule on immunity

1

issues as a matter of law and "secure the just, speedy, and inexpensive" disposition of this case. Fed. R. Civ. P. 1.

## OVERVIEW

The core dispute in this case is about staples—may a county jail prohibit inmates from receiving items containing staples in the mail because of the risks they pose to the facility's safety and security?  There has been a no-staples rule at the jail since before this suit and Plaintiffs' primary publication is bound together with staples.  Ultimately, this case's disposition turns on whether the jail's content-neutral staples ban is constitutional.

Plaintiffs Prison Legal News and the Human Rights Defense Center (collectively, "Plaintiffs") are publishers and senders of the magazine *Prison Legal News*.  They also distribute other materials, such as books and Internet content.[1]  *Prison Legal News* generally claims to advocate for prisoner rights and often features critical commentary about the policies and practices of correctional departments across the nation.  The publication looks similar to a newspaper, but it is a magazine bound by staples.[2]  After Plaintiffs filed suit alleging constitutional violations, the United States Department of Justice ("DOJ") intervened in this action largely in response to media accounts that the jail allowed only Christian Bibles to inmates.[3]  However, primary books for all religions have been allowed at the facility for years.[4]  The unfortunate vernacular found in one policy did state that only soft-bound "bibles" were permitted, but the jail's Inmate Hand Guide, Religious Diets and Vestments policy (enacted pre-suit and at least by June of 2009), and the deposition testimony of staff members have explained that "bible" and "Bible" were considered to include any primary religious book or text and not

---

[1] However, Plaintiffs are not "distributors" of many books they offer for sale.
[2] *See* Paul Wright Decl. ¶ 26, May 3, 2011, ECF No. 47-2.
[3] *See* Senn Aff. ¶ 2, May 27, 2011, ECF No. 66.  In a separate motion, Defendants will move for summary judgment on all claims asserted by DOJ in its Complaint in Intervention.
[4] Shuler Aff. ¶ 10, May 27, 2011, ECF No. 70.

just the Christian Bible.[5]   Bible with a lowercase "b" refers to any book containing the sacred writings of a religion or a book regarded as authoritative (e.g., the angler's bible), while the capitalized version of the word generally is defined as the writings of the Christian religion, comprising the Old and New Testaments.  *See Collins English Dictionary* (9th ed.).   However, this case is not about the Christian Bible or alleged preferential treatment given to inmates of that faith.

Hill Finklea Detention Center is a rural county jail that houses pretrial detainees. Overcrowding at this old facility is a problem.[6]   Although a new addition to the jail has been built which would ease overcrowding, the state is mandating that a minimum of thirty-eight correctional officers be added to the payroll before the new facility can open.[7]   The jail's funding comes from the Berkeley County budget, which also faces the issue of limited resources.[8]   Like any other detention facility, the jail has rules governing inmate access to reading materials through the mail.   In the past, inmates were not allowed to receive magazines and other periodicals unless on the limited canteen list.   However, current policies do in fact permit a wide range of religious and non-religious reading materials.[9]   Pursuant to a content-neutral policy, jail officials reject incoming mail that contains staples, paperclips, or tape.[10]   If incoming mail does comply with policy, only then will officials review its content.   A publication will be rejected on

---

[5] *See* Jacumin Dep. 210:4–24, 211:1–10, May 25, 2011 (attached).  Staff members at the jail considered, for example, a Koran, a Torah, or any other primary religious book to be that religion's "bible" and permitted inmates to have those books so long as they were soft cover books.  *See id.* at 211:8–25, 212:1–22.  Older copies of the policies were not maintained, and June 2009 is the operative date for the policy at issue in this case.  *See* Jacumin Supplemental Aff. ¶ 19–21, May 27, 2011, ECF No. 68.
[6] The jail facility is currently rated for 154 beds and typically houses around 380 inmates.  Jacumin Aff. ¶ 4, May 4, 2011, ECF No. 52.
[7] Davis Aff. ¶ 2–4, May 27, 2011, ECF No. 64-2.
[8] *Id* at ¶ 5–6.
[9] HFDC Policy 706 is the jail's "Inmate Correspondence" policy, which jail officials have revised since this litigation began.  Jacumin Supplemental Aff., Dec. 20, 2011, at Ex. A, B, & C (attached).
[10] Jacumin Supplement Aff., Dec. 20, 2011, at Ex. C.

the basis of its content if it contains sexually explicit or pornographic materials.[11]  The definition of "pornographic" or "sexually explicit" has always been within constitutional guidelines in all policies, though the jail now has a written policy utilizing Federal Bureau of Prisons language, which diminishes the discretion allowed to mailroom personnel.[12]

Plaintiffs have sent copies of *Prison Legal News* along with subscription information and solicitation materials to inmates housed at the jail.[13]  But, it is unproven that prior to this litigation *any* inmates were actually subscribers.  Plaintiffs have not produced any evidence in this regard.  Jail officials have testified that they were not aware of any *Prison Legal News* subscribers in the facility pre-suit, nor were they aware of any inmate demand for the magazine before initiation of this lawsuit.[14]  Also, Plaintiffs have not shown any documentary evidence demonstrating that they had any *pre-suit* subscribers at the jail.  While Plaintiffs also challenge the jail's content-based rejection policies, what is really at issue here is a blanket prohibition against staples.  Because *Prison Legal News* is bound with staples (which Plaintiffs refuse to remove before mailing it), the magazine does not comply with jail policy and is not permitted.

## SUMMARY JUDGMENT STANDARD

Summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

---

[11] *Id.*

[12] During the pendency of this lawsuit, the jail revised its definition of "pornography" to duplicate that used by the Federal Bureau of Prisons.  It is set out in the Correspondence Policy, HFDC 706 (attached as exhibit to Jacumin affidavit).  This definition was recently placed into the formal policy and signed by Sheriff DeWitt.  However, it has been used in practice by mailroom staff for over a month.  Jacumin Supplemental Aff. ¶ 12, Dec. 20, 2011.

[13] *See* Paul Wright Supplemental Decl., ¶ 3, June 16, 2011.

[14] Demand at many institutions is low, and generally only rises when suit is filed.  *See* Leach Expert Report 30 (attached).  Moreover, Plaintiffs utilize "a strategy of increased unsolicited mailings that would have a significant impact on agency resources to process."  *Id.*  As part of its business strategy, members of Human Rights Defense Counsel employ a deceptive practice whereby they send solicitation letters to inmates disguised as confidential legal communications.  *Id.*  This practice causes a significant increase in mailings to inmates of prohibited and unsolicited items.  *See* Shuler Aff. ¶ 4, May 27, 2011, ECF No. 70.

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Although the party moving for summary judgment must show there is no genuine issue of material fact, Rule 56 provides that the nonmoving party "opposing a properly supported motion for summary judgment may not rest on the mere allegations of his pleadings but must set forth or point to specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see* Fed. R. Civ. P. 56(e). Courts draw "all justifiable inferences" in the nonmoving party's favor, but must also "distinguish between evidence of disputed facts and disputed matters of professional judgment." *Beard v. Banks*, 548 U.S. 521, 530 (2006). Regarding issues that are matters of professional judgment, any "inferences must accord deference to the views of prison authorities." *Id.* (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)).

## LAW AND ARGUMENT

Plaintiffs allege that Defendants violated their rights, as secured by the First and Fourteenth Amendments. Specifically, Plaintiffs maintain their First Amendment rights were violated when its materials were not delivered to jail inmates. Plaintiffs further claim violations of their procedural due process rights because non-policy compliant issues of *Prison Legal News* were returned to sender. However, Plaintiffs' suit amounts to an improper attempt to substitute their judgment for that of the professionals responsible for running the jail, and they have failed to "overcome the presumption that the [jail] officials acted within their 'broad discretion'" in developing their policies and practices on incoming mail." *Shaw v. Murphy*, 532 U.S. 223, 232 (2001) (quoting *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989)). Defendants therefore respectfully submit that summary judgment is warranted on all Plaintiffs' causes of action.

## I.

### DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE MERITS OF PLAINTIFFS' FIRST AMENDMENT CLAIMS

**A.    Plaintiffs' Establishment Clause claims for prospective relief are unnecessary.**

In the past, jail inmates were only allowed to possess their primary religious text.[15]   The jail's current policies and practices, however, have cured any supposed Establishment Clause violation by permitting inmates to access a wide range of secular and religious reading materials.[16]   The Supreme Court has held that laws of general applicability that have the incidental effect of burdening religious conduct do not violate the First Amendment's Establishment Clause.  *Employment Division v. Smith*, 494 U.S. 872, 890 (1990).  In evaluating an alleged violation of the Establishment Clause, the critical issue is neutrality—it operates to prevent governmental decisionmakers "from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters."   *Corp. of the Presiding Bishop v. Amos*, 483 U.S. 327, 335 (1987).   The general test for determining whether government action is constitutional under the Establishment Clause has three prongs; specifically, government action: (1) must have a legitimate secular purpose; (2) must not have the effect of impermissibly advancing or inhibiting religion, and (3) must not result in excessive governmental entanglement with religion.  *Lemon v. Kurtzman*, 403 U.S. 612–13 (1971).  The jail's current policies and practices, which apply neutrally to all incoming mail, easily satisfy the *Lemon* test.[17]   Even if the

---

[15] *See* Jacumin Aff. ¶ 4, May 4, 2011, ECF No. 52; Wilder Dep. 34–37, Apr. 13, 2011, ECF No. 67-1.

[16] *See* HFDC Policy 706 & Revised Policy (attached).  Additionally, a wide variety of religious books are available in the jail's library for inmates to check out on request.  Jacumin Memo. to Detainees/Inmates, Oct. 18, 2011 (listing religious books available) (attached).

[17] *See* HFDC Policy 706 & Revised Policy; HFDC Policy 711 & Revised Policy (attached).  In 2000, Congress passed the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, which adopted "a more searching standard" with respect to governmental regulation of land use and institutionalized persons.  *Madison v. Riter*, 355 F.3d 310, 315 (4th Cir. 2003).  However, RLUIPA does not apply to Plaintiffs' Establishment Clause claims because they do not have standing under that law.  *See* 42 U.S.C. § 2000cc-1(b).

no-staples rule has the incidental effect of making it more difficult for some publications to enter the jail through the mail, such does not rise to the level of a constitutional violation.

With respect to Plaintiffs' complaints about past policies and practices that have been revised, their ongoing request for relief is moot.  A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Powell v. McCormack*, 395 U.S. 486, 496 (1969); *see also Doe v. Kidd*, 501 F.3d 348, 354 (4th Cir. 2007) (same).  Where, as here, the defendants' voluntary conduct cures an alleged violation, such "does not deprive a federal court of its power to determine the legality of the practice unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks and citations omitted).  However, it is a well-settled principle that, absent extraordinary circumstances, the federal courts should not "immerse themselves in the management of state prisons or substitute their judgment for that of the trained penological authorities charged with the administration of such facilities."  *Taylor v. Freeman*, 34 F.3d 266, 268 (4th Cir. 1994).  Considerations of federalism and comity "underlie this fundamental principle of federal judicial restraint."  *Id.*  Moreover, "[e]ven where there has been a finding on the merits that unconstitutional conditions exist, federal courts should proceed cautiously and incrementally in ordering remediation so as not to assume the role of prison administrators."  *Id.* at 269.  States must be given "the first opportunity to correct the errors made in the internal administration of their prisons."  *Id.* (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973)).

Here, officials have voluntarily revised the jail's policies to replace the unpopular vernacular "bible" with "any religious texts."[18]  Their practices have never inhibited or advanced religion, and any Establishment Clause issues are not "live."[19]   In addition, Defendants will maintain the policies as revised.  It is also "absolutely clear" that Plaintiffs' mail will not be rejected for being of a secular nature.  Their magazines are rejected pursuant to the jail's no-staples rule, which applies generally and equally to all incoming mail.  As has now been admitted by Plaintiffs and DOJ, pre-suit rejections have many times been made due to staples, a fact which cannot be denied and has roots deeply embedded in valid security and health concerns.[20]   Thus, Plaintiffs' ongoing Establishment Clause claims for prospective relief are unnecessary and improper.

**B.    Plaintiffs do not have a freestanding First Amendment right to send unsolicited materials to incarcerated persons.**

The Supreme Court has indicated that, in challenges to jail and prisons regulations restricting speech, the first question is whether a First Amendment interest is even implicated. *See Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989).  In *Thornburgh*, the Court concluded that "publishers who wish to communicate with those who, through subscription, willing seek their point of view have a legitimate First Amendment interest in access to prisoners."  *Id.*   Only because the Court found such an interest was implicated did it apply the *Turner* test to next determine whether the plaintiffs had a protected First Amendment right to send and receive the

---

[18] HFDC 711, "Religious Diets and Vestments" Policy.

[19] Although Plaintiffs claim that the jail's allowance of religious material other than the Christian Bible was *post hoc*, the deposition testimony of staff members explained that any primary religious book or text was permitted under prior policy and practice.  Jacumin Dep. 210:4–11, 15–25, 211:1–10; Shuler Aff. ¶ 10, ECF No. 70.

[20] *See* Jacumin Supplemental Aff. ¶ 7–17, May 27, 2011, ECF No. 68; Garrett Aff. ¶ 5, Apr. 27, 2011, ECF No. 68-2; Taschner Aff. ¶ 3–4, Apr. 27, 2011, ECF No. 53; Harvey Aff. ¶ 3–5, Apr. 27, 2011, ECF No. 55; *see also* discussion *infra* Part I.C; Leach Aff. ¶ 36, May 26, 2011, ECF No. 65; Deland Expert Report 29–30, Dec. 21, 2011 (attached).

publications at issue.  *See id.* at 419.  Here, to the extent that Plaintiffs have not proved that jail officials refused to deliver publications to inmates who, on their own initiative, actually requested or otherwise willingly sought them, the issue is whether a First Amendment interest was implicated in the first instance.  Because Plaintiffs do not have a freestanding right under the First Amendment to distribute and send mail to the jail, the no-staples rule should be upheld as a reasonable and viewpoint neutral restriction on the sending of unsolicited materials.

In general, First Amendment free speech analysis begins by determining whether speech is "protected speech."  *ACLU v. Mote*, 423 F.3d 438, 442 (4th Cir. 2005) (citing *Goulart v. Meadows*, 345 F.3d 239, 246 (4th Cir. 2003)).  If so, the nature of forum will determine "the extent to which the Government may limit access."  *Id.* (quoting *Goulart*, 345 F.3d at 246) (internal quotation marks omitted).  The Supreme Court has held that jails and prisons are non-public forums where government has broad latitude to restrict access.  *See Adderley v. Florida*, 385 U.S. 39, 41 (1966).  A jail is not only *not* a public forum, but it is also among the most restricted and non-public of all government properties.  *See United States v. Douglass*, 579 F.2d 545, 549 (9th Cir. 1978) ("[Jails are] public institutions which do not perform speech-related functions at all . . . [and] the government is free to exclude even peaceful speech and assembly which interferes in any way with the function of those organizations.").  In a non-public forum such as the jail, speech restrictions "should be upheld if they are viewpoint neutral and reasonable 'in light of the purpose of the forum and all the surrounding circumstances.'"  *ACLU v. Mote*, 423 F.3d at 443 (quoting *Warren v. Fairfax Cnty.*, 196 F.3d 186, 193 (4th Cir. 1999)).

The Fourth Circuit has previously found that the First Amendment protects a publisher's access to inmates who have requested its publications.  *Montcalm v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996).  But, there is no precedent suggesting that publishers have a special right to require

jail officials to distribute unsolicited publications.[21]   Without evidence that individual inmates requested subscriptions to *Prison Legal News*, no inmate rights are implicated by the no-staples rule and Plaintiffs' claim is that they were denied a First Amendment right to solicit readership by mail.  As solicitors attempting to advertise a product to inmates, Plaintiffs do not have a right to demand a change in jail policy that would provide them a *per se* special right of access beyond that available to other members of the public.  *See generally Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 809 (1985) ("The First Amendment does not demand unrestricted access to a non-public forum merely because use of that forum may be the most efficient means of delivering the speaker's message."); *Houchins v. KQED*, 438 U.S. 1, 11 (1978) (recognizing that the public's right of access to a prison or jail is strictly limited); *Pell v. Procunier*, 417 U.S. 817, 834 (1974) (holding that members of the press have "no constitutional right of access to prisons or their inmates beyond that afforded the general public").  The jail is a secure environment and the First Amendment does not protect a "right" to solicit business or subscribers in a non-public forum.  Outsiders simply do not have a constitutional right to distribute flyers, handbills, or other literature at the jail, and even visitors are subjected to searches (as Plaintiffs' attorneys are surely aware, having visited the jail themselves).

Without a subscription relationship, the only manner in which the jail's rules restrict Plaintiffs is by denying general access to the jail much like many other businesses and members of the public who might seek to solicit business from inmates are restricted.  Under these circumstances, the jail's content-neutral ban on staples does not implicate the First Amendment.

---

[21] The Ninth Circuit recently held that there publishers and inmates have a First Amendment interest in distributing and receiving unsolicited publications.  *Hrdlicka v. Reniff*, 631 F.3d 1044, 1049 (9th Cir. 2011).   But, the decision was met with a powerful dissent criticizing its reasoning, *see id.* at 1055–58 (Smith, J., dissenting), and in any event, it is not the law of this circuit.  *Cf. Montcalm v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996) ("[T]his case involves *only* the relationship between Montcalm and particular inmate subscribers." (emphasis added)).

C.    **The jail's no-staples rule is reasonably related to legitimate penological interests.**

The First Amendment encompasses a right to receive written communications and the freedom to communicate one's views, and incarcerated persons do not lose these rights altogether simply because of their confinement.  *See Thornburgh v. Abbott*, 490 U.S. 401, 413–14 (1989); *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  However, First Amendment rights that involve the distribution of materials to inmates may be circumscribed when legitimate penological objectives outweigh the preservation of those rights.  *See Turner v. Safley*, 482 U.S. 78, 85 (1987); *Thornburgh*, 490 U.S. at 407–08.  These objectives include, for example, maintenance of institutional order and security, deterrence of crime, and rehabilitation of inmates.  *See, e.g.*, *Turner*, 482 U.S. at 85.  Judicial review of a detention center's policies and practices must also be informed by the substantial deference and flexibility given to the officials responsible for the management of the facility.  *See Sandin v. Conner*, 515 U.S. 472, 482 (1995). The constitutional protections that are afforded to outsiders seeking access are necessarily limited by the nature and purpose of the institution.  *See Guajardo v. Estelle*, 580 F.2d 748, 762 (5th Cir. 1978).

Plaintiffs challenge the jail's no-staples rule, basing their claims on their desire to communicate with inmates by mail.  Although publishers have a First Amendment interest in communicating with their inmate-subscribers, Plaintiffs' allegations overstate what is constitutionally required to protect that interest and fail to appreciate the countervailing interests of jail officials.  *See generally Shaw v. Murphy*, 532 U.S. 223, 229–30 (2001) (applying the standard enunciated in *Turner v. Safley*, 482 U.S. 78 (1987) to all claims that implicate the First Amendment rights of prisoners).  The issue is fundamentally one of whether rejection of

incoming mail for failing to comply with jail policy is reasonably related to a legitimate penological interest. *See id.* at 230 (citing *Turner*, 482 U.S. at 89).

Courts have held that a wide variety of jail and prisons rules regulating incoming mail are "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89; *see, e.g.*, *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009) ("Prisons have great latitude in limiting the reading material of prisons, and it takes no great leap to understand the prison's reasons for wanting an article about a prison riot and images of gang signs kept away from inmates."); *Guajardo v. Estelle*, 580 F.2d 748, 762 (5th Cir. 1978) (concluding that officials could, consistent with the First Amendment, limit prisoner access to sexually explicit materials); *Henderson v. Virginia*, No. 7:07-cv-00266, 2008 WL 792171, at *3–4 (W.D. Va. Mar. 25, 2008) (concluding defendants' refusal to allow inmates to possess commercially distributed photographs satisfied *Turner* analysis); *Smalls v. Johnson*, No. 7:06-cv-00029, 2006 WL 2456343, at *2 (W.D. Va. Aug. 21, 2006) (recognizing defendants' "legitimate interest in rehabilitating inmates, as well as in maintaining security, discipline, and order" and finding that sexually explicit materials negatively affect these interests). Here, the jail's no-staples rule requires staff to reject Plaintiffs' staples–bound magazines. Recognizing that the officials who manage such facilities are usually the ones who are best suited to make policy decisions, the Supreme Court has directed courts to apply "a unitary, deferential standard" of review. *Shaw v. Murphy*, 532 U.S. at 229; *see also In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 469 (4th Cir. 1999) (emphasizing that officials are best positioned to evaluate and respond to threats to discipline and order). Under this standard, the no-staples rule is constitutional.

In *Turner v. Safley*, 482 U.S. 78 (1987), the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89; *see also Beard v. Banks*, 548 U.S. 521, 528 (2006) (discussing *Turner*).   In making this determination, there are four relevant considerations: (1) whether there is a logical connection between the regulation and the governmental interests invoked to justify it; (2) whether there are alternative means for inmates to exercise the right; (3) the impact that accommodating the asserted right will have on other inmates, staff, and resources at the facility; and (4) whether there are any ready alternatives that can fully accommodate the inmates' right at a *de minimis* cost to penological interests. *Id.* at 89–91; *see Shaw*, 532 U.S. at 229–30.   *Turner*'s reasonableness standard is a flexible one, and the four factors operate to channel the inquiry to that end. *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989).

When applying *Turner*, courts "accord substantial deference to the professional judgment of prison administrators." *Overton v. Bazetta*, 539 U.S. 126, 132 (2003); *see also Thornburgh*, 490 U.S. at 407–08 ("[T]his Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world."); *United States v. Stotts*, 925 F.2d 83, 86 (4th Cir. 1991) (same).   In *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), the Court refined the second factor and disavowed any requirement that officials prove the absence of available alternatives. *See id.* at 350.   As the party challenging jail policy, Plaintiffs bear the burden of establishing a constitutional violation. *See Overton*, 539 U.S. at 132; *Hause v. Vaught*, 993 F.2d 1079, 1082 (4th Cir. 1993).   Because Plaintiffs are unable to meet their burden, their First Amendment claims must fail.

   **(1)     The no-staples rule is rational.**

The first factor, which the Court has emphasized to be the most important one, looks to whether there is a "valid, rational connection" between the rule and "legitimate governmental interest put forward to justify it." *Beard v. Banks*, 548 U.S. 521, 533 (2006). In applying this factor, it is "important to inquire whether prison regulations restricting inmates' First Amendment rights operate[] in a neutral fashion, without regard to the content of the expression." 482 U.S. at 89–90. A policy or regulation is "'neutral' in the technical sense" when "prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security." *Thornburgh v. Abbott*, 490 U.S. 401, 415–16 (1989). Also, the logical connection between the asserted justification and the regulation should not be "so remote as to render the policy arbitrary or irrational." *Id.* Fundamentally, the issue is whether the challenged restriction is reasonable. *See id.*

Here, officials, "relying on their professional judgment, reached an experience-based conclusion that the [jail's] policies help to further legitimate prison objectives." *Id.* These officials have supplied a non-arbitrary and rational connection that operates "in a neutral fashion" in support. *See Turner*, 482 U.S. at 90. Issues of *Prison Legal News* were returned to sender because they are bound with staples,[22] in violation of a content-neutral policy that has been in practice since at least 2002[23] and applies equally to all incoming mail.[24] There is no

---

[22] It is immaterial in the constitutional sense that the mailroom logs and the notations on the returned items did not always correctly state "staples" as the reason each time *Prison Legal News* was returned. This is because Defendants cannot be held liable under § 1983 for negligence or for violations of their own policies. Only violations of federal law are actionable under § 1983. *See Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979); *Baker v. McCollan*, 443 U.S. 137, 145–46 (1979).

[23] There has been a staples ban at the jail since at least 2002, and the no-staples rule has been set forth in writing since at least 2009 (older policies were not maintained). The policy has applied pre- and post-suit. *See* Jacumin Supplemental Aff. ¶ 18–23, May 27, 2011, ECF No. 68.

[24] Plaintiffs assert that their "expressive works" are "core protected speech" that provide "information about legal issues." Pls.'s Compl. paras. 1, 8, 27. However, the Supreme Court has made it clear that "the *Turner* test, by its terms, simply does not accommodate valuations of content." *Shaw v. Murphy*, 532 U.S. 223, 230 (2001). The supposed value of such information is thus not relevant to the analysis.

evidence of bias against *Prison Legal News*, as jail officials have enforced the no-staples policy with respect to other publications.[25]   Further, evidence in the record clearly demonstrates that the staples ban furthers the legitimate penological interests of safety, security, and effective management of the jail.[26]   Jail officials have a duty to review any and all incoming mail for security reasons.[27]   These officials have, in their informed discretion and based on their professional experience at the facility, determined that staples pose a safety and security threat to inmates and staff and increase the potential for property damage.[28]   Additionally, the presence of staples at the facility exacerbates other serious problems—for example, staples have been used as unsterile tattoo devices and to create makeshift battery chargers for cell phones (which are also prohibited).[29]   Documentation of such problems at the jail was not usually kept when staples or tattoo materials were found until after the Plaintiffs initiated this litigation.   Under prior practice, officials simply confiscated and discarded these items.[30]   Now, however, in just a matter of months, the evidence of staple abuse is abundant even though staples are contraband and should

---

[25] *See* Jacumin Supplemental Aff. ¶ 24, May 27, 2011, ECF No. 68; Shuler Aff. ¶ 11, May 27, 2011, ECF No. 70.

[26] *See id.* at 26–31; *see also* Leach Expert Report 22–33.   While staples may seem innocuous to outsiders, in the confinement setting, many "commonly found" items can be transformed into dangerous and destructive tools.  *Id.* at 29.

[27] Additionally, as part of providing humane confinement conditions, they have a duty to make reasonable efforts to protect inmates from violence and exposure to contagious disease.  *See Farmer v. Brennan*, 511 U.S. 825 (1994).

[28] Staples have been used destructively in a number of ways.   For example, they have been used to jam and irreparably damage locks, manipulate the electrical locking mechanisms of jail cells, remove the face from intercoms, arc electrical wires to light fires, tamper with plumbing fixtures, and create unsterile tattoo devices (which spread the MRSA disease).  Jacumin Supplemental Aff. ¶ 26–31, May 27, 2011, ECF No. 68; Leach Expert Report 22.  All of these destructive uses not only cause damage to the facility, but also pose security problems that threaten the safety of other inmates and jail staff.

[29] Jacumin Supplemental Aff. ¶ 6–17, 26–31, May 27, 2011, ECF No. 68.   As Defendants' expert notes, "The banning of staples is a legitimate penological interest in ensuring the health of the inmate population by minimizing the use of the staples as tattoo needles.   The medical costs associated with infectious diseases, especially MRSA, can quickly overwhelm many jails' budget[s]."  Leach Expert Report 30.

[30] Jacumin Dep. 43–46, May 24, 2011.

not be in the facility.[31]  Since the filing of this lawsuit, numerous tattooing items as well as wires manipulated with a staple have been found, confiscated, and kept by officials.[32]  In any event, the legal analysis does not turn on the volume of specific quantified evidence of damage caused by staples (which does exist, although apparently the quantum of evidence provided by the Defendants is not to Plaintiffs' liking).  Instead, what matters is the connection between the asserted objective and the challenged regulation.  *Turner v. Safley*, 482 U.S. 78, 89 (1987).  Additionally, the no-staples rule helps conserve the jail's limited resources with respect to monetary costs and staff time.[33]  Any of these articulated justifications alone would be sufficient, and evidence supporting each one overwhelmingly proves a "valid rational connection."

While Plaintiffs assert that Defendants must prove actual documented problems with staples to support their stated justifications, it is these "officials [who] are to remain the primary arbiters of the problems that arise in prison management," and not private plaintiffs.  *Shaw v. Murphy*, 532 U.S. 223, 230 (2001).  There is no requirement that officials demonstrate an "actual danger in order to support the reasonableness of their determinations."  *Espinoza v. Wilson*, 814 F.2d 1093, 1097–98 (6th Cir. 1987).  Rather, "[i]t is enough to show that a *potential* danger exists."  *Id.* (emphasis added).  The Seventh Circuit Court of Appeals recently addressed an argument similar to that advanced by Plaintiffs—the court found "unpersuasive" the suggestion that (because none of the security concerns advanced by the defendant prison officials had ever materialized) the justifications for the challenged action were merely pretextual.  *Van Den Bosch v. Raemisch*, 2011 WL 4089590, at *8 (7th Cir. 2011).  Significantly, the concern for security need only bear a rational *relationship* to a particular prohibition, and "[t]he essential question is not whether the [security] threats were eventually carried out, but whether plaintiff has shown

---

[31] Jacuimin Supplemental Aff. ¶ 6–17, 31, May 27, 2011, ECF No. 68.
[32] *Id.* at 6–12.
[33] *See id.* at ¶ 26–31; Shuler Aff. ¶ 4, 11, May 27, 2011, ECF No. 70.

that it was not reasonable for defendants to perceive the newsletter as a potential threat to rehabilitation and security." *Id.*  In any event, the evidence demonstrates that staples are not merely a potential problem at the jail.[34]  Staples actually threaten the jail's safety, security, and management goals,[35] and preventing such items from entering through the mail is of legitimate penological interest.

### (2)    Alternative means exist.

The second *Turner* factor explains that, if alternative means for exercising the asserted right remain available, "courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials.'"  *Turner v. Safley*, 482 U.S. 78, 90 (1987) (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)).  The relevant inquiry is not "whether the inmates were deprived of all means of expression."  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 352 (1987).  Instead, when applying the second factor:

> "[T]he right" in question must be viewed sensibly and expansively.  [For example, t]he Court in *Turner* did not require that prisoners be afforded other means of communicating with inmates at other institutions, nor did it in *O'Lone*

---

[34] Plaintiffs' experts correctly point out that, with respect to repair work done at the facility, many entries made by workers who are dispatched to repair damages are often not documented as having been caused by staples.  However, even if repair workers did not write up a work order form specifically identifying what exactly caused the damage, there is documentation of calls and bills for services.  Jacumin Aff. ¶ 6–7, May 4, 2011, ECF No. 52.  The affidavits and deposition testimony of officials and repairmen further demonstrates the actual causal connection between damage caused by staples and the need for repairs.  *See* Jacumin Dep. 232–35; Davis Aff. ¶ 7, ECF No. 64-2; Garrett Aff. ¶ 5, ECF No. 68-2; Taschner Aff. ¶ 3–4, ECF No. 53; Harvey Aff. ¶ 3–6, ECF No. 55.

[35] Plaintiffs make much of the fact that some of the legal pads sold at the jail's commissary contained hidden staples.  However, as soon as officials discovered that the pads had staples, they immediately switched to a glue-bound version.  Jacumin Supplemental Aff. ¶ 32, ECF No. 68.  A much larger county jail in Georgia experienced the same problem.  Leach Aff. ¶ 46, May 26, 2011, ECF No. 65 ("We recently found that the legal pads we sell on our commissary contain staples so be on the lookout for that also.").  Moreover, the officials' failure to discover the hidden staples at an earlier date is neither actionable by the Plaintiffs under § 1983 nor is it persuasive evidence that the staples ban is anything less than the product of legitimate concerns about security and property damage at the facility.  *Cf. Hause v. Vaught*, 993 F.2d 1079, 1083 (4th Cir. 1993) ("[I]n our view the efforts of prison administrators to accommodate First Amendment rights . . . should not be weighed against them in considering other measures adopted in the interest of security.").

> require that there be alternative means of attending the Jumu'ah religious
> ceremony. Rather, it held in *Turner* that it was sufficient if other means of
> expression (not necessarily other means of communicating with inmates in other
> prisons) remained available, and in *O'Lone* if prisoners were permitted to
> participate in other Muslim religious ceremonies.

*Thornburgh v. Abbott*, 490 U.S. 401, 417–18 (1989) (internal citations omitted) (citing *Turner*, 482 U.S. at 92; *O'Lone*, 482 U.S. at 351). A "sensible" and "expansive" view of the right at issue in this case is the First Amendment right of *inmates* to access information and ideas through reading materials. Where rules allow inmates to access a variety of reading materials, the Supreme Court has explained that "this factor is clearly satisfied." *Id.* at 418.

Jail policy and practice allows inmates to exercise their right to information and ideas by permitting access to a wide variety of publications.[36] Inmates may obtain religious and secular books, magazines, and other materials, including *Prison Legal News*, which is available for inmates to check out.[37] If incoming mail does not contain staples, paper clips, or tape and does not otherwise violate jail policy, then inmates may receive it.[38] Plaintiffs, however, complain that they rely on the mail to communicate with inmates and it would be "cost-prohibitive" for them to remove the staples from *Prison Legal News* before sending them to inmates.[39] This argument is misplaced because the concern is *not* with the rights of outsiders, but rather the ability of inmates to exercise their own First Amendment rights. *See Turner*, 482 U.S. at 90. Moreover, alternatives "need not be ideal," they only must be "available." *Overton v. Bazzetta*,

---

[36] In addition to reading materials, jail inmates also have access to a broad variety of television programming for significant times periods and from which they obtain information and ideas. *See* Leach Expert Report 16.

[37] With its own funds, the Berkeley County Sheriff's Office recently purchased four subscriptions to *Prison Legal News* for inmates to check out from the jail's law library. Current issues and back issues will be available in metal-free binders with the staples removed. Additionally, the jail has purchased several bookshelves and filled them with reading materials for inmates (although the inmates have already destroyed and pilfered the shelves as well as the books). *See* Jacumin Supplemental Aff., Dec. 20, 2011 & Exhibits (attached).

[38] Jacumin Aff. ¶ 4, May 4, 2011, ECF No. 52.

[39] Paul Wright Decl. ¶ 32, May 3, 2011, ECF No. 47-2.

539 U.S. 126, 135 (2003); *see also Hause v. Vaught*, 993 F.2d 1079 (4th Cir. 1993) (upholding a jail library as a constitutional alternative where inmates were denied any personal subscriptions). The no-staples rule does not operate as a complete ban on *Prison Legal News* or even the type of information contained therein.  Its effect is merely to require Plaintiffs to package and send mail in a proper manner, the same as any other sender.[40]

   **(3)**  **Impact of accommodation.**

   The third *Turner* factor considers "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90.  The concern is that accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or staff. *See Thornburgh v. Abbott*, 490 U.S. at 418.  Furthermore, "[i]n the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order." *Jones v. Salt Lake Cnty.*, 503 F.3d 1147, 1153 (10th Cir. 2007) (quoting 482 U.S. at 90).  Plaintiffs have failed to prove that the impact of changing jail policy to allow items containing staples will not negatively impact the jail's interests.

   While jail staff have on average processed admittedly few published items of mail with staples each day, an increase in individual subscriptions to daily, weekly, and monthly magazines containing staples would further increase (and has already increased) the amount of time necessary for staff to review and inspect incoming mail for security screening.[41] Accommodating Plaintiffs' demands would thus increase the administrative burden on jail staff. More importantly, based on legitimate concerns about staples, officials have determined that

---

[40] For example, Narcotics Anonymous representatives agreed to send, and have sent, their booklets and pamphlets without staples.  Jacumin Supplemental Aff. ¶ 24, ECF No. 68; Shuler Aff. ¶ 11, ECF No. 70.
[41] *See* Shuler Aff. ¶ 3–10; Lucas Aff. ¶ 8, May 27, 2011, ECF No. 70-1.

allowing them into the facility is not an option.[42]  This is true, notwithstanding the apparent argument of DOJ's expert, who claims that the jail is so insecure officials might as well let everything in its gates.[43]  While amusing, such an argument is not reasonable and is much like claiming that because one knife made its way into the facility, jail officials should just allow all to inmates possess knives.

Ultimately, Plaintiffs have not met their burden to demonstrate that allowing *Prison Legal News* to enter the jail containing staples would not impact the orderly management of the facility (and the evidence compels the opposite conclusion).  Because the no-staples rule is reasonable, any alleged ease of accommodation is not determinative.

### (4)    No readily available alternatives exist.

The fourth factor considers whether alternatives exist that would impose a "*de minimis* cost to valid penological interests" while fully accommodating the rights of inmates.  *Turner*, 482 U.S. at 90.  Although Plaintiffs claim that the jail's no-staples rule amounts to an "exaggerated response" to the concerns of jail officials, "[t]his is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint."  *Turner*, 482 U.S. at 90–91; *see also Block v. Rutherford*, 468 U.S. 576, 581 (1984) ("[W]e rejected in [*Bell v.]Wolfish* the suggestion that existence of less restrictive means for achievement of security objectives is proof of an exaggerated response to security concerns.").  In effect, Plaintiffs ignore the wide discretion given to jail officials when it comes to determining which items potentially

---

[42]  The jail's officials are not alone in their perception that access to staples presents a legitimate penological concern.  Plaintiffs are surely aware of this fact, since they filed suit earlier this year against the Sacramento County Jail where, as in this case, a core issue involves staples.  Leach Expert Report 30.  Plaintiffs have also acknowledged their involvement in two other cases where *Prison Legal News* was not allowed because of staples.  *See* Letter from David M. Shapiro, Re: Supplementation of Discovery Responses (Dec. 15, 2011) (attached).

[43]  *See* Clark Expert Report 17–18, Nov. 21, 2011, ECF No. 186-24.

endanger institutional security.  *See Thornburgh*, 490 U.S. at 413.  The fact that Plaintiffs happen to disagree with the professional judgment of jail officials in this regard is simply not enough to establish that challenged policies bear no reasonable relationship to legitimate penological concerns.

As an alternative to rejecting publications containing staples, Plaintiffs propose that the jail's mailroom staff remove the staples.  They argue that jail staff should be responsible for removing the staples from *Prison Legal News* because removing the staples on their end would be too burdensome.[44]  Significantly, of the few inmates identified as now desiring to receive a free subscription to their magazine, Plaintiffs claim that sending these items in regular envelopes without staples would overburden their office.  However, the Plaintiffs have previously indicated their ability and willingness to do just that—in 2011, they sent numerous copies of their magazine via envelope and subscriptions are solicited in that manner as well.[45]  Placing this burden on jail staff, on the other hand, would add to their current duties and require the hiring of additional mailroom personnel as their magazine is certainly not the only one bound with staples,[46] and the jail simply does not have the additional resources to commit to handling and screening an increased amount of staples-bound publications.[47]  Other jail officials have faced the same problem and have in their discretion taken differing approaches for handling it.[48]

---

[44] Paul Wright Decl. ¶ 31–32, ECF No. 47-2.

[45] *See* Shuler Aff. ¶ 6–7, ECF No. 70.

[46] Plaintiffs' expert also asserts that it takes more time for staff to take the necessary steps to return items to sender than it does for them to remove staples.  Even assuming that this were true, it fails to appreciate the fact that if mailroom staff neglects to remove the staples from even just one item that enters the jail, it has the potential to cause significant problems.  *See* Jackson Aff. ¶ 29–32, May 27, 2011, ECF No. 68-1.  The costs of additional staff time and resources that would be required to remove staples and handle problems caused by any staples that inadvertently make their way into the facility are not *de minimis* and detract from other valid penological aims.

[47] After the filing of this lawsuit, jail officials for a brief period of time removed staples from all items and allowed them into the facility.  This effort was undertaken in an attempt to determine whether it would be feasible for jail staff to bear the burden of removing the prohibited staples as the Plaintiffs claim they should.  However, the practice created problems for mailroom staff as it encouraged more and more

Further, Berkeley County is already struggling to obtain funding to hire thirty-eight additional officers required by the state to open its new jail facility.[49]  The county's priority is understandably focused on hiring those officers due to the overcrowding problems at the jail, and Plaintiffs should not be permitted to substitute their judgment for that of jail officials by in effect requiring its limited resources to go towards hiring additional mailroom staff.  Importantly, Plaintiffs have demonstrated that they have a healthy first-class mailing budget,[50] and any burden should be on those who seek to profit from the inmate population.

**D.    Summary.**

Plaintiffs have not met their burden to establish that the jail's no-staples rule is not "reasonably related to legitimate penological interests."  All issues of *Prison Legal News* contain staples and can legitimately be rejected pursuant to the no-staples rule.  Plaintiffs simply cannot overcome the "substantial deference" accorded to the jail officials' professional judgment, and they have failed to show that Defendants violated their First Amendment rights.

## II.

## DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DUE PROCESS CLAIMS.

The Due Process Clause has a limited reach in the restrictive environment of a jail or prison.  Plaintiffs raise the issue of whether, in such an environment, officials are required to provide them with "adequate notice" and a hearing each time mail is rejected for violating jail policy.  The Fourth Circuit Court of Appeals has concluded that publishers are entitled to some

---

materials containing staples to be sent (including for example, *The Daily Bread*).  The jail simply did not have the resources to remove staples from every item sent; officials made the decision to discontinue the practice and personnel contacted publishers to request that they remove the staples on their end or not send their materials.  *See* Shuler Aff. ¶ 4, 11, ECF No. 70; Leach Expert Report 30–33.

[48] *See* Leach Aff. ¶ 41–45, ECF No. 65.

[49] Davis Aff. ¶ 2–7, ECF No. 64-2.

[50] *See* Wright Dep. 189:7–22, 190:1–6, Aug. 30, 2011; Wright Dep., Ex. 2, 8 (attached).

procedural due process when, because of objectionable content, officials totally disallow receipt of their publications to inmate-**subscribers**. *Montcalm Publ'g Corp. v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996). Accordingly, Plaintiffs' claimed entitlement to procedural due process is unavailing insofar as they cannot show *Prison Legal News* was not delivered to particular inmate-subscribers and they have never sent the magazine in a policy-compliant fashion.

For example, in *Jacklovich v. Simmons*, 392 F.3d 420, 433 (10th Cir. 2004), *Prison Legal News* and Kansas Department of Corrections (KDOC) inmates challenged KDOC policies that limited the inmates' ability to purchase reading materials and magazine subscriptions. *See id.* at 421. The policies banned publications not purchased through inmate prison accounts and capped the amount of outgoing funds from those accounts. *See id.* at 422–25. Application of the challenged policies prevented the receipt of *Prison Legal News* where family and friends had purchased subscriptions for inmates. *See id.* at 425. Although the district court had found the ban on gift subscriptions to be a "purely procedural decision," the rule was a means to enforce the dollar cap on outgoing funds and did not apply to *all* incoming mail. *Id.* at 426–27. Additionally, the gift subscription ban in effect operated as a total ban. *See id.* Under these circumstances, the Tenth Circuit concluded that KDOC's practice of providing notice to inmate-subscribers only was insufficient to protect publishers' rights. *See id.* at 433. Also, in *Prison Legal News v. Cook*, 238 F.3d 1145 (9th Cir. 2001), the Ninth Circuit held that Oregon Department of Corrections regulations prohibiting *all* standard mail were unconstitutional as applied to subscription mail. *Id.* at 1152–53. Given that the First Amendment interests of publishers and prisoners were implicated with respect to such mail, the court concluded that the Department's practice of providing *no* procedural protections for standard mail rejections deprived them of due process. *Id.*

Procedural protections for publishers derive in part from the recognition that, like the correspondents in *Procunier v. Martinez*, 416 U.S. 396 (1974), publishers have an interest in communicating with inmate-subscribers. *See, e.g.*, *Montcalm*, 80 F.3d at 109. In *Martinez*, the Supreme Court considered challenges to prisoner mail censorship and concluded that "[i]n the case of direct personal correspondence between inmates and those who have a particularized interest in communicating with them, mail censorship implicates more than the right of prisoners." 416 U.S. at 408 (footnote omitted). Because it found this "particularized interest" in uncensored correspondence to be a "liberty interest" under the Fourteenth Amendment, the Court determined that decisions to censor such correspondence "must be accompanied by minimum procedural safeguards." *Id.* at 417. In reaching its conclusion, however, the Court did not explain how censorship causes a liberty deprivation within the meaning of the Due Process Clause. *See Martinez*, 416 U.S. at 417–19. Instead, the Court relied on its prior decisions in cases involving due process protections for employment decisions and reasoned that providing notice of non-delivery and an opportunity to challenge censorship decisions would "protect[] from arbitrary governmental invasion." *Id.* at 418 (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972); *Perry v. Sindermann*, 408 U.S. 593 (1972)).

Since *Martinez*, subsequent decisions have significantly limited its holding. In *Thornburgh v. Abbott*, 490 U.S. 401 (1989), the Court expressly overruled aspects of *Martinez* and limited its holding to restrictions on outgoing correspondence. *Thornburgh*, 490 U.S. at 413–14. The scope of due process was further limited in *Sandin v. Conner*, 515 U.S. 472 (1995), which articulated the "atypical and significant hardship" standard for evaluating such claims. *Id.* at 484; *see also Cosco v. Uphoff*, 195 F.3d 1221, 1224 (1999) ("The Supreme Court mandate since *Sandin* is that henceforth we are to review property and liberty interest claims arising from

prison conditions by asking whether the prison condition complained of presents 'the type of atypical, significant deprivation in which a State might conceivably create a liberty [or property] interest.'" (alteration in original) (quoting *Sandin*, 515 U.S. at 486)).  The Fourth Circuit has similarly limited the reach of due process in this context.  *See e.g.*, *Lovelace v. Lee*, 472 F.3d 174, 202 (4th Cir. 2006) (requiring inmate to show on a procedural due process claim that denial of a protected liberty interest imposed an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life" (omission in original) (quoting *Sandin*, 515 U.S. at 484) (internal quotation marks omitted)); *Pink v. Lester*, 52 F.3d 73, 75–75 (4th Cir. 1995) (finding that allegations of negligent interference with inmate's access to the courts failed to state a due process claim).

Here, relying on *Montcalm v. Beck*, Plaintiffs argue their rights were violated because they were not given "adequate notice" and an opportunity to be heard when their mail was rejected for not complying with jail policy.  Essentially, Plaintiffs complain about the *quality* of the notice they received, as mailroom staff simply wrote the reasons for rejection in pen and returned the items to sender.[51]  The Fourth Circuit in *Montcalm* concluded that, where there is an existing subscription relationship between a publisher and a particular inmate-subscriber and the publication to which the inmate has subscribed is "permanently disallowed," the publisher has a First Amendment interest at stake.  *See Montcalm v. Beck*, 80 F.3d 105, 109 (4th Cir. 1996).  *Montcalm* did not, however, establish a constitutional minimum for the process that jail officials must provide to publishers when publications sent to inmate-subscribers are rejected.  Instead, *Montcalm* recognized that a publisher's interest hinges on a subscription relationship, and given that interest, publishers must be given *some* process.  *See id.*  Below, the district court had

---

[51] However, since this litigation began, jail officials have adopted a formal Notice of Rejection and Opportunity to Appeal, under which notice is provided to both inmates and senders for all rejected publications.  Jacumin Supplemental Aff. ¶ 6–11, Dec. 20, 2011.

applied *Matthews v. Eldridge*, 424 U.S. 319 (1976), to the publisher's due process claim and had concluded that the defendants' policy and practice of notifying inmates but not publishers adequately protected publishers' interests. *Hodges v. Virginia*, 871 F. Supp. 873, 875, 877–80 (W.D. Va. 1994). On appeal, the Fourth Circuit disagreed and held that due process does require notice to publishers where their **subscription** publications are permanently disallowed. *See Montcalm*, 80 F.3d at 109. While the court opined as to a procedure that would satisfy constitutional requirements, it did not apply the *Matthews* analysis and instead remanded the case for the district court to fashion an appropriate remedy in light of its holding. *See id.* at 109–10.

The facts of this case are distinguishable from *Montcalm*. Although Plaintiffs demand notice and a hearing whenever *any* of their publications are rejected, no Supreme Court decision or case law in this circuit has ever required that due process protections be afforded to publishers in the absence of a subscription relationship. When Plaintiffs send mail to inmates who are not subscribers, they are soliciting subscriptions, and providing due process protections to solicitation efforts would be an unwarranted extension of the law by providing greater constitutional protections to outsiders seeking access to the jail for commercial reasons than that available to the general public. Critically, both *Thornburgh* and *Montcalm* establish that publishers have a protected liberty interest only with respect to their inmate-subscribers. *See Thornburgh v. Abbot*, 490 U.S. 401, 404–06; *Montcalm*, 80 F.3d 109. Both cases were also decided at a time when inmates' identities were not readily obtainable.[52] Thus, to the extent that Plaintiffs cannot show their publications were not delivered to inmate-**subscribers**, they cannot establish a protected liberty interest in the first instance and it follows that no deprivation occurred.

---

[52] Now, in contrast, the Internet facilitates easy and inexpensive solicitation of subscribers because lists of inmates at most facilities are available online. A commercial solicitor can then address mailings to all inmates and drop their product at jails in bulk, a practice that can legitimately be prohibited.

Even if Plaintiffs can demonstrate that there were instances where issues of *Prison Legal News* were not delivered to inmate-subscribers at the jail, their procedural due process claim still must fail.  The Fourteenth Amendment provides that due process of law must accompany deprivations of life, liberty, or property, and the general test used to evaluate the adequacy of governmental procedures balances three factors:

> (1) the private interest affected by the government action; (2) the risk of erroneous deprivation through the procedures used and the probable value, if any, of alternative or additional procedures; and (3) the state's interest, including the function involved and the fiscal and administrative burdens of added safeguards.

*Matthews v. Eldridge*, 424 U.S. 319 (1976) (citing *Wilkinson v. Austin*, 545 U.S. 209, 220–21 (2005)).  In assessing governmental action, the degree of a potential deprivation with respect to a particular decision informs the analysis—"procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions."  *Id.* at 344; *see id.* at 341.

Applying these principles here requires the conclusion that Plaintiffs are not entitled to specific notice and a hearing whenever their magazine is rejected pursuant to the jail's no-staples rule.  With respect to the first *Matthews* factor, the private interest implicated is not that of sending publications generally, but is instead confined to Plaintiffs' ability to send their magazine through the mail at a lower cost.[53]  Knowing that the jail does not permit staples, Plaintiffs need not even suffer a temporary delay in sending magazines to inmate-subscribers by taking steps to comply with jail policy.[54]  However, Plaintiffs consistently refuse to remove

---

[53] Paul Wright Decl. ¶ 31–32, ECF No. 47-2.

[54] *See* Jacumin Dep. 154.  Plaintiffs acknowledge that they received numerous rejection notices over the years and they cannot prove that any issue of *Prison Legal News* not returned to sender with a written reason for rejection was not actually delivered to the inmate or that the jail ever received it.  On some (but, admittedly few) occasions, officials would remove staples from *Prison Legal News* editions and then give them to the inmates.  But, the process became overly burdensome when more and more issues were

staples before sending their magazines. Plaintiffs' private interest at stake amounts to money and the cost differences between mailing methods (a minor impediment to their ability to send mail to subscribers). On the other hand, the jail's interest in the no-staples rule is significant.[55] Also, risk of erroneous application of the no-staples rule to other mail (if any) is extremely slight. Due process simply does not require specific notice and a hearing each time mail is rejected for containing staples.

Moreover, providing such notice and a hearing would be unnecessary and pointless. The rule itself provides notice of its application to those wishing to send mail to inmates at the jail. Also, the staples ban is distinguishable from the content-based censorship policy in *Montcalm* because it applies to all incoming mail, regardless of content. *Cf. Montcalm v. Beck*, 80 F.3d at 109 (noting that Virginia Department of Corrections Operating Procedures "completely precluded" inmates from accessing their sexually explicit subscription magazines). With content-based censorship, officials decide on a case-by-case basis whether to allow publications, and notice of the objectionable content and an opportunity to contest the decision therefore makes sense. In contrast, such procedures make little sense when mail is rejected due to application of a content-neutral rule. Admittedly, under prior practice inmates often did not receive notice and Plaintiffs were not given a right to appeal after receiving a rejection notice.[56] But, an appeal would have provided Plaintiffs with no benefit. There would be nothing to discuss and any appeal would always be denied because the reason for returning affected mail would always be the same—it was sent containing staples, in violation of jail policy.

---

being sent in a non-policy compliant fashion and bearing staples. Shuler Aff. ¶ 4, 10–11, ECF No. 70. Although Plaintiffs know that staples are not allowed, they refuse to send their magazines without them.

[55] As previously discussed, allowing mail with staples into the jail would burden its staff and resources, and poses a number of safety and security problems.

[56] Current policy, however, provides inmates to receive both a formal notice of a rejection and an opportunity to appeal. Senders are also provided formal notices and an opportunity to appeal. Jacumin Supplemental Aff. ¶ 6–11, Dec. 20, 2011.

Additionally, *Prison Legal News* would have then spent more money on postage in sending an appeal than they would have if they had sent the magazine without staples in the first place.

In sum, it makes little sense to accept Plaintiffs' contention that they are entitled to notice and a hearing whenever jail officials, applying the no-staples rule, reject issues of their magazine. The rule itself gives Plaintiffs the notice to which they are entitled, having nothing to do with the content of their magazine, there is little risk of its erroneous application, and any deprivation caused by its application is *de minimis*. Moreover, *Bell v. Wolfish*, 441 U.S. 520 (1979), is more on point than *Montcalm v. Beck*. In *Bell*, the Court concluded that First Amendment and due process rights were not violated by a content-neutral rule barring the receipt of hardback books from senders other than the publisher because other avenues remained open for inmates to receive similar materials. 441 U.S. at 549–52. Ultimately, because the no-staples rule may be properly applied under the First Amendment to magazines sent to inmate-subscribers and because Plaintiffs have never sent *Prison Legal News* in a policy-compliant fashion, no due process concerns operate to prevent its use. This is true despite the fact that Defendants do admit that no appellate procedure was in place as contemplated in *Montcalm*. Even if such a procedure was in place, however, an appeal would have been entirely fruitless due to the staples.

## III.

## DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS FOR DAMAGES.

**A.     Defendants sued in their official capacity for damages are protected by sovereign immunity.**

The Eleventh Amendment bars this action against states, state entities, and state officials sued in their official capacity for damages. It provides, "The Judicial power of the United States

shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court has interpreted the provision to prohibit any suit against a state in federal court "unless the State has unequivocally consented to suit or Congress has unequivocally abrogated the State's immunity from suit." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984). Importantly, in enacting 42 U.S.C. § 1983 Congress did not abrogate state sovereign immunity and the Eleventh Amendment has been held to prohibit a § 1983 suit against a state official sued in an official capacity for damages. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). An official capacity claim against a governmental official is tantamount to a claim against the governmental entity itself. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). For purposes of liability under § 1983, the issue of whether an official is a state policymaker depends on state law. *McMillian v. Monroe Cnty.*, 520 U.S. 781 (1997); *see Gulledge v. Smart*, 691 F. Supp. 947, 954 (D.S.C. 1988).

Plaintiffs have sued the Sheriff's Department, Sheriff DeWitt, and individual deputies for damages under § 1983. However, under South Carolina law, sheriff's departments are state agencies and sheriffs and their deputies are state employees. *See* S.C. Code § 23-13-550; *Edwards v. Lexington Cnty. Sheriff's Dep't*, 386 S.C. 285, 287 n.1, 688 S.E.2d 125, 127 n.1 (2010). In South Carolina, only the sheriff has the authority to hire and fire department employees and the sheriff is responsible for any neglect of duty or misconduct by deputies, who serve at their sheriff's pleasure. *See* S.C. Code § 23-13-10; *Allen v. Fidelity & Deposit Co.*, 515 F. Supp. 1185, 1189–91 (D.S.C. 1981). As "arms of the state," if any monetary damages were to be awarded against Defendants, they would be paid out of the state treasury. *Comer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996); *see also Nivens v. Gilchrist*, 444 F.3d 237, 249 (4th Cir.

2006) ("[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945), *overruled on other grounds by Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613 (2002)) (internal quotation marks omitted)).

In sum, the Sheriff's Department is immune from monetary liability as to all claims in this action. Sheriff DeWitt and his deputies are likewise immune from claims for damages brought against them in their official capacities. *See, e.g., Gulledge v. Smart*, 691 F. Supp. at 954 ("With respect to the defendants' liability in their official capacities, the eleventh amendment prohibits a federal court from entertaining an action for any kind of relief where the defendant is a state or a state agency. . . . [T]he defendants cannot be sued in their official capacities because they are agents of the state and are therefore outside its jurisdiction."). Therefore, this Court should grant summary judgment as to any damages claims in favor of the Sheriff's Department and Defendants sued in their official capacities.

**B.    Defendants are entitled to qualified immunity from liability for damages.**

Governmental officials performing discretionary functions are shielded from liability for damages insofar as their conduct does not violate clearly established federal rights. The affirmative defense of qualified immunity turns on whether the defendant's actions violated a federal constitutional or statutory right, and if so, whether the right was clearly established at the time of the challenged conduct. *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Because mere existence of a broad and general right is insufficient to hold a government official liable for damages under § 1983, a plaintiff must also show that "[t]he contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates that

right." *Id.* at 640.  Ordinarily, a Supreme Court or Fourth Circuit decision is needed to show clearly established law, and qualified immunity shields an official from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Saucier v. Katz*, 533 U.S. 194, 206 (2001).  The inquiry is made in light of the specific context of the case, focusing on the "particularized" acts of a defendant, and not as a broad proposition.  *Anderson*, 483 U.S. at 640.  Here, Plaintiffs assert broad rights under the First and Fourteenth Amendments to send mail in the form of their choice into the secure confinement environment of the jail, but they are unable to show Defendants violated their rights.  Even assuming a violation, qualified immunity would still apply as to all claims because "in the light of pre-existing law the unlawfulness [was not] apparent."  483 U.S. at 640.

Neither the issue of whether Plaintiffs have a freestanding right to send unsolicited publications to inmates nor that of the constitutionality of a content-neutral prohibition on staples has been conclusively resolved in the federal courts.  While *Montcalm* indeed holds that publishers and inmates should be afforded notice and an opportunity to appeal, here such notice and appeal would go without reward to Plaintiffs as their publication is unsafe and has been properly rejected, based on *Turner*, within jail officials' discretion.  Defendants are unaware of any case law in this circuit holding that publishers have a right to deliver unsolicited materials to inmates, and at least one circuit has held that a "complaint about undelivered catalogs fails to raise an issue of constitutional magnitude."  *Smith v. Maschner*, 899 F.2d 940, 944 (10th Cir. 1990); *see also Dixon v. Kirby*, 210 F. Supp. 2d 792, 800 (S.D. W.Va. 2002) (holding a "blanket prohibition against inmates' receipt of catalogs" did not violate the First Amendment).  If officials may properly ban catalogs that inmates specifically requested it follows that a rule under which unsolicited publications are rejected is also permissible.  Additionally, the Fourth Circuit

has upheld a total ban on personal subscriptions where inmates had access to information and ideas through other means. *See Hause v. Vaught*, 993 F.2d 1079, 1083–84 (4th Cir. 1993). *See generally Bell v. Wolfish*, 441 U.S. 520, 549 (1979) (upholding regulations that "permitted inmates to receive books and magazines from outside the institution only if the materials were mailed directly from the publisher or a book club."). Regarding the reasons for refusal, officials should be shielded by qualified immunity because there is no law regarding a staples prohibition whatsoever and they were not on notice that their actions could infringe on Plaintiffs' First Amendment rights.

With respect to Plaintiffs' due process claims, Defendants were merely on notice that publishers were entitled to *some* process if their publications were disapproved for delivery to inmate-subscribers on the basis of content. *See Montcalm v. Beck*, 80 F.3d 105, 106–09 (4th Cir. 1996). And, Plaintiffs got it, based on the very evidence they produced, even if the notices were "scrawled" and the reasons were handwritten on the return envelope. If Defendants' policy and practice of returning mail that violated the no-staples rule deprived Plaintiffs of procedural due process, it was based on a reasonable misapprehension of the law as officials felt that the penned notice on returned envelopes was sufficient notice. *See Saucier v. Katz*, 533 U.S. at 206.

While analysis of each of their claims "varies in some particulars," Plaintiffs have not "alleged a violation of clearly established law of which a reasonable official would have known." *Lopez v. Robinson*, 914 F.2d 486, 489 (4th Cir. 1990) (citing *Turner v. Dammon*, 848 F.2d 440 (4th Cir. 1988)); *see also Prison Legal News v. Lehman*, 272 F. Supp. 2d 1151, 1163 (W.D. Wa. 2003) ("[T]he Court finds that because the 'contours' of PLN's right to send and inmates' right to receive catalogs and non-subscription standard rate mail were not 'sufficiently clear' . . . , the law in this case was not 'clearly established.'"). Before and during the course of this litigation,

the defendant officials have demonstrated their good faith, including making several changes to jail policy.[57]    As such, Defendants enjoy qualified immunity on all claims.

## CONCLUSION

In sum, the relevant legal authorities favor Defendants, who are given deference and flexibility where matters of professional judgment are involved.  The legitimate penological interests underlying the challenged policies and practices are "compelling interests in safety and security."  *Lovelace v. Lee*, 472 F.3d 174, 212 (Wilkinson, J., concurring in part & dissenting in part).  Moreover, the dual "concerns of federalism and comparative expertise militate against federal court supervision of administrative decisions made by state departments of corrections." *Lenz v. Washington*, 444 F.3d 295, 304 (4th Cir. 2006).  Wherefore, and for the foregoing reasons, the Court should grant the Defendants' Motion for Summary Judgment and dismiss the Plaintiffs' civil action in its entirety.

Respectfully submitted,

  *s/Sandra J. Senn*
Sandra J. Senn
Fed. I.D. No.: 05761
Senn Legal, LLC
P.O. Box 12279
Charleston, SC 29422
(843) 556–4045

Attorney for Defendants

December 23, 2011
Charleston, South Carolina

---

[57] Notably, in a good faith attempt to further ensure that the jail is in compliance with what the law requires, officials have purchased four subscriptions to Plaintiffs' magazine (from which they will remove staples and put in a metal-free binder), adopted the Federal Bureau of Prisons definition of pornography, adopted a formal procedure for giving notice and an opportunity to appeal to both inmates and senders, and purchased books on more than ten religions for the jail's law library.  *See* Jacumin Supplemental Aff. & Exs., Dec. 20, 2011.