**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**

_____

PRISON LEGAL NEWS, et al.,    )
    )
    Plaintiffs;    )
    )
UNITED STATES OF AMERICA,    )    No. 2:10-cv-02594
    )
    Plaintiff-Intervenor;    )
    )
    v.    )    **MOTION AND MEMORANDUM**
    )    **OF POINTS AND AUTHORITIES**
BERKELEY COUNTY SHERIFF    )    **IN SUPPORT OF PETITION**
H. WAYNE DeWITT, et al.,    )    **FOR ATTORNEYS' FEES**
    )    **AND COSTS**
    Defendants.    )
    )
    )    ORAL ARGUMENT REQUESTED

Plaintiffs Prison Legal News and Human Rights Defense Center (hereinafter collectively "PLN") respectfully request an award of reasonable attorneys' fees and costs for their post-judgment work monitoring implementation of the Consent Injunction (Doc. No. 201). During the period for which fees are sought, Plaintiffs' counsel identified multiple violations of the Consent Injunction and worked successfully with Defendants to remedy those violations, resulting in the full and successful implementation of effective systems and policies to uphold Constitutional and federal law.

Plaintiffs respectfully request oral argument on this motion.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Before this lawsuit, Defendants prohibited detainees at the Berkeley County Detention Center ("BCDC") from receiving virtually all expressive material, including books, magazines, newspapers, pamphlets, and educational materials. The only publication Defendants allowed detainees to receive was the Bible. Complaint ¶ 20 (Doc. No. 1) and Ex. B to Complaint, Email

from Sgt. K. Habersham to Paul Wright, July 12, 2010 (Doc. No. 1-1).  During the course of this litigation, Defendants amended some, but not all, of their mail policies.  Defendants continued to reject a large number of publications, including those that contained staples or "[a]ny photo that is considered inappropriate (i.e., pornographic, lack of clothing, drugs, weapons, alcohol, cigarettes, etc.)."[1]  These two prohibitions, in combination, continued to prevent publishers from sending and detainees from accessing a large amount of expressive and religious material, in violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc ("RLUIPA").  Neither of these prohibitions is justified by a legitimate penological interest.[2]  Accordingly, the United States, PLN, and the Defendants entered into a Consent Injunction in January 2012 "designed to ensure that BCDC detainees receive all the publications and religious materials sent to them, as required by the First Amendment and RLUIPA, unless BCDC has a legally valid reason for denying BCDC detainees access to these publications and religious materials."  Consent Injunction (Doc. No. 201) at ¶ 1.

The monitoring period ran from January 13, 2012, when the Consent Injunction was entered by the Court, until April 18, 2014, when the Court terminated relief on an unopposed motion by Defendants.  The monitoring activities of Plaintiffs and their results are described in greater detail in the following section, but the general trend over the two-year monitoring period was that after major compliance problems in the first year, sustained pressure from Plaintiffs persuaded Defendants to adopt policies that complied with the injunction, adequately train their staff regarding these policies, and – after some period of time – successfully implement these

---

[1] 2011 Hill-Finklea Detention Center Inmate Rule 706(A)(7).

[2] When a correctional facility's denial of a religious publication imposes a substantial burden on an inmate's religious exercise, the institution must demonstrate that denial of the publication is the least restrictive means of furthering a compelling government interest.  *See* 42 U.S.C. § 2000cc-1(a).  Prior to this litigation, Defendants' restrictions on accessing religious and other expressive material failed to meet even the lower threshold of furthering a "legitimate penological interest" that is required by the First Amendment.

policies with violations that began as major, became more minor over time, and eventually virtually ended. For this reason, Plaintiffs agreed in April 2014 that judicial oversight was no longer necessary for Defendants to meet their obligations under Constitutional and federal law. *See* Response to Defendants' Motion to Terminate the Consent Injunction (Doc. No. 213).

On April 30, 2014, the Court granted PLN and Defendants' joint motion for extension of time for PLN to file a petition and application for attorneys' fees (Doc. No. 216). Unfortunately, the parties were unable to reach agreement before the extended deadline. PLN is therefore seeking attorneys' fees and costs in this Motion.

## II.    PLAINTIFFS' MONITORING OF THE CONSENT INJUNCTION

In early 2012, Defendants began to implement policy changes and provided monthly status reports to the United States and PLN pursuant to the Consent Injunction. However, Defendants continued to unlawfully deny various expressive materials for many months afterward. For example, in the first round of policies and other documents revised to comply with the Consent Injunction in April 2012, Defendants had failed to revise the Inmate Rules to fully comply with the Consent Injunction. *See* Ex. A-6: Letter from Plaintiffs' Counsel David Shapiro and Plaintiff-Intervenor's Counsel Michael Songer to Defendants' Counsel Robin Jackson, Apr. 3, 2012 (noting, inter alia, that Inmate Rules had not been revised to comply with Consent Injunction). In response to notices of violation from Plaintiffs, Defendants revised the Inmate Rules multiple times until Plaintiffs agreed that the final revised version was fully compliant. *See* Ex. A-7: Letter from Plaintiffs' Counsel David Shapiro and Plaintiff-Intervenor's Counsel Michael Songer to Defendants' Counsel Robin Jackson, Apr. 5, 2012 (explaining, inter alia, that revised Inmate Rules are noncompliant); Ex. A-8: Letter from Plaintiffs' Counsel David Shapiro and Plaintiff-Intervenor's Counsel Michael Songer to Defendants' Counsel Robin

Jackson, Apr. 12, 2012 (explaining, inter alia, why revised Inmate Rules remain noncompliant); Ex. A-9: Email from Defendants' Counsel Robin Jackson to Plaintiffs' Counsel David Shapiro and Plaintiff-Intervenor's Counsel Michael Songer, Apr. 17, 2012 (enclosing final version of Inmate Rules). From April 2012 to July 2012, Defendants repeatedly rejected publications without the formal determinations required by the Consent Injunction, rejected publications with tardy formal determinations, and rejected publications with inappropriate or insufficient justifications.  Plaintiffs provided notices of violation to Defendants and explained how these issues should have been handled.  *See* Ex. A-10: Letter from Plaintiffs' Counsel David Shapiro and Plaintiff-Intervenor's Counsel Michael Songer to Defendants' Counsel Robin Jackson, May 1, 2012; Ex. A-11: Letter from Plaintiff-Intervenor's Counsel Michael Songer to Defendants' Counsel Robin Jackson, Aug. 7, 2012.  In July 2012, Plaintiff-Intervenor U.S. Department of Justice conducted an inspection of BCDC, which revealed further violations of the Consent Injunction, including failures to adequately instruct relevant BCDC staff on the procedures required by the injunction.  *See* Ex. A-11: Letter from Plaintiff-Intervenor's Counsel Michael Songer to Defendants' Counsel Robin Jackson, Aug. 7, 2012.  From September 2012 to February 2013, Defendants repeatedly rejected publications with inappropriate or insufficient justifications, failed to provide request forms when the electronic kiosks malfunctioned, failed to adequately describe rejected items, and rejected religious materials without evaluating less restrictive means for addressing security interests. Plaintiffs provided notices of violation to Defendants and explained how these issues should have been handled.  *See* Ex. A-12: Letter from Plaintiffs' Counsel David Fathi to Defendants' Counsel Robin Jackson, Nov. 16, 2012; Ex. A-13: Letter from Plaintiffs' Counsel David Fathi to Defendants' Counsel Robin Jackson, Dec. 31, 2012.

Over time, Defendants changed their practices in response to these repeated explanations and admonitions. From early to mid-2013, the number of violations decreased. Additionally, the later violations were of a different type than the earlier violations—these later violations were almost all rejections for inappropriate reasons rather than, for example, failures to provide the formal determinations altogether or failures to provide request forms to detainees. *See* Ex. A-14: Letter from Plaintiff-Intervenor's Counsel Michael Songer to Defendants' Counsel Robin Jackson, June 26, 2013. For the violations that did occur, Plaintiffs provided notices of violation to Defendants and explained how these issues should have been handled. *See* Ex. A-15: Letter from Plaintiffs' Counsel David Fathi to Defendants' Counsel Robin Jackson, Oct. 15, 2013. Defendants continued to change their practices in response to these explanations and admonitions.

In November 2013, in response to Defendants' request that Plaintiffs consent to terminating the Consent Injunction, Plaintiffs conducted a second inspection. During this inspection, Plaintiffs' counsel toured the facility, met the new leadership that had arrived at BCDC a few months earlier, met with staff and inmates, and observed the mail review process. Fathi Decl. ¶ 15. Plaintiffs' counsel left the visit impressed by Capt. Keith Novak's philosophical orientation and commitment to facilitating detainee access to books, magazines, newspapers, pamphlets, and educational materials. In the months that followed, Plaintiffs issued no further notices of violation to Defendants. Based on the major improvements observed leading up to, during, and after the final inspection, Plaintiffs did not object to Defendants' motion to terminate the Consent Injunction, filed in March 2014.

### III.    ARGUMENT

"[A] prevailing plaintiff is entitled to compensation for reasonable litigation expenses under [42 U.S.C.] § 1988." *Daly v. Hill*, 790 F.2d 1071, 1084 (4th Cir. 1986).  This includes monitoring activities.  *See, e.g.*, *Duran v. Carruthers*, 885 F.2d 1492, 1495-96 (10th Cir. 1989) (stating that after entry of consent decree, "counsel for the plaintiffs has a continuing duty and responsibility to make sure that the defendants comply, and continue to comply, with the decree," and upholding attorney fee award for compliance monitoring); *Willie M. v. Hunt*, 732 F.2d 383, 387 (4th Cir. 1984) (upholding fee award for monitoring compliance with consent judgment); *Alexander v. Hill*, 625 F. Supp. 567, 569 (W.D.N.C. 1985) (ordering fee award for monitoring activities).  It also includes "fees on fees"—i.e., the work that goes into securing a reasonable fee award.  *E.g.*, *Trimper v. City of Norfolk, Va.,* 58 F.3d 68, 77 (4th Cir. 1995) ("[I]t is well settled that the time spent defending entitlement to attorney's fees is properly compensable under § 1988"); *Daly*, 790 F.2d at 1080 ("Time spent defending entitlement to attorney's fees is properly compensable in a § 1988 fee award").

Attorneys' fee awards under 42 U.S.C. § 1988 are based upon the "lodestar" calculation of "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v. Stenson*, 465 U.S. 886, 888 (1984).  In awarding fees, "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."  *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). "A proper computation of the lodestar fee will, in the great majority of cases, constitute the 'reasonable fee' contemplated by § 1988."  *Daly*, 790 F.2d at 1078.  The $53,574.71 request in this case is apportioned as follows:

| Entity | Fees | Costs |
|---|---|---|
| ACLU National Prison Project | $28,199.50 | $3,117.21 |
| ACLU of South Carolina | $9,900.00 | $38.00 |
| HRDC | $12,320.00 | $0.00 |
| *Total* | *$50,419.50* | *$3,155.21* |

In determining whether the requested fees are reasonable, the Court should consider the following factors derived from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974): "(1) the time and labor required;(2) the novelty and difficulty of the questions;(3) the skill requisite to properly perform the legal service;(4) the preclusion of other employment by the attorney due to acceptance of the case;(5) the customary fee;(6) whether the fee is fixed or contingent;(7) time limitations imposed by the client or the circumstances;(8) the amount involved and the results obtained;(9) the experience, reputation, and ability of the attorneys;(10) the "undesirability" of the case;(11) the nature and length of the professional relationship with the client; and(12) awards in similar cases." *Daly*, 790 F.2d at 1076 n.2.

The *Johnson* factors are addressed below:

**(1) The time and labor required:** The fees sought in this motion represent approximately 144 hours of work by Plaintiffs' counsel over a period from January 2012 through June 2014 – more than two years. In light of the work required to bring Defendants into compliance with the Consent Injunction and verify that compliance once achieved, this was a reasonable number of hours and represented an efficient use of time by Plaintiffs' counsel. The tasks involved in the monitoring phase of this case – identifying violations of the Consent Injunction, explaining to Defendants why these represented violations and how to correct them, and carrying out an on-site inspection of BCDC to evaluate compliance – required specialized knowledge and expertise, and could not have been easily performed by non-lawyers.

Additionally, the attorneys exercised billing judgment to no-charge various items that were duplicative or unnecessary.  Fathi Decl. ¶ 8; Weber Decl. ¶ 7; Dunn Decl. ¶ 12, 13.

(2) **The novelty and difficulty of the questions:** For purposes of determining fees under Section 1988, civil rights cases are presumptively deemed to be as "complex" as antitrust cases. *Blum*, 465 U.S. at 893; *Hensley*, 461 U.S. at 430 n.4.  Section 1983 litigation involving prisons and jails requires particular expertise, as counsel must not only be familiar with the intricacies of Section 1983 and have a broad understanding of constitutional law, but must also understand the limitations on various constitutional rights when applied in the context of prisons and jails.

(3) **The skill requisite to properly perform the legal service:** This factor is addressed to the Court's assessment of the attorneys based on its observation of "the attorney's work product, his preparation, and general ability before the court."  *Johnson*, 488 F.2d at 718.  The specialized knowledge of counsel in correctional reform and correctional systems enabled them to carry out this monitoring work efficiently and effectively.

(4) **The preclusion of other employment by the attorney due to acceptance of the case:** The preclusion of other work is a factor that ordinarily applies to all litigation, for once representation "is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes."  *Johnson*, 488 F.2d at 718.  When the ACLU National Prison Project and the ACLU of South Carolina accept a case, they must forego the opportunity to take some other potentially fee-generating cases, and this case is no exception.

(5) **The customary fee:** The billing rates used by Plaintiffs' counsel are reasonable and reflect prevailing market rates.  Each attorney's rate was set according to the attorney's level of experience and prevailing rates in the attorney's home jurisdiction.

For the ACLU of South Carolina, Attorney Dunn's rate was set according to prevailing market rates in South Carolina for an attorney of her experience (she has been practicing law since 1977). Dunn Decl. ¶ 5. Because her hourly rate of $400 is fair and reasonable according to current market rates in South Carolina, and this Court is in the District of South Carolina, her rate therefore satisfies *Johnson* factor 5. *Id*. ¶ 17. *See Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313, 317 (4th Cir. 1988) ("The community in which the court sits is the appropriate starting point for selecting the proper rate.").

The use of out-of-district rates for the NPP and HRDC attorneys should be evaluated based on the outcome of two questions: (1) are "services of like quality truly available in the locality where the services are rendered" and (2) "did the party choosing the attorney from elsewhere act reasonably in making that choice?" *Hanson*, 859 F.2d at 317. *See also Rum Creek Coal Sales, Inc v. Caperton*, 31 F.3d 169, 179 (4th Cir. 1994) (holding *Hanson* satisfied where plaintiffs relied on their regular out-of-state counsel who were "well-experienced in the types of matters involved" and the case would have been politically sensitive for a local firm). In this case, services of like quality were not available locally. The ACLU of South Carolina lacked in-house expertise and time to handle the case competently without co-counsel, and was unable to secure local counsel who had such expertise. Dunn Decl. ¶ 8. Indeed, the only local firm with expertise in this subject matter was already fully occupied by another case. *Id*.

Meanwhile, the ACLU NPP has decades of experience in complex prison and jail conditions suits and has represented prisoners in five cases before the U.S. Supreme Court. Fathi Decl. ¶ 2. Courts have repeatedly recognized the special expertise of NPP staff in prison and jail litigation, and lead counsel Fathi has devoted his practice exclusively to prison and jail conditions litigation for the past eighteen years. *Id*. ¶ 2-3. Accordingly, services of like quality

9

were not available locally, and it was reasonable for Plaintiffs to choose NPP to lead the litigation.  The use of Washington, DC rates for the ACLU NPP attorneys is therefore appropriate.

The rates of the NPP attorneys are reasonable in their home jurisdiction of Washington, DC.  These rates were set using the "Laffey Matrix," a resource maintained by the United States Attorney for the District of Columbia, showing prevailing hourly rates for attorneys of varying levels of experience in the District of Columbia, as well as for law clerks and paralegals.  Fathi Decl. ¶ 9-11; Ex. A-5: Laffey Matrix.  The rates for NPP attorneys thus reflect prevailing rates in the Washington, DC area.  *See, e.g.*, *Covington v. District of Columbia,* 57 F.3d 1101, 1109 (D.C. Cir. 1995) (approving fee award based in part on the Laffey Matrix, and describing the Matrix as "a useful starting point" that may be supplemented with further evidence if necessary); *Blackman v. District of Columbia*, 59 F. Supp. 2d 37, 43 (D.D.C. 1999) (relying on Laffey Matrix to determine prevailing rates); *Jefferson v. Milvets Sys. Tech., Inc.*, 986 F. Supp. 6, 11 (D.D.C. 1997) (same).  Accordingly, the NPP attorneys should be compensated at the requested rates.

Similarly, HRDC regularly represents *Prison Legal News* in disputes about censorship of its publications and correspondence in jurisdictions across the country.  Weber Decl. ¶ 4. Attorney Weber has particular expertise in prison and jail censorship policies; he has appeared as counsel for PLN in more than a dozen federal cases and helped change the unconstitutional mail policies of at least twelve different county jails across the country.  *Id*.  *See also Rum Creek Coal Sales*, 31 F.3d at 179.  Accordingly, services of like quality were not available locally, and it was reasonable for Plaintiffs to choose to retain HRDC.  The use of Florida rates for Attorney Weber is therefore appropriate.

HRDC attorney Weber's hourly rate of $350 is reasonable in his home jurisdiction of Florida. Weber Decl. ¶ 6 (this billing rate is "lower than other attorneys of similar skill and experience who engage in this type of practice in the jurisdiction in which I maintain my office."). Accordingly, he should be compensated at the requested rate.

**(6) Whether the fee is fixed or contingent:** The fees in this case are purely contingent. As a matter of policy, the ACLU does not charge clients for legal services, and therefore depends on fees by court award or settlement to be compensated for its work. Fathi Decl. ¶ 12. Similarly, HRDC does not charge clients for legal services and depends on fees by court award or settlement to be compensated. Weber Decl. ¶ 8. This weighs in favor of full compensation. "Johnson criterion number six, 'whether the fee is fixed or contingent.' . . . reflects the provisions of the ABA Code of Professional Responsibility, DR 2-106(B)(8), and the practice of the bar. Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result. This is neither less nor more appropriate in civil rights litigation than in personal injury cases. The standard of compensation must enable counsel to accept apparently just causes without awaiting sure winners." *Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir. 1981) *overruled on other grounds by Int'l Woodworkers of Am., AFL-CIO & its Local No. 5-376 v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986).

**(7) Time limitations imposed by the client or the circumstances:** See discussion of *Johnson* factor 4, *supra*.

**(8) The amount involved and the results obtained:** Although this factor is largely addressed to cases for money damages rather than injunctive relief, it "should not obviate court scrutiny of the decision's effect on the law. If the decision corrects across-the-board

discrimination affecting a large class of an employer's employees, the attorney's fee award should reflect the relief granted." *See Johnson*, 488 F.2d at 718.  In this case, the full and correct implementation of the Consent Injunction vindicated the First Amendment rights of all current and future BCDC detainees, as well as all current and future publishers and others who wish to send publications to BCDC detainees.

**(9) The experience, reputation, and ability of the attorneys:** Founded as a project of the American Civil Liberties Union in 1972, the ACLU National Prison Project has decades of experience in complex prison and jail conditions suits and has represented prisoners in five cases before the U.S. Supreme Court.  Courts have repeatedly recognized the special expertise of NPP staff.  See *Plyler v. Evatt*, 902 F.2d 273, 278 (4th Cir. 1990); *Palmigiano v. Garrahy*, 707 F.2d 636, 637 (1st Cir. 1983); *Knop v. Johnson*, 712 F. Supp. 571, 583 (W.D. Mich. 1989); *Lightfoot v. Walker*, 619 F. Supp. 1481, 1487 (S.D. Ill. 1985), aff'd, 826 F.2d 516, 522 (7th Cir. 1987); *Ramos v. Lamm*, 539 F. Supp. 730, 750 (D. Colo. 1982),  *remanded*, 713 F.2d 546 (10th Cir. 1983).

The ACLU of South Carolina is the local affiliate organization of the ACLU in the State of South Carolina.  Dunn Decl. ¶ 4.  ACLU of South Carolina Legal Director Susan Dunn has served as counsel in numerous cases in the U.S. District Court for the District of South Carolina, and has extensive litigation experience from 1977 to the present. *Id.* ¶ 7.

HRDC is a nonprofit organization dedicated to the advancement of the non-economic and public-spirited goals of education, advocacy and outreach in furtherance of the rights of incarcerated individuals and their families.  Weber Decl. ¶ 4.  HRDC General Counsel Lance Weber has extensive litigation experience from 1997 to the present, including disputes about

censorship of Prison Legal News publications and correspondence in jurisdictions across the country. *Id*. ¶ 2-4.

**(10) The "undesirability" of the case:** A general negative stigma is commonly associated with prison and jail litigation. *See Alberti v. Klevenhagen*, 903 F.2d 352 (5th Cir. 1990) (affirming lodestar enhancement of hourly rates for plaintiffs' attorneys, since an enhancement was necessary "to attract competent counsel to take on this undesirable prison conditions litigation"). Like other Section 1983 cases involving prison conditions, this case was exceedingly fact-intensive, time-consuming, and expensive to litigate, and necessitated the hiring of a correctional expert at significant cost.

**(11) The nature and length of the professional relationship with the client:** As stated in *Johnson*'s discussion of this factor, "A lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client with his office. The Court may appropriately consider this factor in determining the amount that would be reasonable." *Johnson*, 488 F.2d at 719. In this case, the ACLU has previously represented PLN regarding the newspaper's First Amendment rights in prisons and jails, as has HRDC. However, this case involved extremely time-consuming litigation of unique issues, particularly in discovery, that would not have merited a discounted rate.

**(12) Awards in similar cases:** The approximately $54,000 fee and expense request for over two years of monitoring work in this case is reasonable compared with awards in similar cases. In *Alexander v. Hill*, 625 F. Supp. 567 (W.D.N.C. 1985), the court awarded $55,226.80 in fees and expenses (equivalent to $122,104.61 in 2014 dollars[3]) for approximately two years of compliance monitoring for a consent decree involving processing times for welfare and Medicaid

---

[3] *See* Bureau of Labor Statistics, CPI Inflation Calculator, http://www.bls.gov/data/inflation_calculator.htm.

applications.  In *Wilder v. Bernstein*, 975 F. Supp. 276 (S.D.N.Y. 1997), the court awarded $74,962.61 in fees and expenses (equivalent to $111,112.80 in 2014 dollars) for approximately six months of compliance monitoring for a settlement involving non-discrimination in the New York City foster care system.

By comparison, the fee claim in this case—two years of monitoring for approximately $54,000—is modest and quite reasonable.


## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court award them $50,419.50 in attorneys' fees and $3,155.21 in expenses, for work performed from January 13, 2012 through June 30, 2014.[4]

Respectfully submitted,

s/ Susan Dunn
Susan Dunn
Federal Bar No. 647
Legal Director
ACLU of South Carolina
P.O. Box 20998
Charleston, SC 29413-0998
(843) 720-1425
Fax: (843) 720-1428
sdunn@aclusouthcarolina.org

DAVID C. FATHI*
Director,
ACLU National Prison Project
*Not admitted in DC; practice limited to federal courts*

Carl Takei
Staff Attorney
ACLU National Prison Project

---

[4] To litigate this Motion, Plaintiffs will incur additional fees and expenses after June 30, 2014. Plaintiffs will seek those further fees by separate motion.

915 15th St. N.W., 7th Floor
Washington, DC  20005


Lance Weber
Human Rights Defense Center
P.O. Box 2420
West Brattleboro, VT 05303
(802) 579-1309
Fax: (866) 735-7136
lweber@humanrightsdefensecenter.org


Attorneys for Prison Legal News, et. al.

July 2, 2014

### Local Rule 7.02 Certification

I hereby certify that pursuant to L.R. 7.02, prior to filing the foregoing motion, Plaintiffs'

counsel conferred or attempted to confer with opposing counsel and attempted in good faith to

resolve the matter contained in the motion.


s/ Susan Dunn
Susan Dunn

## CERTIFICATE OF SERVICE

I certify that on July 2, 2014, I electronically filed the foregoing using the CM/ECF system, which will send notification to the following:

ROBIN L. JACKSON
Senn Legal, LLC
3 Wesley Drive
P.O. Box 12279
Charleston, SC 29422
843-556-4045
Robin@SennLegal.com
Attorney for Defendants

MICHAEL J. SONGER
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Ave NW
Washington, DC 20530
Ph: 202.305.1762
Fax: 202.514.6273
michael.songer@usdoj.gov
Attorney for Plaintiff-Intervenor United States of America

Respectfully submitted,

s/ Susan Dunn
SUSAN DUNN
Legal Director,
ACLU of South Carolina